## EXHIBIT FILE

### Madson v. Roberts & Stevens et al

The first 19 documents are pdfs of individual emails relating to the Complaint. Original metadata is available for each of these emails. These emails are sequential, and the timeline will follow that of the timeline in the Factual Allegations section of the Complaint.

The next set of documents are the attachments files that were attached to each of the emails. Those documents are sequential in the order in which they appear in the underlying emails.

I'm inexperienced and doing this for the first time - organizing all of this was challenging. But I think if the reader had the complaint printed, and then had the emails printed in one stack and the attachments printed in another stack, everything would be streamlined.

I am available at any time for any questions concerning the Exhibit File.

Bill Madson
Mobile:  404.226.2040
Email:    bill@cliftontrust.com

**Bill Madson**

| | |
|---|---|
| **From:** | Bill Madson <bill@cliftontrust.com> |
| **Sent:** | Saturday, October 18, 2025 11:15 PM |
| **To:** | warren.deponti@hcahealthcare.com |
| **Cc:** | 'Bill Madson' |
| **Subject:** | Warren Deponti – Litigation Hold Notice and Madson Family Matter Information Package |
| **Attachments:** | Deponti Lit Hold Notice - 10.18.25 - final.pdf |
| | |
| **Importance:** | High |

Warren,

Review the attached.

Bill

Bill Madson
Clifton Property Trust, LLC
Mobile: 404.226.2040
www.cliftontrust.com

1

**Bill Madson**

| From: | Phillip Jackson <PJackson@roberts-stevens.com> |
| --- | --- |
| Sent: | Monday, October 20, 2025 5:18 PM |
| To: | Bill Madson |
| Subject: | RE: Warren Deponti - Litigation Hold Notice and Madson Family Matter Information Package |

Dear Mr. Madson – Please allow this email to confirm that I have been retained to represent MH Mission Hospital, LLLP (hereinafter "Mission"), its affiliated corporate entities, its officers, its agents, and its employed physicians related to this matter. Please do **not** have any further communication of any type with any person at Mission related to this matter. Please direct all communications to this email address or the address listed below. To the extent that you have already sent via email, US Mail, or overnight courier any communication to any person at Mission related to this matter, I ask that you provide a copy of that communication to me directly.

Phillip T. Jackson
Attorney | Roberts & Stevens, P.A.
City Centre Building | 301 College Street, Suite 400, Asheville, NC 28801
Office: 828-252-6600 | Direct: 828-210-6873
www.roberts-stevens.com

From: Bill Madson <bill@cliftontrust.com>
Sent: Saturday, October 18, 2025 11:15 PM
To: warren.deponti@hcahealthcare.com
Cc: 'Bill Madson' <bill@cliftontrust.com>
Subject: Warren Deponti - Litigation Hold Notice and Madson Family Matter Information Package
Importance: High

You don't often get email from bill@cliftontrust.com. Learn why this is important

Warren,

Review the attached.

Bill

Bill Madson
Clifton Property Trust, LLC
Mobile: 404.226.2040
www.cliftontrust.com



RE: Warren Deponti – Litigation Hold Notice and Madson Family Matter Information Package



Bill Madson <bill@cliftontrust.com>
To 'Phillip Jackson'
Cc 'Bill Madson'

Mon 10/20/2025 7:42 PM

Reply | Reply All | Forward | ...

You forwarded this message on 10/20/2025 7:45 PM.

HCA and Melina – Lit Hold Notice – Final.pdf
300 KB

RS – Madson – Litigation Hold Notice – Final.pdf
202 KB

Deponti Lit Hold Notice - 10.18.25 – final.pdf
2 MB

Phil,

First off, I'm going to stop your sanctionable conduct, citing Rule 8.4 and the First Amendment.  I can and will contact anyone I want, whenever I want, with whatever information I want, in whatever setting I want.  If you want to walk down the path of telling me what I can and can't do, please keep doing do so in writing.  My daughter and I are victims of your client's conduct.  I'm no longer "redirectable."

understanding. CNC Jonathan had conversation with father about expectations while on the unit. Father is frustrated about system issues and movement into an inpatient bed, and is advocating for his child. Although he is frustrated, he is redirectable and able to discuss those concerns with PC and CNC.

I am confirming receipt of your email.  Please confirm receipt of my response, in addition to the following:

- Litigation Hold Notice to Warren Deponti
- Litigation Hold Notice to HCA Healthcare and Melina Arrowood
- Litigation Hold Notice to Roberts Stevens.

Please let me know if you represent any of these individuals as part of your representation of MH Mission Hospital, LLLP:

- Warren Deponti
- Matthew Edwards
- Melina Arrowood
- Greg Lowe
- Jonathon Gluck

Bill

**Bill Madson**

| | |
|---|---|
| **From:** | Bill Madson <bill@cliftontrust.com> |
| **Sent:** | Tuesday, October 21, 2025 8:44 PM |
| **To:** | warren.deponti@hcahealthcare.com |
| **Cc:** | 'Bill Madson' |
| **Subject:** | FW: Warren Deponti - Litigation Hold Notice and Madson Family Matter Information Package |
| **Attachments:** | HCA and Melina - Lit Hold Notice - Final.pdf; RS - Madson - Litigation Hold Notice - Final.pdf; Deponti Lit Hold Notice - 10.18.25 - final.pdf; Exhibit B.pdf |

Warren:

Last night I received a response to your Litigation Hold Notice from someone named Phil Jackson. Do you know him? He claims to be a legal professional representing an entity called MH Mission Hospital LLLP. His email and my response are below.

Are you in some way connected to an entity called MH Mission Hospital LLLP? He did not offer any background of this entity called MH Mission Hospital LLLP so I do not have any way of knowing what that entity is, or why he is responding to a Litigation Hold Notice to you. Approximately 24 hours ago, I asked him if he represented you and he has not responded. Did your insurance company hire him to be your representative?

This email is a reminder of returning a signed version of Exhibit B to me tomorrow by noon. I've attached it for your reference.

---

**Outline of Complaints to NC Medical Board and The Joint Commission**

- Sign and return Exhibit B prior to Wednesday October 22, 2025 at noon (acknowledgement of receipt of this notice). If I do not receive the signed Exhibit B on time, I am beginning the complaint processes with the NC Medical Board (Exhibit C) and The Joint Commission (Exhibit D).

---

Bill

---

**From:** Bill Madson <bill@cliftontrust.com>
**Sent:** Monday, October 20, 2025 7:42 PM
**To:** 'Phillip Jackson' <PJackson@roberts-stevens.com>
**Cc:** 'Bill Madson' <bill@cliftontrust.com>
**Subject:** RE: Warren Deponti - Litigation Hold Notice and Madson Family Matter Information Package

Phil,

First off, I'm going to stop your sanctionable conduct, citing Rule 8.4 and the First Amendment. I can and will contact anyone I want, whenever I want, with whatever information I want, in whatever setting I

1

want. If you want to walk down the path of telling me what I can and can't do, please keep doing do so in writing. My daughter and I are victims of your client's conduct. I'm no longer "redirectable."

understanding. CNC Jonathan had convers
system issues and movement into an inpat
redirectable and able to discuss those conc

I am confirming receipt of your email. Please confirm receipt of my response, in addition to the following:

- Litigation Hold Notice to Warren Deponti
- Litigation Hold Notice to HCA Healthcare and Melina Arrowood
- Litigation Hold Notice to Roberts Stevens.

Please let me know if you represent any of these individuals as part of your representation of MH Mission Hospital, LLLP:

- Warren Deponti
- Matthew Edwards
- Melina Arrowood
- Greg Lowe
- Jonathon Gluck

Bill

---

**From:** Phillip Jackson <PJackson@roberts-stevens.com>
**Sent:** Monday, October 20, 2025 5:18 PM
**To:** Bill Madson <bill@cliftontrust.com>
**Subject:** RE: Warren Deponti - Litigation Hold Notice and Madson Family Matter Information Package

Dear Mr. Madson – Please allow this email to confirm that I have been retained to represent MH Mission Hospital, LLLP (hereinafter "Mission"), its affiliated corporate entities, its officers, its agents, and its employed physicians related to this matter. Please do **not** have any further communication of any type with any person at Mission related to this matter. Please direct all communications to this email address or the address listed below. To the extent that you have already sent via email, US Mail, or overnight courier any communication to any person at Mission related to this matter, I ask that you provide a copy of that communication to me directly.

Phillip T. Jackson
Attorney | Roberts & Stevens, P.A.
City Centre Building | 301 College Street, Suite 400, Asheville, NC 28801
Office: 828-252-6600 | Direct: 828-210-6873
www.roberts-stevens.com

2

**From:** Bill Madson <bill@cliftontrust.com>
**Sent:** Saturday, October 18, 2025 11:15 PM
**To:** warren.deponti@hcahealthcare.com
**Cc:** 'Bill Madson' <bill@cliftontrust.com>
**Subject:** Warren Deponti - Litigation Hold Notice and Madson Family Matter Information Package
**Importance:** High

You don't often get email from bill@cliftontrust.com. Learn why this is important

Warren,

Review the attached.

Bill

Bill Madson
Clifton Property Trust, LLC
Mobile: 404.226.2040
www.cliftontrust.com

**Bill Madson**

---

| | |
|---|---|
| **From:** | Jordan Barnette <JBarnette@roberts-stevens.com> |
| **Sent:** | Wednesday, October 22, 2025 10:07 AM |
| **To:** | bill@cliftontrust.com |
| **Cc:** | Phillip Jackson |
| **Subject:** | Madson - Correspondence Concerning Representation of Edwards, Arrowood, Lowe, and Gluck |
| **Attachments:** | Madson - Notice of Representation_Cease and Desist(3763231.3).pdf |

Mr. Madson,

Please see the attached correspondence. Thank you for your time and attention.

Jordan P. Barnette
Attorney | Roberts & Stevens, P.A.
City Centre Building | 301 College Street, Suite 400, Asheville, NC 28801
Office: 828-252-6600 | Direct: 828-210-6826
www.roberts-stevens.com

1

| | |
|---|---|
| **From:** | Bill Madson |
| **To:** | "Jordan Barnette" |
| **Cc:** | "Phillip Jackson" |
| **Bcc:** | bill@cliftontrust.com |
| **Subject:** | RE: Madson - Correspondence Concerning Representation of Edwards, Arrowood, Lowe, and Gluck |
| **Date:** | Wednesday, October 22, 2025 11:54:05 AM |
| **Attachments:** | Deponti Lit Hold Notice - 10.18.25 - final.pdf |
| | HCA and Melina - Lit Hold Notice - Final.pdf |
| | Litigation Hold Notice - HCA and Melina (310 KB).msg |

Jordan,

I'm letting you know I received your email. I now understand that your firm is a representative of these people or entities:

- Warren Deponti
- Melina Arrowood
- Matthew Edwards
- Greg Lowe
- Jonathon Gluck
- MH Mission Hospital, LLLP

Regarding Warren:

- I have not sent him anything that I would consider to be a "letter." I did send him a 54-page Litigation Hold Notice and Madson Family Matter Information Package.
- Can you confirm that you, Phil, and Warren all have the attached 54-page pdf entitled "Deponti – Lit Hold Notice – 10.18.25 – final" and that is what you are referring to as the "letter"?
- If you can reach Warren, can you ask him about signing Exhibit B to the Litigation Hold Notice? I have emailed it to him, and he has not replied. I requested that the signed Exhibit B be delivered to me by noon today and that's in 10 minutes.

Regarding Melina:

- Can you confirm that she has received the attached Litigation Hold Notice?
- I delivered this to an HCA employee named Michael McAlevey on 9/3/25 but no one wrote me back. I've attached the correspondence.
- I tried to send this to her yesterday, and she refused delivery according to the Fedex driver who called me, so I don't what's going on but I'm sending it to you now since you represent her.
- In the communication, I requested further discharge guidance from Melina but no one wrote me back.

Could let me know if you represent a company called HCA Healthcare, Inc?

Bill

**From:** Jordan Barnette <JBarnette@roberts-stevens.com>
**Sent:** Wednesday, October 22, 2025 10:07 AM
**To:** bill@cliftontrust.com
**Cc:** Phillip Jackson <PJackson@roberts-stevens.com>
**Subject:** Madson - Correspondence Concerning Representation of Edwards, Arrowood, Lowe, and Gluck

Mr. Madson,

Please see the attached correspondence. Thank you for your time and attention.

Jordan P. Barnette
Attorney | Roberts & Stevens, P.A.
City Centre Building | 301 College Street, Suite 400, Asheville, NC 28801
Office: 828-252-6600 | Direct: 828-210-6826
www.roberts-stevens.com

## Bill Madson

| | |
|---|---|
| **From:** | Jordan Barnette <JBarnette@roberts-stevens.com> |
| **Sent:** | Wednesday, October 22, 2025 2:29 PM |
| **To:** | Bill Madson |
| **Cc:** | Phillip Jackson |
| **Subject:** | RE: Madson - Correspondence Concerning Representation of Edwards, Arrowood, Lowe, and Gluck |

Mr. Madson,

Our firm also represents HCA Healthcare.

Jordan

Jordan P. Barnette
Attorney | Roberts & Stevens, P.A.
City Centre Building | 301 College Street, Suite 400, Asheville, NC 28801
Office: 828-252-6600 | Direct: 828-210-6826
www.roberts-stevens.com

---

**From:** Bill Madson <bill@cliftontrust.com>
**Sent:** Wednesday, October 22, 2025 11:54 AM
**To:** Jordan Barnette <JBarnette@roberts-stevens.com>
**Cc:** Phillip Jackson <PJackson@roberts-stevens.com>
**Subject:** RE: Madson - Correspondence Concerning Representation of Edwards, Arrowood, Lowe, and Gluck

Jordan,

I'm letting you know I received your email. I now understand that your firm is a representative of these people or entities:

- Warren Deponti
- Melina Arrowood
- Matthew Edwards
- Greg Lowe
- Jonathon Gluck
- MH Mission Hospital, LLLP

Regarding Warren:

- I have not sent him anything that I would consider to be a "letter." I did send him a 54-page Litigation Hold Notice and Madson Family Matter Information Package.
- Can you confirm that you, Phil, and Warren all have the attached 54-page pdf entitled "Deponti – Lit Hold Notice – 10.18.25 – final" and that is what you are referring to as the "letter"?

1

- If you can reach Warren, can you ask him about signing Exhibit B to the Litigation Hold Notice? I have emailed it to him, and he has not replied. I requested that the signed Exhibit B be delivered to me by noon today and that's in 10 minutes.

Regarding Melina:

- Can you confirm that she has received the attached Litigation Hold Notice?
- I delivered this to an HCA employee named Michael McAlevey on 9/3/25 but no one wrote me back. I've attached the correspondence.
- I tried to send this to her yesterday, and she refused delivery according to the Fedex driver who called me, so I don't what's going on but I'm sending it to you now since you represent her.
- In the communication, I requested further discharge guidance from Melina but no one wrote me back.

Could let me know if you represent a company called HCA Healthcare, Inc?

Bill

---

**From:** Jordan Barnette <JBarnette@roberts-stevens.com>
**Sent:** Wednesday, October 22, 2025 10:07 AM
**To:** bill@cliftontrust.com
**Cc:** Phillip Jackson <PJackson@roberts-stevens.com>
**Subject:** Madson - Correspondence Concerning Representation of Edwards, Arrowood, Lowe, and Gluck

Mr. Madson,

Please see the attached correspondence. Thank you for your time and attention.

Jordan P. Barnette
Attorney | Roberts & Stevens, P.A.
City Centre Building | 301 College Street, Suite 400, Asheville, NC 28801
Office: 828-252-6600 | Direct: 828-210-6826
www.roberts-stevens.com

2

**Bill Madson**

| | |
|---|---|
| **From:** | Jordan Barnette <JBarnette@roberts-stevens.com> |
| **Sent:** | Wednesday, October 22, 2025 2:46 PM |
| **To:** | Bill Madson |
| **Cc:** | Phillip Jackson |
| **Subject:** | RE: Madson - Correspondence Concerning Representation of Edwards, Arrowood, Lowe, and Gluck |

Mr. Madson,

I can inform you that our firm has been engaged to represent the aforementioned persons and entities as it relates to the claims concerning your daughter and other items you have noted in prior correspondence. I can further advise that I am in receipt of the attachments you provided via email to me, today.

As for the other items of note in your emails, I do not plan on providing a response to those queries and I will reiterate my request that you cease and desist communicating with those represented individuals, directly.

Thank you,

Jordan P. Barnette
Attorney | Roberts & Stevens, P.A.
City Centre Building | 301 College Street, Suite 400, Asheville, NC 28801
Office: 828-252-6600 | Direct: 828-210-6826
www.roberts-stevens.com

**From:** Bill Madson <bill@cliftontrust.com>
**Sent:** Wednesday, October 22, 2025 2:36 PM
**To:** Jordan Barnette <JBarnette@roberts-stevens.com>
**Cc:** Phillip Jackson <PJackson@roberts-stevens.com>
**Subject:** Re: Madson - Correspondence Concerning Representation of Edwards, Arrowood, Lowe, and Gluck

Thanks for letting me know. Can you get back to me on the other questions?

On Wed, Oct 22, 2025, 2:28 PM Jordan Barnette <JBarnette@roberts-stevens.com> wrote:

Mr. Madson,


Our firm also represents HCA Healthcare.


Jordan

1

Jordan P. Barnette

Attorney | Roberts & Stevens, P.A.

City Centre Building | 301 College Street, Suite 400, Asheville, NC 28801

Office: 828-252-6600 | Direct: 828-210-6826

www.roberts-stevens.com

**From:** Bill Madson <bill@cliftontrust.com>
**Sent:** Wednesday, October 22, 2025 11:54 AM
**To:** Jordan Barnette <JBarnette@roberts-stevens.com>
**Cc:** Phillip Jackson <PJackson@roberts-stevens.com>
**Subject:** RE: Madson - Correspondence Concerning Representation of Edwards, Arrowood, Lowe, and Gluck

Jordan,

I'm letting you know I received your email. I now understand that your firm is a representative of these people or entities:

- Warren Deponti
- Melina Arrowood
- Matthew Edwards
- Greg Lowe
- Jonathon Gluck
- MH Mission Hospital, LLLP

Regarding Warren:

- I have not sent him anything that I would consider to be a "letter." I did send him a 54-page Litigation Hold Notice and Madson Family Matter Information Package.
- Can you confirm that you, Phil, and Warren all have the attached 54-page pdf entitled "Deponti – Lit Hold Notice – 10.18.25 – final" and that is what you are referring to as the "letter"?
- If you can reach Warren, can you ask him about signing Exhibit B to the Litigation Hold Notice? I have emailed it to him, and he has not replied. I requested that the signed Exhibit B be delivered to me by noon today and that's in 10 minutes.

2

Regarding Melina:

- Can you confirm that she has received the attached Litigation Hold Notice?
- I delivered this to an HCA employee named Michael McAlevey on 9/3/25 but no one wrote me back. I've attached the correspondence.
- I tried to send this to her yesterday, and she refused delivery according to the Fedex driver who called me, so I don't what's going on but I'm sending it to you now since you represent her.
- In the communication, I requested further discharge guidance from Melina but no one wrote me back.

Could let me know if you represent a company called HCA Healthcare, Inc?

Bill

---

**From:** Jordan Barnette <JBarnette@roberts-stevens.com>
**Sent:** Wednesday, October 22, 2025 10:07 AM
**To:** bill@cliftontrust.com
**Cc:** Phillip Jackson <PJackson@roberts-stevens.com>
**Subject:** Madson - Correspondence Concerning Representation of Edwards, Arrowood, Lowe, and Gluck

Mr. Madson,

Please see the attached correspondence. Thank you for your time and attention.

Jordan P. Barnette

Attorney | Roberts & Stevens, P.A.

3

City Centre Building | 301 College Street, Suite 400, Asheville, NC 28801

Office: 828-252-6600 | Direct: 828-210-6826

www.roberts-stevens.com

4

## Bill Madson

**From:** Bill Madson <bill@cliftontrust.com>
**Sent:** Friday, October 24, 2025 3:42 PM
**To:** 'Phillip Jackson'
**Cc:** 'Jordan Barnette'
**Subject:** RE: Warren Deponti - Litigation Hold Notice and Madson Family Matter Information Package
**Attachments:** Discharge Survey From Greg.pdf

Phil,

In the lobby of the Sweeten Creek Mental Health Center at the conclusion of my daughter's 3-4 minute discharge appointment, the male nurse handed me an envelope. Inside the envelope (and attached to this email) was a letter from Greg Lowe, the CEO of Mission Hospital. In this letter, Greg mentioned to me "you can help make our care better for future patients and families." I am interested in doing that. The letter was placed in my hand and signed by Greg so he was communicating directly to me. The envelope contained a 2-page survey to highlight what Sweeten Creek is "doing right and what needs improvement." I have some actionable ideas for improvement, and I want to share them with Greg.

However, in your email below and Jonathon's emails yesterday (mentioning the words 'cease and desist' on back-to-back emails), you all have told me that you represent Greg Lowe and that I am no longer allowed to contact him directly. I had previously made you aware that I was not an attorney, but I'm doing so again – I am a private citizen and single father advocating for my child's rights. I am not an attorney.

While I am advocating for my daughter's rights and offering suggestions for systemic improvement vis a vis Greg's survey, I want to make sure to not get sued by a powerful law firm like yours - so I am asking you this question:

May I have your permission to fill this out and mail it to Greg?

I'm asking you to get back to me by 7pm tonight, because I'm running errands in the morning and I want to stop by the post office. Greg included a prepaid postage envelope, so I don't even need a stamp.

Bill

---

**From:** Phillip Jackson <PJackson@roberts-stevens.com>
**Sent:** Monday, October 20, 2025 5:18 PM
**To:** Bill Madson <bill@cliftontrust.com>
**Subject:** RE: Warren Deponti - Litigation Hold Notice and Madson Family Matter Information Package

Dear Mr. Madson – Please allow this email to confirm that I have been retained to represent MH Mission Hospital, LLLP (hereinafter "Mission"), its affiliated corporate entities, its officers, its agents, and its employed physicians related to this matter. Please do **not** have any further communication of any type with any person at Mission related to this matter. Please direct all communications to this email address or the address listed below. To the extent that you have already sent via email, US Mail, or overnight courier any communication to

1

any person at Mission related to this matter, I ask that you provide a copy of that communication to me directly.

Phillip T. Jackson
Attorney | Roberts & Stevens, P.A.
City Centre Building | 301 College Street, Suite 400, Asheville, NC 28801
Office: 828-252-6600 | Direct: 828-210-6873
www.roberts-stevens.com

**From:** Bill Madson <bill@cliftontrust.com>
**Sent:** Saturday, October 18, 2025 11:15 PM
**To:** warren.deponti@hcahealthcare.com
**Cc:** 'Bill Madson' <bill@cliftontrust.com>
**Subject:** Warren Deponti - Litigation Hold Notice and Madson Family Matter Information Package
**Importance:** High

You don't often get email from bill@cliftontrust.com. Learn why this is important

Warren,

Review the attached.

Bill

Bill Madson
Clifton Property Trust, LLC
Mobile: 404.226.2040
www.cliftontrust.com

## Bill Madson

| | |
|---|---|
| **From:** | Bill Madson <bill@cliftontrust.com> |
| **Sent:** | Friday, October 24, 2025 3:42 PM |
| **To:** | 'Phillip Jackson' |
| **Cc:** | 'Jordan Barnette' |
| **Subject:** | RE: Warren Deponti - Litigation Hold Notice and Madson Family Matter Information Package |
| **Attachments:** | Discharge Survey From Greg.pdf |

Phil,

In the lobby of the Sweeten Creek Mental Health Center at the conclusion of my daughter's 3-4 minute discharge appointment, the male nurse handed me an envelope. Inside the envelope (and attached to this email) was a letter from Greg Lowe, the CEO of Mission Hospital. In this letter, Greg mentioned to me "you can help make our care better for future patients and families." I am interested in doing that. The letter was placed in my hand and signed by Greg so he was communicating directly to me. The envelope contained a 2-page survey to highlight what Sweeten Creek is "doing right and what needs improvement." I have some actionable ideas for improvement, and I want to share them with Greg.

However, in your email below and Jonathon's emails yesterday (mentioning the words 'cease and desist' on back-to-back emails), you all have told me that you represent Greg Lowe and that I am no longer allowed to contact him directly. I had previously made you aware that I was not an attorney, but I'm doing so again – I am a private citizen and single father advocating for my child's rights. I am not an attorney.

While I am advocating for my daughter's rights and offering suggestions for systemic improvement vis a vis Greg's survey, I want to make sure to not get sued by a powerful law firm like yours - so I am asking you this question:

May I have your permission to fill this out and mail it to Greg?

I'm asking you to get back to me by 7pm tonight, because I'm running errands in the morning and I want to stop by the post office. Greg included a prepaid postage envelope, so I don't even need a stamp.

Bill

From: Phillip Jackson <PJackson@roberts-stevens.com>
Sent: Monday, October 20, 2025 5:18 PM
To: Bill Madson <bill@cliftontrust.com>
Subject: RE: Warren Deponti - Litigation Hold Notice and Madson Family Matter Information Package

Dear Mr. Madson – Please allow this email to confirm that I have been retained to represent MH Mission Hospital, LLLP (hereinafter "Mission"), its affiliated corporate entities, its officers, its agents, and its employed physicians related to this matter. Please do **not** have any further communication of any type with any person at Mission related to this matter. Please direct all communications to this email address or the address listed below. To the extent that you have already sent via email, US Mail, or overnight courier any communication to

1

any person at Mission related to this matter, I ask that you provide a copy of that communication to me directly.

Phillip T. Jackson
Attorney | Roberts & Stevens, P.A.
City Centre Building | 301 College Street, Suite 400, Asheville, NC 28801
Office: 828-252-6600 | Direct: 828-210-6873
www.roberts-stevens.com

**From:** Bill Madson <bill@cliftontrust.com>
**Sent:** Saturday, October 18, 2025 11:15 PM
**To:** warren.deponti@hcahealthcare.com
**Cc:** 'Bill Madson' <bill@cliftontrust.com>
**Subject:** Warren Deponti - Litigation Hold Notice and Madson Family Matter Information Package
**Importance:** High

You don't often get email from bill@cliftontrust.com. Learn why this is important

Warren,

Review the attached.

Bill

Bill Madson
Clifton Property Trust, LLC
Mobile: 404.226.2040
www.cliftontrust.com

## Bill Madson

| | |
|---|---|
| **From:** | Bill Madson <bill@cliftontrust.com> |
| **Sent:** | Friday, October 24, 2025 8:04 PM |
| **To:** | Phillip Jackson |
| **Cc:** | Jordan Barnette |
| **Subject:** | Re: Warren Deponti - Litigation Hold Notice and Madson Family Matter Information Package |

Jordan, I didn't hear from Phil. Will you allow me to process the survey that Greg asked for?

On Fri, Oct 24, 2025, 3:42 PM Bill Madson <bill@cliftontrust.com> wrote:

Phil,

In the lobby of the Sweeten Creek Mental Health Center at the conclusion of my daughter's 3-4 minute discharge appointment, the male nurse handed me an envelope. Inside the envelope (and attached to this email) was a letter from Greg Lowe, the CEO of Mission Hospital. In this letter, Greg mentioned to me "you can help make our care better for future patients and families." I am interested in doing that. The letter was placed in my hand and signed by Greg so he was communicating directly to me. The envelope contained a 2-page survey to highlight what Sweeten Creek is "doing right and what needs improvement." I have some actionable ideas for improvement, and I want to share them with Greg.

However, in your email below and Jonathon's emails yesterday (mentioning the words 'cease and desist' on back-to-back emails), you all have told me that you represent Greg Lowe and that I am no longer allowed to contact him directly. I had previously made you aware that I was not an attorney, but I'm doing so again – I am a private citizen and single father advocating for my child's rights. I am not an attorney.

While I am advocating for my daughter's rights and offering suggestions for systemic improvement vis a vis Greg's survey, I want to make sure to not get sued by a powerful law firm like yours - so I am asking you this question:

May I have your permission to fill this out and mail it to Greg?

I'm asking you to get back to me by 7pm tonight, because I'm running errands in the morning and I want to stop by the post office. Greg included a prepaid postage envelope, so I don't even need a stamp.

1

Bill

From: Phillip Jackson <PJackson@roberts-stevens.com>
Sent: Monday, October 20, 2025 5:18 PM
To: Bill Madson <bill@cliftontrust.com>
Subject: RE: Warren Deponti - Litigation Hold Notice and Madson Family Matter Information Package

Dear Mr. Madson – Please allow this email to confirm that I have been retained to represent MH Mission Hospital, LLLP (hereinafter "Mission"), its affiliated corporate entities, its officers,  its agents, and its employed physicians related to this matter. Please do **not** have any further communication of any type with any person at Mission related to this matter. Please direct all communications to this email address or the address listed below. To the extent that you have already sent via email, US Mail, or overnight courier any communication to any person at Mission related to this matter, I ask that you provide a copy of that communication to me directly.

Phillip T. Jackson

Attorney | Roberts & Stevens, P.A.

City Centre Building | 301 College Street, Suite 400, Asheville, NC 28801

Office: 828-252-6600 | Direct: 828-210-6873

www.roberts-stevens.com

From: Bill Madson <bill@cliftontrust.com>
Sent: Saturday, October 18, 2025 11:15 PM
To: warren.deponti@hcahealthcare.com
Cc: 'Bill Madson' <bill@cliftontrust.com>
Subject: Warren Deponti - Litigation Hold Notice and Madson Family Matter Information Package
Importance: High

You don't often get email from bill@cliftontrust.com. Learn why this is important

Warren,

Review the attached.


Bill


Bill Madson

Clifton Property Trust, LLC

Mobile: 404.226.2040

www.cliftontrust.com

## Bill Madson

| | |
|---|---|
| **From:** | Bill Madson <bill@cliftontrust.com> |
| **Sent:** | Sunday, October 26, 2025 8:32 AM |
| **To:** | 'Phillip Jackson'; 'Jordan Barnette' |
| **Cc:** | 'Bill Madson' |
| **Subject:** | Madson Family - Question about Represented Individuals |
| **Attachments:** | RE: Madson - Correspondence Concerning Representation of Edwards, Arrowo... (29.9 KB); RE: Madson - Correspondence Concerning Representation of Edwards, Arrowo... (23.8 KB); Madson – Correspondence Concerning Representation of Edwards, Arrowood, L... (220 KB); RE: Warren Deponti - Litigation Hold Notice and Madson Family Matter Inf... (14.5 KB) |

Phil and Jordan,

You've told me you represent these 5 individuals: Warren Deponti, Matthew Edwards, Melina Arrowood, Greg Lowe, and Jonathon Gluck.

My question is if I am allowed to use any of the methods below to have direct contact with them.

- Email
- Mail
- Process Server

Please let me know Yes or No on each of those three methods.

For at least the fifth time, I'm letting you know in writing that I am not an attorney. There is no active litigation between me and any of the Represented Individuals, so no court has yet established rules for who can contact who. I believe it is within my rights to contact these individuals, but you have sent me a cease-and-desist letter among other attached forms of potential intimidation. I don't want a powerful law firm like Roberts Stevens to sue me, so I'm seeking clarity about what my rights are and what they aren't relating to these Represented Individuals. I'm currently nervous about trying to follow your rules while still maintaining my civil rights.

I will await your response.

Bill

Bill Madson
Clifton Property Trust, LLC
Mobile: 404.226.2040
www.cliftontrust.com

1

**Bill Madson**

| | |
|---|---|
| **From:** | Jordan Barnette <JBarnette@roberts-stevens.com> |
| **Sent:** | Monday, October 27, 2025 10:35 AM |
| **To:** | Bill Madson; Phillip Jackson |
| **Subject:** | RE: Warren Deponti - Litigation Hold Notice and Madson Family Matter Information Package |

Mr. Madson,

**You may return the survey via the post-paid envelope.**

As for whether I can permit you to communicate directly via email/mail with our represented personnel in this matter—I would refer you to the prior correspondence attached to you email asking that you cease and desist making continued communications.

Additionally, I have noted much urgency in your correspondence with certain requests demanding responses by a specific date certain or time of day (even if a request is sent the same day). For my part, I will endeavor to communicate with you promptly and professionally concerning this matter but I am generally unlikely to adhere to any immediate or protracted deadlines. I hope that you understand.

Thank you,

Jordan P. Barnette
Attorney | Roberts & Stevens, P.A.
City Centre Building | 301 College Street, Suite 400, Asheville, NC 28801
Office: 828-252-6600 | Direct: 828-210-6826
www.roberts-stevens.com

**From:** Bill Madson <bill@cliftontrust.com>
**Sent:** Friday, October 24, 2025 8:04 PM
**To:** Phillip Jackson <PJackson@roberts-stevens.com>
**Cc:** Jordan Barnette <JBarnette@roberts-stevens.com>
**Subject:** Re: Warren Deponti - Litigation Hold Notice and Madson Family Matter Information Package

Jordan, I didn't hear from Phil. Will you allow me to process the survey that Greg asked for?

On Fri, Oct 24, 2025, 3:42 PM Bill Madson <bill@cliftontrust.com> wrote:

Phil,

In the lobby of the Sweeten Creek Mental Health Center at the conclusion of my daughter's 3-4 minute discharge appointment, the male nurse handed me an envelope. Inside the envelope (and attached to this email) was a letter from Greg Lowe, the CEO of Mission Hospital. In this letter, Greg mentioned to me "you can help make our care better for future patients and families." I am interested in doing that. The letter was placed in my hand and signed by Greg so he was communicating directly to

1

me. The envelope contained a 2-page survey to highlight what Sweeten Creek is "doing right and what needs improvement." I have some actionable ideas for improvement, and I want to share them with Greg.

However, in your email below and Jonathon's emails yesterday (mentioning the words 'cease and desist' on back-to-back emails), you all have told me that you represent Greg Lowe and that I am no longer allowed to contact him directly. I had previously made you aware that I was not an attorney, but I'm doing so again – I am a private citizen and single father advocating for my child's rights. I am not an attorney.

While I am advocating for my daughter's rights and offering suggestions for systemic improvement vis a vis Greg's survey, I want to make sure to not get sued by a powerful law firm like yours - so I am asking you this question:

May I have your permission to fill this out and mail it to Greg?

I'm asking you to get back to me by 7pm tonight, because I'm running errands in the morning and I want to stop by the post office. Greg included a prepaid postage envelope, so I don't even need a stamp.

Bill

---

**From:** Phillip Jackson <PJackson@roberts-stevens.com>
**Sent:** Monday, October 20, 2025 5:18 PM
**To:** Bill Madson <bill@cliftontrust.com>
**Subject:** RE: Warren Deponti - Litigation Hold Notice and Madson Family Matter Information Package

Dear Mr. Madson – Please allow this email to confirm that I have been retained to represent MH Mission Hospital, LLLP (hereinafter "Mission"), its affiliated corporate entities, its officers, its agents, and its employed physicians related to this matter. Please do **not** have any further communication of any type with any person at Mission related to this matter. Please direct all communications to this email address or the address listed below. To the extent that you have already sent via email, US Mail, or overnight courier any communication to any person at Mission related to this matter, I ask that you provide a copy of that communication to me directly.

2

Phillip T. Jackson

Attorney | Roberts & Stevens, P.A.

City Centre Building | 301 College Street, Suite 400, Asheville, NC 28801

Office: 828-252-6600 | Direct: 828-210-6873

www.roberts-stevens.com

---

**From:** Bill Madson <bill@cliftontrust.com>
**Sent:** Saturday, October 18, 2025 11:15 PM
**To:** warren.deponti@hcahealthcare.com
**Cc:** 'Bill Madson' <bill@cliftontrust.com>
**Subject:** Warren Deponti - Litigation Hold Notice and Madson Family Matter Information Package
**Importance:** High

You don't often get email from bill@cliftontrust.com. Learn why this is important

Warren,

Review the attached.

Bill

Bill Madson

Clifton Property Trust, LLC

Mobile: 404.226.2040

www.cliftontrust.com

## Bill Madson

| | |
|---|---|
| **From:** | Bill Madson <bill@cliftontrust.com> |
| **Sent:** | Thursday, October 30, 2025 8:23 PM |
| **To:** | 'Jordan Barnette'; 'Phillip Jackson' |
| **Cc:** | 'Bill Madson' |
| **Subject:** | Cease and Desist Notice Recap |

Jordan,

I understand that I cannot impose any kind of deadline on the timing for a response from you – I get that. I also understand you have a job to do, and you are doing your best.

That said, your cease-and-desist letter (and repeated follow-up about it) is not lawful. I am not attorney, and I am not represented by an attorney, and you knew that well in advance of sending me a cease and desist. I am individual, and I have some claims against individuals that happen to be your clients now, those individuals are medical professionals that treated my child in what I what I think was an inappropriate manner, and no laws exist that I say I cannot contact those individual medical professionals. In fact, so many laws exist that say I can do exactly that.

Prior to your cease and desist, one individual client of yours received 3 emails from me and one fedex package from me. Your other individual clients received one email from me and one Fedex package from me (although one of your clients refused delivery of the Fedex package). The contents of all communication were legal and medical documents relating to the treatment of my child.

You've been careful not to 'demand' me to cease and desist but saying 'please cease and desist' is akin to a violent criminal saying 'kindly let me cut your arm off' – the 'please' and 'kindly' don't really matter.

As it relates to this cease-and-desist issue, your communication has been intimidating. It certainly has a direct and purposeful chilling effect on patient rights. I believe sending a cease and desist to an unrepresented non-attorney minor patient's dad violates CMS protocols, among a litany of others.

Bill

Bill Madson
Clifton Property Trust, LLC
Mobile: 404.226.2040
www.cliftontrust.com

1

**Bill Madson**

| | |
|---|---|
| **From:** | Bill Madson <bill@cliftontrust.com> |
| **Sent:** | Friday, November 7, 2025 7:02 PM |
| **To:** | 'Phillip Jackson'; 'Jordan Barnette' |
| **Cc:** | 'Bill Madson' |
| **Subject:** | HCA Litigation Hold Notice - 9/4/25 |
| **Attachments:** | Litigation Hold Notice - HCA and Melina (310 KB) |

Phil and Jonathon,

Can you confirm that your client HCA Healthcare received the attached litigation hold notice that I sent to Michael McAlevey on 9/4/25? The original email with metadata is attached for reference.

Bill

Bill Madson
Clifton Property Trust, LLC
Mobile: 404.226.2040
www.cliftontrust.com

## Bill Madson

| | |
|---|---|
| **From:** | Bill Madson <bill@cliftontrust.com> |
| **Sent:** | Friday, November 7, 2025 7:07 PM |
| **To:** | 'Jordan Barnette'; 'Phillip Jackson' |
| **Cc:** | 'Bill Madson' |
| **Subject:** | RE: Cease and Desist Notice Recap |
| **Attachments:** | Deponti - Case #I072J-CLONP.pdf; Edwards - Case #2025-3249.pdf |

Phil and Jonathon,

I need to revisit your cease-and-desist communication.

I'm attaching two letters I received relating to Warren and Matthew. The notices are from the Director of Administrative Investigations of the North Carolina Medical Board.

In the letter concerning Matthew, Ms. Mackiewicz relays to me the option to reach out to the hospital's patient advocate, practice manager, and internal patient complaint personnel. I am interested in doing that, but the problem for me is I have all this cease-and-desist communication from Roberts Stevens. It's worth noting that Ms. Mackiewicz had a copy of the cease-and-desist letter and follow-on emails before sending me this letter.

I'm clearly stating again:

- I am a private citizen and not an attorney. I made you aware of that in writing on 8/29/25 and multiple times thereafter. There has never been a question about whether or not I was an attorney.
- I am not represented by an attorney. I made you aware of this on 8/29/25 and multiple times thereafter. In fact, at this point, I have not even consulted an attorney on this matter.
- I have not filed any lawsuits. There is no ongoing litigation of any kind. Once litigation begins, a Court will almost certainly order me to communicate exclusively with Roberts Stevens on this matter if you are still representing the defendants at that time. When that happens, the request will be reasonable and lawful, and I will of course follow the Court's directions.
- My communications with HCA/Mission personnel preceding your cease-and-desist communications were all lawful and protected by my civil rights, my child's civil rights, and my child's patient rights. The substantive part of the communication was a 54-page detailed summary of my child's experience that I delivered to the individual doctors and individual executives involved with my child's care. There was nothing aggressive or threatening about any of my communication.
- Not an attorney, not in litigation, all communications are protected by CMS, other state and federal entities, and the Consititution.

I do not believe there is any legal basis for your cease-and-desist communication, so it is now time for you to either own or abandon the cease-and-desist communication:

1

- **Owning It.** If you want to own it and state it again, or point me to prior communications like you have before, I require a legal basis. Your response will necessarily have to conflict with the advocacy opportunities that Ms. Mackiewicz mentioned to me in her letter. In the absence of a clear legal basis for the cease-and-desist communication, your response would be indicative of an ongoing-multiple-law-violating attempt at restricting the rights of a special needs minor.

- **Abandoning It.** If you want to abandon it and effectively say 'don't worry about the all of the prior cease-and-desist communication,' your intimidation process will have started on 10/20/25 with Phil's original email and ended on day that I receive I response that we are done with the concept of a cease-and-desist. In this way, you will have essentially 'bookended' the timeframe that you were engaged in restricting the rights of a special needs minor.

I want to avoid any doubt in terms of the precise rights that I strongly believe you are trying to restrict my child from pursuing – the things that immediately come to mind as I'm typing this are ADA, 504, and CMS 42 CFR §482.13(a)(2) & (a)(7).

Jordan had previously let me know that Roberts Stevens' will not be adhering to any response timelines requests from me, so please respond at your leisure.

Bill

---

**From:** Bill Madson <bill@cliftontrust.com>
**Sent:** Thursday, October 30, 2025 8:23 PM
**To:** 'Jordan Barnette' <JBarnette@roberts-stevens.com>; 'Phillip Jackson' <PJackson@roberts-stevens.com>
**Cc:** 'Bill Madson' <bill@cliftontrust.com>
**Subject:** Cease and Desist Notice Recap

Jordan,

I understand that I cannot impose any kind of deadline on the timing for a response from you – I get that. I also understand you have a job to do, and you are doing your best.

That said, your cease-and-desist letter (and repeated follow-up about it) is not lawful. I am not attorney, and I am not represented by an attorney, and you knew that well in advance of sending me a cease and desist. I am individual, and I have some claims against individuals that happen to be your clients now, those individuals are medical professionals that treated my child in what I what I think was an inappropriate manner, and no laws exist that I say I cannot contact those individual medical professionals. In fact, so many laws exist that say I can do exactly that.

Prior to your cease and desist, one individual client of yours received 3 emails from me and one fedex package from me. Your other individual clients received one email from me and one Fedex package from me (although one of your clients refused delivery of the Fedex package). The contents of all communication were legal and medical documents relating to the treatment of my child.

You've been careful not to 'demand' me to cease and desist but saying 'please cease and desist' is akin to a violent criminal saying 'kindly let me cut your arm off' – the 'please' and 'kindly' don't really matter.

2

As it relates to this cease-and-desist issue, your communication has been intimidating. It certainly has a direct and purposeful chilling effect on patient rights. I believe sending a cease and desist to an unrepresented non-attorney minor patient's dad violates CMS protocols, among a litany of others.

Bill

Bill Madson
Clifton Property Trust, LLC
Mobile: 404.226.2040
www.cliftontrust.com

**Bill Madson**

---

| | |
|---|---|
| **From:** | Jordan Barnette <JBarnette@roberts-stevens.com> |
| **Sent:** | Thursday, November 13, 2025 3:33 PM |
| **To:** | Bill Madson; Phillip Jackson |
| **Subject:** | RE: HCA Litigation Hold Notice - 9/4/25 |

This was received. Thank you.

Jordan P. Barnette
Attorney | Roberts & Stevens, P.A.
City Centre Building | 301 College Street, Suite 400, Asheville, NC 28801
Office: 828-252-6600 | Direct: 828-210-6826
www.roberts-stevens.com

---

**From:** Bill Madson <bill@cliftontrust.com>
**Sent:** Friday, November 7, 2025 7:02 PM
**To:** Phillip Jackson <PJackson@roberts-stevens.com>; Jordan Barnette <JBarnette@roberts-stevens.com>
**Cc:** 'Bill Madson' <bill@cliftontrust.com>
**Subject:** HCA Litigation Hold Notice - 9/4/25

Phil and Jonathon,

Can you confirm that your client HCA Healthcare received the attached litigation hold notice that I sent to Michael McAlevey on 9/4/25? The original email with metadata is attached for reference.

Bill

Bill Madson
Clifton Property Trust, LLC
Mobile: 404.226.2040
www.cliftontrust.com

1

**Bill Madson**

| | |
|---|---|
| **From:** | Bill Madson <bill@cliftontrust.com> |
| **Sent:** | Friday, November 14, 2025 10:48 AM |
| **To:** | 'Jordan Barnette'; 'Phillip Jackson' |
| **Cc:** | 'Bill Madson' |
| **Subject:** | RE: HCA Litigation Hold Notice - 9/4/25 |

Jordan,

When you say "this was received" you are referring to HCA having received the litigation hold notice on 9/4/25 – is that correct? "This was received" could also mean you simply received my email and are acknowledging receipt of my email. Just looking to avoid any ambiguity.

Bill

**From:** Jordan Barnette <JBarnette@roberts-stevens.com>
**Sent:** Thursday, November 13, 2025 3:33 PM
**To:** Bill Madson <bill@cliftontrust.com>; Phillip Jackson <PJackson@roberts-stevens.com>
**Subject:** RE: HCA Litigation Hold Notice - 9/4/25

This was received. Thank you.


Jordan P. Barnette
Attorney | Roberts & Stevens, P.A.
City Centre Building | 301 College Street, Suite 400, Asheville, NC 28801
Office: 828-252-6600 | Direct: 828-210-6826
www.roberts-stevens.com

**From:** Bill Madson <bill@cliftontrust.com>
**Sent:** Friday, November 7, 2025 7:02 PM
**To:** Phillip Jackson <PJackson@roberts-stevens.com>; Jordan Barnette <JBarnette@roberts-stevens.com>
**Cc:** 'Bill Madson' <bill@cliftontrust.com>
**Subject:** HCA Litigation Hold Notice - 9/4/25

Phil and Jonathon,

Can you confirm that your client HCA Healthcare received the attached litigation hold notice that I sent to Michael McAlevey on 9/4/25? The original email with metadata is attached for reference.

Bill

Bill Madson
Clifton Property Trust, LLC
Mobile: 404.226.2040
www.cliftontrust.com

1

**Bill Madson**

| | |
|---|---|
| **From:** | Bill Madson <bill@cliftontrust.com> |
| **Sent:** | Wednesday, November 19, 2025 6:27 PM |
| **To:** | 'Jordan Barnette'; 'Phillip Jackson' |
| **Cc:** | 'Bill Madson' |
| **Subject:** | RE: HCA Litigation Hold Notice - 9/4/25 |

Jordan,

Following back up here. I'm not being obtuse. "This was received" has two distinct possible meanings. Either you are saying you just received my email, or you are saying that your client received the litigation hold email when I sent it – as it relates to evidence preservation in the matter concerning my child, those are two extraordinarily different messages. I'm asking for clarity again, five days after asking for it for the first time. It's appropriate for you to clarify this for me.

Bill

**From:** Bill Madson <bill@cliftontrust.com>
**Sent:** Friday, November 14, 2025 10:48 AM
**To:** 'Jordan Barnette' <JBarnette@roberts-stevens.com>; 'Phillip Jackson' <PJackson@roberts-stevens.com>
**Cc:** 'Bill Madson' <bill@cliftontrust.com>
**Subject:** RE: HCA Litigation Hold Notice - 9/4/25

Jordan,

When you say "this was received" you are referring to HCA having received the litigation hold notice on 9/4/25 – is that correct? "This was received" could also mean you simply received my email and are acknowledging receipt of my email. Just looking to avoid any ambiguity.

Bill

**From:** Jordan Barnette <JBarnette@roberts-stevens.com>
**Sent:** Thursday, November 13, 2025 3:33 PM
**To:** Bill Madson <bill@cliftontrust.com>; Phillip Jackson <PJackson@roberts-stevens.com>
**Subject:** RE: HCA Litigation Hold Notice - 9/4/25

This was received. Thank you.

Jordan P. Barnette
Attorney | Roberts & Stevens, P.A.
City Centre Building | 301 College Street, Suite 400, Asheville, NC 28801
Office: 828-252-6600 | Direct: 828-210-6826
www.roberts-stevens.com

**From:** Bill Madson <bill@cliftontrust.com>
**Sent:** Friday, November 7, 2025 7:02 PM

1

**To:** Phillip Jackson <PJackson@roberts-stevens.com>; Jordan Barnette <JBarnette@roberts-stevens.com>
**Cc:** 'Bill Madson' <bill@cliftontrust.com>
**Subject:** HCA Litigation Hold Notice - 9/4/25

Phil and Jonathon,

Can you confirm that your client HCA Healthcare received the attached litigation hold notice that I sent to Michael McAlevey on 9/4/25?  The original email with metadata is attached for reference.

Bill

Bill Madson
Clifton Property Trust, LLC
Mobile: 404.226.2040
www.cliftontrust.com

**Bill Madson**

| | |
|---|---|
| **From:** | Jordan Barnette <JBarnette@roberts-stevens.com> |
| **Sent:** | Wednesday, November 19, 2025 6:28 PM |
| **To:** | Bill Madson; Phillip Jackson |
| **Subject:** | RE: HCA Litigation Hold Notice - 9/4/25 |

Thanks for following up, Bill. It was received by the client.

Jordan P. Barnette
Attorney | Roberts & Stevens, P.A.
City Centre Building | 301 College Street, Suite 400, Asheville, NC 28801
Office: 828-252-6600 | Direct: 828-210-6826
www.roberts-stevens.com

---

**From:** Bill Madson <bill@cliftontrust.com>
**Sent:** Wednesday, November 19, 2025 6:27 PM
**To:** Jordan Barnette <JBarnette@roberts-stevens.com>; Phillip Jackson <PJackson@roberts-stevens.com>
**Cc:** 'Bill Madson' <bill@cliftontrust.com>
**Subject:** RE: HCA Litigation Hold Notice - 9/4/25

Jordan,

Following back up here. I'm not being obtuse. "This was received" has two distinct possible meanings. Either you are saying you just received my email, or you are saying that your client received the litigation hold email when I sent it – as it relates to evidence preservation in the matter concerning my child, those are two extraordinarily different messages. I'm asking for clarity again, five days after asking for it for the first time. It's appropriate for you to clarify this for me.

Bill

---

**From:** Bill Madson <bill@cliftontrust.com>
**Sent:** Friday, November 14, 2025 10:48 AM
**To:** 'Jordan Barnette' <JBarnette@roberts-stevens.com>; 'Phillip Jackson' <PJackson@roberts-stevens.com>
**Cc:** 'Bill Madson' <bill@cliftontrust.com>
**Subject:** RE: HCA Litigation Hold Notice - 9/4/25

Jordan,

When you say "this was received" you are referring to HCA having received the litigation hold notice on 9/4/25 – is that correct? "This was received" could also mean you simply received my email and are acknowledging receipt of my email. Just looking to avoid any ambiguity.

Bill

---

**From:** Jordan Barnette <JBarnette@roberts-stevens.com>
**Sent:** Thursday, November 13, 2025 3:33 PM
**To:** Bill Madson <bill@cliftontrust.com>; Phillip Jackson <PJackson@roberts-stevens.com>
**Subject:** RE: HCA Litigation Hold Notice - 9/4/25

1

This was received. Thank you.


Jordan P. Barnette
Attorney | Roberts & Stevens, P.A.
City Centre Building | 301 College Street, Suite 400, Asheville, NC 28801
Office: 828-252-6600 | Direct: 828-210-6826
www.roberts-stevens.com

---

**From:** Bill Madson <bill@cliftontrust.com>
**Sent:** Friday, November 7, 2025 7:02 PM
**To:** Phillip Jackson <PJackson@roberts-stevens.com>; Jordan Barnette <JBarnette@roberts-stevens.com>
**Cc:** 'Bill Madson' <bill@cliftontrust.com>
**Subject:** HCA Litigation Hold Notice - 9/4/25

Phil and Jonathon,

Can you confirm that your client HCA Healthcare received the attached litigation hold notice that I sent to Michael McAlevey on 9/4/25? The original email with metadata is attached for reference.

Bill

Bill Madson
Clifton Property Trust, LLC
Mobile: 404.226.2040
www.cliftontrust.com

Note to all HCA or HCI employees viewing this document. This document contains facts about the treatment of autistic minor. Please carefully review the section contained herein titled "HCA Healthcare Code of Conduct, Required Reportability and The Concept of Regenerative Liability."

October 18, 2025

Via Email and Certified Mail

Warren Deponti
116 Adams Creek Place
Simpsonville, SC 29681

Warren Deponti
c/o Sweeten Creek
32 Apex Circle
Asheville, NC 28803

RE: Litigation Hold Notice and Madson Family Matter Information Package

Dear Warren:

I am a victim and the father of a 14-year minor autistic victim of your conduct. In this package of information you are receiving, my daughter and I are the "Madson Family." The Madson Family is pursuing well-supported legal claims against you as an individual. I strongly suggest you do two things immediately:

- Hire an attorney to represent you individually.
- Send this information package to your professional insurance company.

There is a lot to talk about, but I'm starting here:

- You discharged my child in a public, non-confidential setting via an appointment that lasted 3-4 minutes, while standing up, with strangers present, without a physician, without a case manager, in the lobby of the Sweeten Creek Mental Health (herein referred to as "The Lobby Discharge").
- Your discharge did not provide for a Personal Safety Plan, which is a cornerstone of any discharge (herein referred to as "No Personal Safety Plan").
- My child was discharged (with me present) from Sweeten Creek one another time on 2/14/25. Your discharge process for her on 8/29/25 was different from the 2/14/25 discharge in nearly every material way.
- On their own, The Lobby Discharge and No Personal Safety Plan may be catastrophic to your ability to maintain a license to practice medicine, and they each crystallize your

personal liability in this situation. However, as I will lay out, the context and the events leading up to The Lobby Discharge and the No Personal Safety Plan make this situation even more troubling because they were purposeful, willful, wanton, retaliatory in nature, and conducted in direct coordination with executive leadership at the hospital.

**Events Leading Up to the Lobby Discharge**

- On 8/27/25, my daughter did not receive her scheduled medicine in the evening (the "Missed Medication Dose").
- The following morning (8/28/25 at 9:27am), I receive a call from Nurse 1 (from phone number 828-213-4055) that notifies me of the Missed Medication Dose. I ask nurse 1 for something in writing to memorialize this, and I want reassurance that whatever caused the missed medication won't happen again. I want to know WHY the dose was missed, because that seems impossibly negligent in any medical setting, but especially in an acute stabilization inpatient psychiatric setting, and especially for an autistic minor who is unlikely to request the medicine on her own.
- The call lasted 9 minutes and was concluded when Nurse 1 hung up on me without finishing our conversation.
- I subsequently receive a phone call from Nurse 2 at 9:53am (from phone number 828-213-5227). I'm concerned about not receiving any further information, so I decided to record the call. This is my first time ever touching the 'record button' on my cell phone and then the phone system audibly states "You are now recording the conversation." I did not know that 'alert' would be coming but I do know it's legal for me to record that call. Nurse 2 asks if I'm recording the call and I say Yes.
- Nurse 2 hangs up on me too. No one is willing to go on the record about my child not getting medicine.
- Then a few hours later, I have an in-person family appointment at Sweeten Creek with you, a therapist named Michael, my child and me ("The Family Appointment"). Michael's discussion with my child was very effective as we were able to talk about her return to in-person school. He walked through a number of ideas, asked a lot of great questions and offered several suggestions, and was able to engage with her in a productive way.
- In this meeting, but without my daughter present, I mention a number of concerns about the quality of care that children receive in this system, especially those children who do not have parents advocating for them on a nonstop basis. I'm observing a number of problems, and I consider myself a vigilant parent – I am beyond uncomfortable about how a child may be treated if they are in the social services program (which many are) or otherwise have parents or guardians who are not able to be fierce advocates.

Note to all HCA or HCI employees viewing this document. This document contains facts about the treatment of autistic minor. Please carefully review the section contained herein titled "HCA Healthcare Code of Conduct, Required Reportability and The Concept of Regenerative Liability."

- I mention my experiences in the Mission ER with my daughter not being offered showers for 4 days.
- I mention that I personally observed a situation where the ER staff was unable to locate a child (not my child) for approximately 15 minutes. The parents arrive in lobby of ER1 to meet their child who had been transported to the ER, the child had been in the ER for over an hour, but staff could not locate the child, all of which forced me to wait in the lobby of ER1 while I told my daughter I was just getting us a snack and I'd be back quickly. The mother of this child was labeled as "aggressive" by staff and I quickly stepped in to defend her (see Exhibit E to this information package).
- In the meeting, I mention the fact that I'm considering starting a social media campaign called "WTF Mission" to highlight issues I'm seeing. Michael takes note of this on a sheet a paper, in what I think would have been the upper right-hand corner of that sheet of paper. So that is in the file somewhere.
- I let you know that I had connections with City Council because I am an affordable housing developer.
- I mentioned that I thought the real issue with the hospital is that they are basically not enough people working there. I let you know that I am the kind of person who is willing to push for what I think is right.
- You tried to shift the conversation to the closure of smaller hospitals in WNC. I recall thinking that maybe someone told you to say that, because it did not come across as authentic in your communication.
- The next call I receive is at 4:09pm from Nurse 3. I'm still not getting answers. She's persistent that I had an opportunity to discuss this with you in person earlier that day and I should just be satisfied with that. It was odd.
- Nurse 3 tries to intimidate me by mentioning that I made Nurse 2 feel "uncomfortable" by trying to record the call. I made it clear that I did not care about the nurse's feelings at all, or anyone else's feelings other than my child's for that matter.
- I told Nurse 3 that if anyone was "uncomfortable" it was probably my daughter as a result of not getting her scheduled medicine. At this point, what I am learning about Mission is that when something goes wrong, they try and turn the table and make you feel like YOU are doing something wrong - that mother in the lobby is "aggressive," Charge Nurse Jonathon tells me my behavior is "disturbing," now I've got Nurse 3 telling me that I am "making people uncomfortable.'
- Nurse 3 mentions that the Missed Medication Dose would be entered into the medical record and that will serve as the written record of the Missed Medication Dose. She tells me how to obtain the medical record, and I tell her that I understand how the medical record can't be made available immediately and there is a process to that and I will go through this process. This part of the conversation made sense to me.

Note to all HCA or HCI employees viewing this document. This document contains facts about the treatment of autistic minor. Please carefully review the section contained herein titled "HCA Healthcare Code of Conduct, Required Reportability and The Concept of Regenerative Liability."

- The call lasts 11 minutes, Nurse 3's responses are unsatisfactory, and my final words are "I will be in touch" and I hang up.
- Thirty seconds after completing the call with Nurse 3, I learned that Nurse 3 is not a nurse but is rather the Mission Hospital Chief Operating Officer Melina Arrowood, who had misrepresented her role in the hospital system.
- I found it very peculiar that the C-suite was now involved.
- The next morning, my daughter's discharge is scheduled for 10am. I arrive at approximately 9:40am, I check in and wait in the lobby.
- At 10am, my daughter arrives in the lobby escorted by Nurse 4 (male, Caucasian, in his 30's) and Nurse 5 (female, Caucasian, in her 30's). I am shocked by this because I know discharges don't normally happen in the lobby.
- I verbalize to my daughter that I'm so surprised she is up here and that it's different than last time. The reason I had these expectations is because I have been part of a prior Sweeten Creek discharge. The words I say to my child can be heard by the two nurses. I'm thrilled to see my daughter and she's smiling and ready to go, but I'm knowing something feels off.
- Nurse 4 leads The Lobby Discharge. All 4 of us (me, child, Nurse 4, Nurse 5) are in a standing position the whole time. We are not offered to sit down. Nurse 4 leads the appointment, talks fast, appears nervous, and it's like he is trying to push us out the door. There is no table or flat surface to set the paperwork on. The male nurse has the papers fumbled around, is talking fast, and pointing at different things.
- I ask the male nurse something to the effect of "Do you guys typically do this up here in the lobby?" He stumbles and uses words that it's either 'quicker' or 'faster' or he may have said the words 'quicker and faster' or something like that. I'm knowing this is completely off but my daughter is smiling so I'm just rolling with it but knowing this is wrong and that the only "quicker and faster" way to conduct this meeting would be to do the discharges in the parking lot.
- He mentions that they do have other rooms available but does not specifically offer one. Even if they did offer one, that would then mean my daughter has to go back into the building and at this point she can literally see the exit and is ready to leave, understandably.
- Immediately following the mention of 'quicker/faster' I make direct and intense eye contact with the Nurse 5 to express my concern but without my daughter being able to notice. She tries to smile to shake it off, but she was startled and visibly shaken by my directness.
- The appointment lasted approximately 3-4 minutes and did not contain a Patient Safety Plan or any discussion of one.

Note to all HCA or HCI employees viewing this document. This document contains facts about the treatment of autistic minor. Please carefully review the section contained herein titled "HCA Healthcare Code of Conduct, Required Reportability and The Concept of Regenerative Liability."

- There were multiple strangers present The Lobby Discharge, but the main one was a white female, around 60 years old, sitting with crossed legs, briskly flipping through a magazine, noticeably not wearing hospital credentials or a visitor badge, sitting maybe 4 feet away while we stood there. The two nurses were incredibly comfortable speaking about my daughter's mental health in front of this woman.
- Nurse 4 concludes the appointment by asking "is there anything else you need?" and I responded that "the only thing we NEED is to have a bunch of fun this weekend!" My daughter smiled, I placed my arm around her, and we left. Nurse 4 smiled. The complete stranger in our Lobby Discharge Group also smiled.
- Internally, I was absolutely not smiling because I knew this was retaliation for me asking a lot of questions about my daughter's care and highlighting the fact that I may let a broader group of people know about my experiences (through the WTF Mission social media campaign).
- All of this is recorded on video and memorialized on paper.
- I called Melina and left a message that I had questions about the Lobby Discharge. She did not return my call.

**Facts Relating to No Personal Safety Plan**

Personal Safety Plan for my child from her prior discharge at Sweeten Creek on February 14, 2025

> **Personal Safety Plan**
> What makes you angry/upsets/cause crisis: Being forced to do something, Being threatened, My behavior lied about, Yelling, Other: being separated from family
> People I call to help me cope: mom and dad
> People/social setting that can distract: stuffed animal
> Strategies for making environment safe: Other: medications and sharps are already locked away at home
> Makes life worth living/important to me: Koda
> Signals of distress lose control/upset: Agitation, Anxiety, Hurting others, Injuring self, Mood swings
> Calming strategies: Do artwork (paint, draw), Call friend/family member, Exercise, Listen to music, Read a book, Take a shower, Watch TV, Go for a walk with staff, Write in a journal

Note to all HCA or HCI employees viewing this document. This document contains facts about the treatment of autistic minor. Please carefully review the section contained herein titled "HCA Healthcare Code of Conduct, Required Reportability and The Concept of Regenerative Liability."

Warren's Personal Safety Plan for my child's discharge from Sweeten Creek on August 29, 2025

**Personal Safety Plan**
What makes you angry/upsets/cause crisis: Unable to Assess
People I call to help me cope: unable to assess
~~people/social~~ setting that can distract: unable to assess
~~strategies~~ for making environment safe: Other: unable to assess
~~life is~~ worth living/important to me: unable to assess
~~in distress~~ lose control/upset: Unable to Assess
~~strategies:~~ Unable to Assess

There was No Patient Safety Plan in The Lobby Discharge. Nothing discussed and nothing in writing.

## Framework For Appropriate Discharge Policies Established by Centers for Medicare & Medicaid Services (CMS) and The Joint Commission (TJC)

- CMS and TJC are fully aligned on discharge standards for autistic minors with a history of suicidality being discharged from acute inpatient psychiatric facilities.
- CMS and TJC tell us that discharges must be individualized, safe, developmentally appropriate, and adherent to well-established procedural protocols.
- The breaches and deviations from protocol are numerous in this situation.
- I'm not going to spend 5 pages outlining each technical failure, but trust me that I now understand the applicable CMS and TMJ standards on a granular level.
- The essence of all of this is that you discharged a suicidal autistic child in a 3-minute appointment while standing in the lobby with other people around and never included a personal safety plan – is any of that inaccurate?
- On their own, conducting The Lobby Discharge and the No Patient Safety Plan are colossal problems if they were accidents of some kind. But this was no accident.
- This. Was. All. On. Purpose.
- That delineation is what sends this to a different kind of crisis. Moral implications, reporting requirements, medical license considerations, C-suite conduct, retaliation, conspiracy – all of this procedurally deviating behavior towards a child that you're supposed to be caring for.

Note to all HCA or HCI employees viewing this document. This document contains facts about the treatment of autistic minor. Please carefully review the section contained herein titled "HCA Healthcare Code of Conduct, Required Reportability and The Concept of Regenerative Liability."

- This breed of Sentinel Event will stand out within the universe of Sentinel Events because of its purposeful nature and C-suite involvement.

## Outline of Complaints to NC Medical Board and The Joint Commission

- Sign and return Exhibit B prior to Wednesday October 22, 2025 at noon (acknowledgement of receipt of this notice). If I do not receive the signed Exhibit B on time, I am beginning the complaint processes with the NC Medical Board (Exhibit C) and The Joint Commission (Exhibit D).
- The processes are very simple. I will fill out the requisite online forms and then subsequently provide a copy of this information package.
- The Joint Commission will likely consider this matter a Sentinel Event – not for the harm, but for the fact The Lobby Discharge and No Patient Safety Plan were purposeful, involved an autistic child with a background of suicidality, in an adolescent acute stabilization setting, with direct involvement from the hospital C-suite, and directly as a result of parent advocacy – that is crazy combination of issues.

## Outline of Claims and Venues

- These are credible claims that are actionable in a short amount of time.
- Limited discovery is needed, this is incredibly straightforward, the issues at hand are essentially not debatable, and I want to be in front of a jury as quickly as possible.
- It will be very easy for a jury to understand this case, and it won't take long either.
- For the lawsuits, I'm going to hire one attorney to help me with drafting and procedural matters. I'm going to handle everything else myself.
- I'm also going to hire one legal expert to outline for the jury all formal discharge protocols and patient safety plan protocols for autistic children from inpatient acute stabilization facilities discharge practices in North Carolina and the United States.
- I already know what they are going to tell me. What I don't know is what you can do to conceivably discredit what this person will say? They could literally just read the policies direct from CMS and Joint Commission and that's all that's needed. What's the plan to examine this witness? What's the theme your series of questions? What could it possibly be?
- This will be a short trial, not more than a couple days.

Note to all HCA or HCI employees viewing this document. This document contains facts about the treatment of autistic minor. Please carefully review the section contained herein titled "HCA Healthcare Code of Conduct, Required Reportability and The Concept of Regenerative Liability."

**Willful and Wanton Conduct**

- After my attempt to record the Nurse 2 phone call because of my daughter not receiving her medicine and being hung up on by Nurse 2, all future events represent purposeful, willful, and wanton conduct by you and others. Everything prior was conceivably just a serious of bad accidents. Everything after was on purpose.
- You and Melina definitely communicated. The reason I know this is that she told me you did. You worked directly with the C-suite to make things happen the way they did. Or, let's look at the opposite scenario – in that case, you didn't communicate with Melina at all, so you have to take exclusive ownership of The Lobby Discharge and No Patient Safety Plan.
- Warren, you signed the discharge paperwork at 10:06am. You were right there in the building. You were sitting somewhere waiting for Nurse 4 and Nurse 5 to come back to tell you what happened. When they told The Lobby Discharge was complete, you signed off. The medical records are timestamped with your name all over them. You hid out somewhere in the building instead of conducting this discharge appointment in a proper manner.

**Causes of Action - Buncombe County Superior Court**

- Medical Malpractice / Professional Negligence
- Negligence
- Negligent Infliction of Emotional Distress (NIED)
- Intentional Infliction of Emotional Distress (IIED)
- Invasion of Privacy / Public Disclosure of Private Facts
- Breach of Fiduciary Duty / Breach of Confidentiality
- Violation of North Carolina Patients' Bill of Rights (N.C. Gen. Stat. § 131E-117)
- Professional Misconduct (N.C. Gen. Stat. § 90-14)
- Civil Conspiracy
- Negligent Supervision
- Breach of North Carolina Mental Health, Developmental Disabilities, and Substance Abuse Act (10A NCAC 27C .0102 et seq.)
- Failure to Report / Duty to Report (N.C. Gen. Stat. § 90-14(a)(6))
- Negligent Communication of Medical Information
- Violation of North Carolina Disability Rights Act

**Causes of Action - Western District of North Carolina Federal Court**

- Violation of the Rehabilitation Act of 1973, § 504 (29 U.S.C. § 794)
- Violation of the Americans with Disabilities Act (ADA, 42 U.S.C. § 12203)

Note to all HCA or HCI employees viewing this document. This document contains facts about the treatment of autistic minor. Please carefully review the section contained herein titled "HCA Healthcare Code of Conduct, Required Reportability and The Concept of Regenerative Liability."

- Civil Rights Conspiracy (42 U.S.C. § 1985(3))

**Evidence Preservation Notice:**
- In anticipation of potential litigation, you are under an obligation to preserve all documents and information related to this matter.
- You must take affirmative steps to prevent the deletion, alteration, or destruction of any such materials, whether in hard copy or electronic form.
- This includes suspending any routine document destruction policies, auto-deletion settings, and ensuring that relevant employees and IT personnel are notified of this hold.
- Failure to comply with this preservation demand could result in legal consequences, including but not limited to spoliation sanctions.
- If you believe that any potentially relevant materials may be subject to automatic deletion or destruction, please notify me immediately so that we can discuss necessary preservation steps.
- If you believe any other parties may have deleted or modified information that you would otherwise have access to, you are to inform me of the relevant details.
- To ensure that all potentially relevant documents and communications are maintained, I demand that you immediately take all necessary steps to preserve the following materials listed on Exhibit A. To the extent the available information occurred verbally, I request that you take detailed notes regarding your recollection of those conversations.
- To confirm that you are complying with this Litigation Hold Notice, please fill out and return Exhibit B to me by Wednesday

**Insurance Notification**

- You are hereby instructed to provide immediate written notice of this litigation hold to all insurance carriers that may provide coverage for the claims and issues described herein, including but not limited to general liability, directors and officers liability, professional liability/medical malpractice, directors and officers liability, and any other applicable insurance policies.
- You must ensure that your insurers are made aware of the potential claims so that they may take appropriate action to preserve coverage and fulfill their duties. In Exhibit B, please confirm in writing that such notice has been provided.

**My Daughter Wants to Be Deposed and Wants to Testify**

Note to all HCA or HCI employees viewing this document. This document contains facts about the treatment of autistic minor. Please carefully review the section contained herein titled "HCA Healthcare Code of Conduct, Required Reportability and The Concept of Regenerative Liability."

- I have explained some of these issues to my daughter and tried to clarify to her that she would never have to testify or speak to anyone and that I would handle everything. She is very upset at that notion and wants to talk.
- Don't for one second think this is some kind of veiled threat or that I have somehow put her up to this – don't disrespect me by thinking that.
- My daughter is a fierce advocate for the disadvantaged, she knows this was very wrong, and wants to prevent it from happening to other children.
- The Madson Family takes advocacy very seriously. My parents ran a group home for abused teenage girls out of their personal residence. Some of my earliest memories of my father were when I was 4 years old, we would sometimes drive this one particular homeless man around to different places he needed to go, and my dad would typically detour the trip to go through the McDonald's drive thru to get this man some food.
- By prosecuting this matter, I'm honoring my parents' legacy as advocates for the disadvantaged who get personally entrenched in solutions.

**HCA Healthcare Code of Conduct, Required Reportability and The Concept of Regenerative Liability**

In the HCA Healthcare Code of Conduct (which you have reviewed and signed), CEO Sam Hazen tells all employees:

> If you have questions regarding our Code of Conduct or encounter any situation that you believe violates provisions of it, you should immediately consult your supervisor, another member of management at your facility, your Facility Human Resources Business Partner, your Facility Ethics and Compliance Officer, the HCA Healthcare Ethics Line (1-800-455-1996 or http://hcahealthcareethicsline.ethix360.com), or the Corporate Ethics and Compliance Officer. You have my personal assurance there will be no retribution for asking questions or raising concerns about the Code or for reporting possible improper conduct. No code of conduct can substitute for each person's own internal sense of fairness, honesty, or integrity. If you encounter a situation or are considering a course of action that does not feel right, please discuss the situation with any of the resources mentioned above.

The report contains the following:

Note to all HCA or HCI employees viewing this document. This document contains facts about the treatment of autistic minor. Please carefully review the section contained herein titled "HCA Healthcare Code of Conduct, Required Reportability and The Concept of Regenerative Liability."

### *Personal Obligation to Report*

We are committed to ethical and legal conduct that is compliant with all relevant laws and regulations and to correcting wrongdoing wherever it may occur in the organization. Each colleague has an individual responsibility for reporting any activity by any colleague, physician, subcontractor, or vendor that appears to violate applicable laws, rules, regulations, accreditation standards, standards of medical practice, federal healthcare conditions of participation, or this Code. If a matter that poses serious compliance risk to the organization or that involves a serious issue of medical necessity, clinical outcomes or patient safety is reported locally, and if the reporting individual doubts that the issue has been given sufficient or appropriate attention, the individual should report the matter to higher levels of management or the Ethics Line until satisfied that the full importance of the matter has been recognized. If a matter that poses concern regarding the safety or quality of care provided to a patient in the hospital is identified and was reported locally but thought to be unresolved, an additional avenue for reporting is available through notification to The Joint Commission. There will be no retaliatory disciplinary action taken against an employee who reports concerns to The Joint Commission.

- The events outlined in this notice certainly qualify for required reporting. That is not up for debate.
- If you are an employee or HCA or HCI and you are reading these words, you now have a duty to report this incident. You must follow the guidelines exactly as written.
- A full copy of the Healthcare Code of Conduct is attached as Exhibit F for further review.
- After the Lobby Discharge, I stayed up for 2 days with no food or sleep having become very focused on all of this. One of the things on my mind was this concept, which I have named "regenerative liability" over the last month or so.
- The Personal Obligation to Report applies to all employees, so everyone with knowledge has to take it 'at least one step up' in terms of reporting it to a more senior employee or manager, etc.
- The key issue is that senior employee who receives the issue from a subordinate, that person has to make sure the issue is either satisfactorily resolved, sent up to a more senior employee, or sent to The Joint Commission.
- If an employee answers the HCA Healthcare Ethics Line at 1-800-455-1996, that employee has the exact same obligation to report.
- If everyone follows the rules, CEO Sam Hazen will have to notify The Joint Commission himself. That is not a sarcastic proposition. In order to comply with this Litigation Hold Notice, this notice will circulate within the corporate hierarchy. Every employee has to report to management. If CEO Sam Hazen sees this, he has to report – there is no higher manager, so it has to go to The Joint Commission – it's the next step in his own words.
- If there is a conference call with a dozen people on it trying to figure out what to do with this letter, all 12 people have to report this as a result of the call.

Note to all HCA or HCI employees viewing this document. This document contains facts about the treatment of autistic minor. Please carefully review the section contained herein titled "HCA Healthcare Code of Conduct, Required Reportability and The Concept of Regenerative Liability."

- Any failures to report this matter represent a new, automatous compliance breach by each person. Multiple failures to report would become evidence of a systemic coverup.
- If you are an HCA or HCI attorney, Regenerative Liability creates state bar ethics considerations. I also have a question about whether attorney-client privilege would exist in this matter.
- If you are an HCA or HCI licensed medical professional, there are additional reporting requirements per the NC Medical Board.
- Warren, you now have an obligation to self-report and provide information about anyone else who may have been involved.

**Potential Deponti Liability Offsets**

- Your insurer has a 'duty to defend' you. You have paid a lot of insurance premium (or your employer has on your behalf which is the same thing) and that contractual relationship exists for times like this. If they do not take this seriously and do not follow up by taking immediate action on your behalf, you have a valid claim against the insurer. Your attorney can advise you further.
- The Department of Justice has whistleblower program for these kinds of matters. One that comes to mind is the recent DOJ Criminal Division Whistleblower Rewards Program. Pursuing the False Claims Act is worthy of consideration as well. Your attorney can advise you further.

**Pro Se / Special Note to the Insurer's General Counsel**

- I am not an attorney, I am not using an attorney to pursue these claims, and no attorney has reviewed this letter or assisted in its development. I am uniquely qualified to prosecute these claims on my own.
- For 12 years, I have provided real estate litigation consulting services. I purposefully do not advertise this service. My cases tend to have 4 components: 1. Involve real estate, 2. Involve ultra-high net worth borrowers have not repaid their loan obligations in a purposeful way (i.e. they likely have the means to repay but choose not to), 3. Greater than $5MM involved, and 4. The matter has potential to be conflict-heavy.
- I am an invisible hand in some of the most contentious real estate litigation in the country. In the last 60 days,
    - I won a verdict resulting in a $10MM personal judgment in Taylor County, Texas.
    - In a federal bankruptcy venue, I'm trying (and so far not failing) to invert creditor lien priority via equitable subordination, which is so rare that most bankruptcy professionals don't even know about it.

Note to all HCA or HCI employees viewing this document. This document contains facts about the treatment of autistic minor. Please carefully review the section contained herein titled "HCA Healthcare Code of Conduct, Required Reportability and The Concept of Regenerative Liability."

- o A Georgia borrower that I was pursuing was sentenced to 29 months incarceration after I seized his other assets last year, making him unable to settle another creditor claim, in which the other creditor took the matter to the FBI.
- We both know you've never received a litigation hold notice like this one and probably never will again. I promise this will continue to be an unconventional scenario for everyone involved. My daughter was certainly treated in an unconventional way.
- If you happen to work for HCI, I think the requirement to escalate this matter almost certainly applies to you. If you have signed the Healthcare Code of Conduct, then that is a sure thing. If someone at your company provided you with this document, or anyone else at HCI for that matter, then they have that obligation as well.
- I encourage you to follow the rules and report this matter to your superior. If the issue is not appropriately addressed, the next course of action is for you to report this issue to The Joint Commission.
- If you are a licensed attorney, there are state bar considerations for your resulting choices.

**I Am The Only Contact Person For This Matter**

- Bill Madson
- Cell Number 404-226-2040 (open to calls or texts)
- Email: bill@cliftontrust.com
- Mail: 33 Pheasant Drive – Asheville, NC 28803
- I am available for in-person meetings.
- The only option is to deal directly with me.
- Signed Exhibit B to me by Wednesday October 22, 2025 at 12pm EST.
- If I don't hear from anyone, I'm ready to get going in a more formal way.

Sincerely,

/s/ Bill Madson

Note to all HCA or HCI employees viewing this document. This document contains facts about the treatment of autistic minor. Please carefully review the section contained herein titled "HCA Healthcare Code of Conduct, Required Reportability and The Concept of Regenerative Liability."

## Exhibit A – List of Materials To Preserve

To ensure that all potentially relevant documents and communications are maintained, I demand that you immediately take all necessary steps to preserve the following materials listed on Exhibit A. To the extent the available information occurred verbally, I request that you take detailed notes regarding your recollection of those conversations. To confirm that you are complying with this Litigation Hold Notice, please fill out and return Exhibit B to me.

1. Your signed Acknowledgement Card for the HCA Healthcare Code of Conduct.
2. Your communications on the MH-CURE platform or similar internal communication system.
3. Notes about where you were physically located from 9:30am to 10:30am on August 29, 2025.
4. Your personal and professional cell phone records and text messages.
5. Your personal and professional email records including Deleted Items and Sent Items.
6. Any form of communication with Melina Arrowood aka Nurse 3.
7. Any form of communication with Greg Lowe.
8. Any form of communication with Matthew Perry.
9. Any form of communication or discussion with an attorney or a law firm, including attorneys that may be employed by or agents of HCA.
10. Any form of communication with Nurse 1.
11. Any form of communication with Nurse 2.
12. Any form of communication with Nurse 4.
13. Any form of communication with Nurse 5.
14. List of all HCA employees or agents who were present in the Sweeten Creek Mental Health Center Lobby at any time between 930am and 1030am on August 29, 2025.
15. List of all persons who knew about or had reason to know about The Lobby Discharge.
16. Security camera footage from the Sweeten Creek Mental Health Center Lobby from 930am to 1030am on August 29, 2025.
17. Copies of your privileges, scope of practice, and credentialing agreements with HCA that applied at the time of the discharge.
18. Any communications with the hospital's compliance department or risk management concerning the Madson Family.
19. Any form of electronic notetaking or handwritten note taking regarding the Madson Family.
20. All records, notes, charts, and electronic medical records (EMR) relating to the patient's admission, treatment, and discharge, including draft versions, edits, or amendments.
21. All patient safety plans or assessments.
22. Medication administration records and nursing notes from the date of treatment and discharge.

Note to all HCA or HCI employees viewing this document. This document contains facts about the treatment of autistic minor. Please carefully review the section contained herein titled "HCA Healthcare Code of Conduct, Required Reportability and The Concept of Regenerative Liability."

23. All records of physician orders and physician sign-offs related to the discharge process.
24. Copies of all hospital policies or protocols in effect at the time covering discharge of minors, discharge of autistic patients, discharge of acute stabilization patients who had previously expressed suicidality, appropriate accommodations for a child with autism, psychiatric discharges, and patient safety plans.
25. Any notice to or from your malpractice insurer regarding this patient or this incident.
26. EMR audit logs showing who accessed, modified, or signed the records related to this patient.
27. Time-stamped login records showing your (and others') involvement in the file.
28. Any incident reports, unusual occurrence reports, or risk management reports filed about the Madson Family.

Note to all HCA or HCI employees viewing this document. This document contains facts about the treatment of autistic minor. Please carefully review the section contained herein titled "HCA Healthcare Code of Conduct, Required Reportability and The Concept of Regenerative Liability."

## Exhibit B – Acknowledgment of Receipt of Litigation Hold Notice and Madson Family Matter Information Package

I acknowledge that I have received and reviewed the Litigation Hold Notice dated October 17, 2025 concerning the matter referenced above.

My professional liability insurance coverage is provided by:

_____

[list all insurance companies]

I understand that:

1. I am required to preserve all documents, records, communications, and data (including electronic materials) that may relate to the issues identified in the Notice.

2. I must suspend any routine destruction or deletion of such materials until further written notice.

3. I must inform you if I have firsthand knowledge of any Exhibit A materials having been destructed or deleted by others.

4. I must notify any insurance companies that provide professional liability insurance coverage to me.

5. If I have questions about what must be preserved or how to comply, I will promptly seek clarification from the sender.

**Signature:** _____

**Printed Name:** _____

**Date Signed:** _____

Note to all HCA or HCI employees viewing this document. This document contains facts about the treatment of autistic minor. Please carefully review the section contained herein titled "HCA Healthcare Code of Conduct, Required Reportability and The Concept of Regenerative Liability."

## Exhibit C – NC Medical Board Complaint Checklist

**NORTH CAROLINA MEDICAL BOARD**

### Complaint Checklist

The following checklist is designed to assist complainants with collecting the necessary materials needed during the NCMB complaint filing process.

| Status | Item | Notes |
|---|---|---|
| ☐ | **Contact information for person filing complaint** | Your full name, address, daytime telephone number and your email address |
| ☐ | **Patient Contact information** | Patient name, their date of birth, and the relationship to the patient |
| ☐ | **Practitioner/Respondent Information** | <ul><li>Practitioner's full name</li><li>their license type (MD, DO, PA, LP, AA, or *NP)</li><li>their primary area of practice (i.e., Cardiology, Neurology, etc.)</li><li>their specialty (i.e., Congenital heart specialist, Epilepsy)</li><li>their phone number</li></ul> |
| ☐ | **Incident Information** | Concise account of your major concern related to the licensee listed on your complaint form along with general event questions. Specific information needed includes: <ul><li>Date or timeframe of occurrence</li><li>Full name and address of practice or hospital where the event occurred</li></ul> |
| ☐ | **Medical Records** | Names, addresses, phone/fax numbers for any other health care provider, facility, clinic, or hospital you reference in the complaint |

Note to all HCA or HCI employees viewing this document. This document contains facts about the treatment of autistic minor. Please carefully review the section contained herein titled "HCA Healthcare Code of Conduct, Required Reportability and The Concept of Regenerative Liability."

## Exhibit D – Joint Commission Safety Event Form



Note to all HCA or HCI employees viewing this document. This document contains facts about the treatment of autistic minor. Please carefully review the section contained herein titled "HCA Healthcare Code of Conduct, Required Reportability and The Concept of Regenerative Liability."

## Exhibit E – Events Preceding The Minor's Admission into Sweeten Creek

- Warren, nothing contained in this section directly involves you. I'm not making any claims against you for these events because she was certainly not in your care at this time. The items here only to provide background and context of the Madson Family's experience leading up to Sweeten Creek.
- My child was a patient in the Mission ER for the 5 days preceding her time at Sweeten Creek.
- For the first 4 days, my daughter was not offered a shower. Charge Nurse Jonathon would later tell me that protocol was to offer a shower every day. The child's mother and I were in the room with the child nearly the entire time. Further, my child has full recollection that she was in fact never offered a shower until I escalated my concerns within the staff.
- There is a shower inside the green pod unit and it was never offered to my daughter until I started asking tons of questions of the staff.
- There was a repeated inability to have any information at all about a transfer to Sweeten Creek. In front of my daughter, a physician assistant told her "I think it would be today" and he was checking. It was 3-4 more days before she was transferred.
- On Saturday August 23, 2025 around 1pm, my daughter became upset in the ER. I told her I was going to get her a snack. I had a 15-20 minute delay in returning to help her get settled, because I could not get back through the lobby.
- The reason I could not get back to my daughter was that the front lobby at ER1 was congested because two parents were trying to visit their son who had been in the ER for at least one hour according to them. The front desk was unable to locate this child within the ER system. There was panic among the front desk employees. This is all happening while the mother is on the phone with her son, who is back in the ER. One employee suggests that the mother ask her son for more information or an identifying feature of where he is so that he can help the hospital staff find him.
- The mom becomes understandably upset but is told that she is being "aggressive" and may be asked to leave the premises. She is directed to a large sign that talks about the consequences of "aggressive behavior" in this medical system.
- I felt a moral responsibility to stand up for this family and I did just that. I immediately interject and said in an assertive tone that this woman is not being aggressive, she is very upset and for good reason because you can't find her child and that child is in your care. I referred to the hospital as 'completely dysfunctional.' Security personnel approach me, and I don't care. I'm looking them all in the eye and telling them all exactly what's going on and why it's inappropriate. This is all on lobby security footage at ER1.

Note to all HCA or HCI employees viewing this document. This document contains facts about the treatment of autistic minor. Please carefully review the section contained herein titled "HCA Healthcare Code of Conduct, Required Reportability and The Concept of Regenerative Liability."

- I'm wanting to push this even further, but I'm also having to balance the fact that my child is waiting for me and I might get kicked out if I continue my advocacy for this family. If I get kicked out, my child would be there alone and I have firsthand in-the-moment knowledge that sometimes the hospital cannot even locate the children who don't have a parent on site – because I am watching it happen in front of me in real time while they can't find this child that they are charged with caring for.
- The totality of my experience led to Charge Nurse Jonathon who escalated the matter with a Patient Experience Manager at the hospital. The three of us had a 20-30 minute meeting. The Patient Experience Manager took no notes, I asked her if she simply memorized everything I said and she said "yes."
- During this conversation, Charge Nurse Jonathon represented that my behavior was "disturbing." I told him those children in his adolescent psych unit not being offered showers is "disturbing." And that the ER not being able to locate the child from the front lobby experience is "disturbing." Me? I am not disturbing, but I am relentless, loud, direct, and in search of conflict when I think morally inappropriate stuff is going on, especially with children involved.
- I repeatedly tell these two people in our meeting that there are clearly not enough people working at this hospital and that's effectively the source of every problem I've had. I also repeatedly tell them that I think the employees are victims of their employer because of how everything is being operated.
- The medical record was constructed to record my concerns in a bizarre way, in fact implying that my suggestion would have been to forcibly hold my daughter down to take a shower, see below:

Upon later emergence from room, father accusatory stating "no one has given Fiona a shower in 4 days". Initially spoke with trainee nurse who stated she did not know where the shower was, which was reported to upset father, but trainee then came straight to get primary/supervising RN(this writer) to obtain answer. This RN explained to father that shower was readily available within unit for patient to use, in same restroom she has been using for other toileting and hygiene needs without incident through out her stay and that staff could provide shower materials such as towels, wash cloths at her request. These items were retrieved for patient and RN went to room to initiate process with Fiona. Fiona states she did not request this nor does she want to shower today. RN informed Fiona that we would have shower materials ready for her if/when she decides she would like to shower in future and Fiona said thank you. Father remained crossed arms and looking away from RN for interaction

After our conversation I did discuss with this with his RN and found out that the patient was offered showers and she refused. I agreed with his nurse that it was inappropriate for somebody to force a shower or hold her down and give them a bath wipe. |The pt's ||RN also had a conversation with the father reportedly about the patient refusing to shower.

- She didn't want to take a shower when she was finally offered on day 4, but the above verbiage is patently insane and intentionally deceptive. I was never suggesting that anyone hold my daughter down to take a shower – that is ridiculous. I was mad because

she was not OFFERED a shower, ever, until I start telling everyone within an earshot of me.

- One thing the medical record does clarify that the in-unit nurse did not even know where a shower was, despite the fact that it was located less than 10 feet away.
- The in-unit nurse is the in-unit nurse as a trainee, but when I approached her, she was the only available person in the unit. How could a trainee possibly be allowed to be the sole responsible party in the adolescent psych unit when there are at least 6 children in the unit? This is the adolescent psych unit of a major hospital, and a trainee – who had apparently never walked around the unit before (because she didn't know where the shower was) – was temporarily in charge of the unit. To me, that is, to borrow Charge Nurse Jonathon's words, "disturbing."
- Around the time of the meeting with Charge Nurse Jonathon and the Patient Experience Manager, I have a conversation with a nurse (female, African American, approximately 60 years old, wore a purple nurse's uniform) about how I don't like how children are being treated here and I feel exceptionally sad for the kids that are in the social services system or don't have parents that can fight on their behalf. I began to cry, and she put her hand on her shoulder to comfort me.
- My child was subsequently transferred to Sweeten Creek.

Note to all HCA or HCI employees viewing this document. This document contains facts about the treatment of autistic minor. Please carefully review the section contained herein titled "HCA Healthcare Code of Conduct, Required Reportability and The Concept of Regenerative Liability."

**Exhibit F – HCA Healthcare Code of Conduct**

# HCA Healthcare Code of Conduct

Dear Colleague,

At HCA Healthcare, we have a comprehensive, values-based Ethics and Compliance Program, which is a vital part of the way we conduct ourselves. Because the program supports our mission and values, it has been incorporated into our daily activities in our tradition of caring for our patients and how we treat each other. We strive to deliver healthcare compassionately and to act with absolute integrity in the way we do our work and the way we live our lives. This program plays a huge part in our achieving these objectives.

Our Code of Conduct provides guidance to ensure our work is done in an ethical and legal manner. It also emphasizes common values and the culture we share. The Code contains resources to help resolve any questions about conduct in the workplace. Please review it thoroughly. Your adherence to its spirit, as well as its specific provisions, is absolutely critical to our success.

If you have questions regarding our Code of Conduct or encounter any situation that you believe violates provisions of it, you should immediately consult your supervisor, another member of management at your facility, your Facility Human Resources Business Partner, your Facility Ethics and Compliance Officer, the HCA Healthcare Ethics Line (1-800-455-1996 or http://hcahealthcareethicsline.ethix360.com), or the Corporate Ethics and Compliance Officer. You have my personal assurance there will be no retribution for asking questions or raising concerns about the Code or for reporting possible improper conduct. No code of conduct can substitute for each person's own internal sense of fairness, honesty, or integrity. If you encounter a situation or are considering a course of action that does not feel right, please discuss the situation with any of the resources mentioned above.

We have a rich heritage at HCA Healthcare that is reflected in our Mission and Values Statement and in our Code of Conduct. We are committed to assuring our actions consistently reflect our words. In this spirit, we want our organization to be a community of shared values, and I expect all of our colleagues' actions to reflect the high standards set forth in our Code. Thank you for bringing our values to life as you live out our commitment to the care and improvement of human life.

Sincerely,

Sam Hazen
Chief Executive Officer

# CONTENTS

**Mission and Values Statement**

**Purpose of our Code of Conduct**

**Code of Ethics for Senior Financial Officers and the Chief Executive Officer**

**Leadership Responsibilities**

**Our Fundamental Commitment to Stakeholders**

**Patients**

>   *Quality of Care and Patient Safety*
>
>   *Patient Rights*
>
>   *Patient Information*
>
>   *Emergency Treatment*

**Physicians**

>   *Interactions with Physicians*
>
>   *Extending Business Courtesies and Tokens of Appreciation to Potential Referral Sources*

**Legal and Regulatory Compliance**

**Accreditation and Surveys**

**Business and Financial Information**

>   *Accuracy, Retention and Disposal of Documents and Records*
>
>   *Coding and Billing for Services*
>
>   *Confidential Information*
>
>   *Cost Reports*
>
>   *Electronic Media*
>
>   *Financial Reporting and Records*
>
>   *Intellectual Property Rights and Obligations*

**Workplace Conduct and Employment Practices**

>   *Conflict of Interest*
>
>   *Controlled Substances*
>
>   *Copyrights*
>
>   *Corporate Opportunities*
>
>   *Equal Employment Opportunity*
>
>   *Government Contracting*
>
>   *Harassment and Workplace Violence*
>
>   *Health and Safety*
>
>   *Hiring of Former and Current Government and Fiscal Intermediary/Medicare*

    *Administrative Contractor Employees*

    *Ineligible Persons*

    *Insider Information and Securities Trading*

    *License and Certification Renewals*

    *Personal Use of HCA Healthcare Resources*

    *Relationships Among HCA Healthcare Colleagues*

    *Relationships with Subcontractors and Suppliers*

    *Research, Investigations, and Clinical Trials*

    *Substance Abuse and Mental Acuity*

**Competitive Activities and Marketing Practices**

    *Antitrust and Unfair Competition*

    *Marketing and Advertising*

    *Global Anti-Corruption*

**Environmental Compliance**

**Responsible Artificial Intelligence (AI)**

**Business Courtesies**

    *General*

    *Receiving Business Courtesies*

    *Extending Business Courtesies to Non-referral Sources*

**Government Relations and Political Activities**

    *Public Policy*

    *Political Activities*

    *Political Contributions*

    *Conduct with Public Officials*

**The Company's Ethics and Compliance Program**

    *Program Structure*

    *Setting Standards*

    *Training and Communication*

    *Resources for Guidance and Reporting Concerns*

    *Personal Obligation to Report*

    *Internal Investigations of Reports*

    *Corrective Action*

    *Discipline*

    *Measuring Program Effectiveness*

*Acknowledgment Process*

**Acknowledgment Card**

*This Code of Conduct is effective January 1, 2025.*

*Note: All references to "HCA Healthcare" or the "organization" in this Code of Conduct refer to HCA Healthcare, Inc. and/or its affiliates, as applicable.*

## Mission and Values Statement

Above all else, we are committed to the care and improvement of human life. In pursuit of our mission, we believe the following value statements are essential and timeless:

- We recognize and affirm the unique and intrinsic worth of each individual.
- We treat all those we serve with compassion and kindness.
- We act with absolute honesty, integrity and fairness in the way we conduct our business and the way we live our lives.
- We trust our colleagues as valuable members of our healthcare team and pledge to treat one another with loyalty, respect, and dignity.

## Purpose of Our Code of Conduct

Our Code of Conduct provides guidance to all HCA Healthcare colleagues and assists us in carrying out our daily activities within appropriate ethical and legal standards. These obligations apply to our relationships with patients, affiliated physicians, third-party payers, subcontractors, independent contractors, vendors, consultants, and one another.

The Code is a critical component of our overall Ethics and Compliance Program. We have developed the Code to ensure we meet our ethical standards and comply with applicable laws and regulations.

The Code is intended to be comprehensive and easily understood. In some instances, the Code deals fully with the subject covered. In many cases, however, the subject requires additional guidance for those directly involved with the particular area to have sufficient direction. To provide additional guidance, we have developed a comprehensive set of compliance policies and procedures which may be accessed on the Ethics and Compliance site of our Intranet, as well as our external web site at www.hcahealthcare.com. Those policies expand upon or supplement many of the principles articulated in this Code of Conduct.

The standards set forth in the Code apply to all HCA Healthcare facilities and employees operating in the United States. The standards are mandatory and must be followed. A separate Code of Conduct has been developed for our facilities outside the United States.

## Code of Ethics for Senior Financial Officers and the Chief Executive Officer

Under the Sarbanes-Oxley Act of 2002 and related Securities and Exchange Commission (SEC) rules, the Company is required to disclose whether it has adopted a written Code of Ethics for its Senior Financial Officers and the Chief Executive Officer (CEO). Any amendments to, or implicit or explicit waiver of, the Code of Ethics for Senior Financial Officers and the CEO must be publicly disclosed as required by SEC and New York Stock Exchange (NYSE) rules. "Senior Financial Officers" include, but are not limited to, facility, Division and Group Chief Financial Officers (CFOs) and controllers, and Corporate officers with financial accounting and reporting responsibilities, including the Executive Vice President and Chief Financial Officer. The Code must be reasonably designed to deter wrongdoing and to promote: honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships; full, fair, accurate, timely and understandable SEC filings and submissions and other public communications by the Company; compliance with applicable

5

governmental laws, rules and regulations; prompt internal reporting of violations of the Code; and accountability for adherence to the Code.

The CEO and all Senior Financial Officers are bound by all provisions of this Code of Conduct and particularly those provisions relating to ethical conduct, conflicts of interest, compliance with law, and internal reporting of violations of the Code. The CEO and all Senior Financial Officers also have responsibility for full, fair, accurate, timely and understandable disclosure in the periodic reports and submissions filed by the Company with the SEC as well as in other public communications made by the Company ("Public Communications"). Accordingly, it is the responsibility of the CEO and each Senior Financial Officer promptly to bring to the attention of the internal working group responsible for the review of the Company's periodic SEC reports ("Disclosure Committee") any information of which they may become aware that materially affects the disclosures made by the Company in its Public Communications. The CEO and each Senior Financial Officer also shall bring promptly to the attention of the Disclosure Committee any information they may have concerning significant deficiencies in the design or operation of internal controls which could adversely affect te company's ability to record, process, summarize and report financial data; or any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's financial reporting, disclosures or internal controls.

The Corporate Ethics and Compliance Steering Committee shall determine appropriate actions to be taken in the event of violations of the Code by the CEO and the Company's Senior Financial Officers. Such actions shall be reasonably designed to deter wrongdoing and to promote accountability for adherence to the Code. In determining what action is appropriate in a particular case, the Corporate Ethics and Compliance Steering Committee shall take into account all relevant information, including the nature and severity of the violation, whether the violation was a single occurrence or repeated occurrences, whether the violation appears to have been intentional or inadvertent, whether the individual in question had been advised prior to the violation as to the proper course of action and whether or not the individual in question had committed other violations in the past. The Corporate Ethics and Compliance Steering Committee must report periodically any actions taken pursuant to this paragraph to the Audit and Compliance Committee of the Board of Directors.

Any waiver of or amendments to the Code of Ethics for Senior Financial Officers and the CEO must be approved by the Audit and Compliance Committee of the Board of Directors and disclosed in accordance with SEC and NYSE rules.

## Leadership Responsibilities

While all HCA Healthcare colleagues are obligated to follow our Code, we expect our leaders to set the example, to be in every respect a model.

We expect everyone in the organization with supervisory responsibility to exercise that responsibility in a manner that is kind, sensitive, thoughtful, and respectful. We expect each supervisor to create an environment where all team members are encouraged to raise concerns and propose ideas.

We also expect that they will ensure those on their team have sufficient information to comply with laws, regulations, and policies, as well as the resources to resolve ethical dilemmas. They must help to create a culture within HCA Healthcare which promotes the highest standards of ethics and compliance. This culture must encourage everyone in the organization to share

6

concerns when they arise. We must never sacrifice ethical and compliant behavior in the pursuit of business objectives.

Specific guidance for leaders throughout the organization regarding their responsibilities under our Ethics and Compliance Program is available on HCA Healthcare's Ethics and Compliance Leadership Resources intranet site. Leaders at all levels of the organization should use that guidance to most effectively incorporate ethics and compliance into all aspects of our organization.

In addition, all leaders should be mindful that HCA Healthcare supports and utilizes various training mechanisms to ensure that our supervisors have excellent managerial skills. These training tools are coordinated by the Corporate Human Resources Department. The foundational principles in such tools reflect the basic concepts of our Ethics and Compliance Program. The Ethics and Compliance Program, together with our leadership training efforts, encourages what we refer to as "principled leadership." Such leadership assumes that those in our organization will lead by example, will confront problems directly and candidly, will be inclusive in making decisions as to who should participate in the decision-making process, will try to give the maximum responsibility to those who work with them, and will emphasize effective team-building. In addition to these fundamental approaches to principled leadership, we expect those in our organization to understand and care about their colleagues at work. Though HCA Healthcare is a large organization, its work is accomplished each day, for the most part, in small team settings. This encourages all leaders to try to ensure that the talents of each member of the organization are utilized to the maximum extent possible and that we give careful attention to the professional development of all of those within HCA Healthcare.

## Our Fundamental Commitment to Stakeholders*

We affirm the following commitments to HCA Healthcare stakeholders:

*To our patients:* We are committed to delivering high quality care for our patients and treating all we serve with compassion and kindness.

*To our HCA Healthcare colleagues:* We are committed to a work setting which treats all colleagues with fairness, dignity, and respect while offering opportunities to develop professionally and to work in a team environment.

*To our physicians:* We are committed to partnering with and empowering employed and affiliated physicians to deliver appropriate care and to guide advances in medicine across our network.

*To the communities we serve:* We are committed to helping build stronger, healthier communities. Whether it's through our time, making charitable donations or partnering with other organizations, at HCA Healthcare, we are driven by our desire to improve more lives in more ways.

*To our volunteers:* We are committed to ensuring volunteers connect to our collective mission and receive recognition for their selfless efforts. We value those who provide voluntary assistance to the needs of patients, colleagues and communities, and consider them part of the HCA Healthcare family.

7

**To our third-party payers:** We are committed to partnering with socially responsible third-party payers and we are uniquely prepared to meet the needs of health plan members. Our partnerships demonstrate our commitment to contractual obligations and our shared focus on high quality, efficient and economical healthcare.

**To our regulators:** We are committed to fostering an environment in which compliance with rules, regulations, and sound business practices is woven into the corporate culture. We accept the responsibility to aggressively self-govern and monitor adherence to the requirements of law and to our Code of Conduct.

**To our joint venture partners:** We are committed to fully performing our responsibilities to manage our jointly-owned facilities and initiatives in a manner that reflects the mission and values of our organizations.

**To our suppliers:** We are committed to fair competition among prospective suppliers and to cultivating and sustaining relationships that broaden our reach and deepen our understanding of the communities we serve.

We encourage our suppliers to adopt their own set of comparable ethical principles.

**To our shareholders:** We believe our shareholders support our Mission commitment to the care and improvement of human life. We are committed to making business decisions that support that Mission and, in turn, support our Shareholders. Our exceptional culture, high standards of disciplined, professional management and innovative approaches to healthcare create unique efficiencies to drive favorable returns for our sareholders' investments.

*The term "stakeholder" refers to those groups of indiviuals to whom an institution sees itself as having obligations.

## Patients

### Quality of Care and Patient Safety

We are committed to the delivery of high quality care for our patients and treating all we serve with compassion and kindness. This includes providing safe, effective, efficient, compassionate, satisfying and culturally competent healthcare to all our patients. We treat patients with warmth, respect, and dignity and provide care that is both necessary and appropriate. HCA Healthcare has a comprehensive program to promote the quality objectives of the organization. In promoting a high quality of care, HCA Healthcare facilities are focused on the attentiveness and dedication of service to patients; the utilization of evolving technology to ensure quality and patient safety and to create an overall culture that makes patient safety paramount; a comprehensive and effective approach to handling the issues of credentialing and privileging of members of the medical staff; and the creation of effective peer review mechanisms within the medical staff. As a general principle, HCA Healthcare strives for excellence for all caregivers within its facilities, including the entire facility team.

There are increasingly numerous measures that relate in some way to the quality of patient care. These include, for example, the Conditions of Participation of the Centers for Medicare and Medicaid Services (CMS), the standards and surveys of The Joint Commission, and the consensus measures of the National Quality Forum. HCA Healthcare is attentive to all of these

8

standards and seeks to establish systems that reflect the best practices required or implied by these various standard-setting efforts.

This commitment to quality of care and patient safety is an obligation of every HCA Healthcare colleague. Accordingly, it is a fundamental principle of being part of HCA Healthcare that each person dedicates themself to achieving the goals described here. In addition, in any circumstance where an HCA Healthcare colleague has a question about whether the quality or patient safety commitments set forth herein are being fully met, that individual is obligated to raise this concern through appropriate channels until it is satisfactorily addressed and resolved. Such channels include those established at the facility, and if necessary, beyond the facility, including the HCA Healthcare Ethics Line. In addition to the facility and HCA Healthcare channels, HCA Healthcare colleagues are provided resources and guidance as to how to solicit intervention or review by external quality partners including The Joint Commission, state survey agencies or state quality improvement organizations.

### Patient Rights

We comply with applicable federal civil rights laws and do not discriminate on the basis of age, gender, disability, race, color, ancestry, citizenship, religion, pregnancy, sexual orientation, gender identity or expression, national origin, medical condition, marital status, veteran status, payment source or ability, or any other basis prohibited by federal, state, or local law. We recognize and respect the diverse backgrounds and cultures of our patients and make every effort to equip our caregivers with the knowledge and resources to respect each patient's cultural needs.

Our facilities respect the patient's right to and need for effective communication. We strive to ensure that patients and/or their representatives have the information necessary to exercise their rights.

Each patient is provided with a written statement of patient rights and a notice of privacy practices. Whenever possible, this notice of patient rights is provided before providing or stopping care in a language or manner that the patient (or patient's representative) can understand. These statements include the rights of a patient to make decisions regarding medical care, the right to refuse or accept treatment, the right to informed decision-making, visitation rights of the patient or their support persons including the patient's right to consent to receive visitors and the right to withdraw or deny visitor consent at any time, and a patient's rights related to their health information maintained by the facility. Such statements conform to all applicable state and federal laws, including but not limited to the Health Insurance Portability and Accountability Act of 1996 (hereinafter referred to as HIPAA).

We seek to involve patients in all aspects of their care, including giving consent for treatment and making healthcare decisions, which may include managing pain effectively, foregoing or withdrawing treatment, and, as appropriate, care at the end of life. The hospital addresses the wishes of the patient relating to end of life decisions. As applicable, each patient or patient representative is provided with a clear explanation of care including, but not limited to, diagnosis, treatment plan, right to refuse or accept care, care decision dilemmas, advance directive options, estimates of treatment costs, organ donation and procurement, and an explanation of the risks, benefits, and alternatives associated with available treatment options. Patients have the right to request transfers to other facilities. In such cases, the patient is given an explanation of the benefits, risks, and alternatives of the transfer.

9

Patients have the right to refuse care, treatment, and services in accordance with the law and regulations. Facilities are expected to take reasonable steps to determine the patient's wishes concerning designation of a representative to exercise the patient's rights. The explicit designation of a representative takes precedence over any non-designated relationship.

Patients are provided information regarding their right to make advance directives regarding treatment decisions, financial considerations and the designation of surrogate healthcare decision-makers. Patient advance directives are honored within the limits of the law and our organization's mission, philosophy, values, and capabilities.

In the promotion and protection of each patient's rights, each patient and their representatives are accorded appropriate confidentiality, privacy, security, advocacy and protective services, opportunity for resolution of complaints, and pastoral care or spiritual care. Patients have the right to an environment that preserves dignity and contributes to positive self- image.

Visitation plays an important role in the care of patients, and HCA Healthcare facilities have written policies and procedures to ensure the visitor experience is a positive one for those in our care. If there are clinical reasons to limit or restrict visitation, our staff will explain those circumstances to the parties involved, and also will inform patients of their rights to consent to visitors or to limit contact while they are in our care. The well-being of our patient is at the center of our care model, and the same standards are applied to all those we serve, in accordance with our commitment to nondiscrimination.

Patients are treated in a manner that preserves their dignity, autonomy, self-esteem, civil rights, and involvement in their own care. HCA Healthcare facilities maintain processes to support patient rights in a collaborative manner which involves the facility leaders and others. These structures are based on policies and procedures, which make up the framework addressing both patient care and organizational ethics issues. These structures include informing each patient or, when appropriate, the patient's representative of the patient's rights in advance of furnishing or discontinuing care. The patient or patient's representative has the right to participate in the development and implementation of their plan of care. Patients receive information about the person(s) responsible for their care, treatment and services. Patients and, when appropriate, their families are informed about the outcomes of care, treatment and services that have been provided, including unanticipated outcomes. Patients are also involved as clinically appropriate in resolving dilemmas about care decisions. The patient's rights include being able to request or refuse treatment. This is not to be construed as a mechanism to demand treatment or services deemed medically unnecessary or inappropriate.

Facilities maintain processes for prompt resolution of patient grievances which include informing patients of whom to contact regarding grievances and informing patients regarding the grievance resolution. The hospital addresses the resolution of complaints from patients and their families.

HCA Healthcare facilities maintain an ongoing, proactive patient safety effort for the identification of risk to patient safety and the prevention, reporting and reduction of healthcare errors. HCA Healthcare colleagues receive training about patient rights in order to clearly understand their role in supporting them. Patients have the right to formulate advance directives and to have facility staff and practitioners who provide care in the facility comply with these directives.

***Patient Information***

10

We collect information about the patient's medical condition, history, medication, and family illnesses in order to provide quality care. We realize the sensitive nature of this information and are committed to maintaining its confidentiality. Consistent with HIPAA, we do not use, disclose or discuss patient-specific information, including patient financial information, with others unless it is necessary to serve the patient, to ethically conduct research to improve patient care or is required by law.

HCA Healthcare colleagues must never use or disclose confidential information that violates the privacy rights of our patients. In accordance with our information privacy and security policies and procedures, which reflect HIPAA requirements, no HCA Healthcare colleague, affiliated physician, or other healthcare partner has a right to any patient information other than that necessary to perform their job.

Subject only to emergency exceptions, patients can expect their privacy will be protected and patient-specific information will be released only to persons authorized by law or by the patient's written authorization. We will not implement practices that interfere with, prevent, or discourage patient access to their electronic health information, except to prevent harm, protect privacy, protect security, or when infeasible, in compliance with federal Information Blocking regulations (see policy IP.GEN.006 for more information).

### Emergency Treatment

We follow the Emergency Medical Treatment and Labor Act (EMTALA) in providing an emergency medical screening examination and necessary stabilization to all patients, regardless of ability to pay. Provided we have the capacity and capability, anyone with an emergency medical condition is treated. In an emergency situation or if the patient is in labor, we will not delay the medical screening and necessary stabilizing treatment in order to seek financial and demographic information. We do not admit, discharge, or transfer patients with emergency medical conditions simply based on their ability or inability to pay or any other discriminatory factor.

Patients with emergency medical conditions are only transferred to another facility at the patient's request or if the patient's medical needs cannot be met at the HCA Healthcare facility (e.g., we do not have the capacity or capability) and appropriate care is knowingly available at another facility. Patients are only transferred in strict compliance with state and federal EMTALA regulatory and statutory requirements.

Patients have the right to have a family member or representative of their choice and their own physician notified promptly of admission to a hospital.

## Physicians

Health care facilities like those owned and operated by HCA Healthcare reflect a collaboration between those who are part of HCA Healthcare and those who have been credentialed and privileged to practice in HCA Healthcare facilities. As in any collaboration, each party has important roles and responsibilities. HCA Healthcare is committed to providing a work environment for physicians and other privileged practitioners who practice in our facilities that is excellent in all respects. We know that historically members of our medical staffs have interacted with those who work in our hospitals in a respectful and supportive way. We appreciate this and know that we can expect it to continue. We encourage members of our Medical Staffs to be familiar with this Code of Conduct. There are many portions of this Code of Conduct that pertain

11

to ethical or legal obligations of physicians in hospitals, and this document is likely to be a helpful summary of those obligations for our medical staff members.

### Interactions with Physicians

Federal and state laws and regulations govern the relationship between hospitals and physicians who may refer patients to the facilities. The applicable federal laws include the Anti-Kickback Law and the Stark Law. It is important that those colleagues who interact with physicians, particularly regarding making payments to physicians for services rendered, providing space or services to physicians, recruiting physicians to the community, and arranging for physicians to serve in leadership positions in facilities, are aware of the requirements of the laws, regulations, and policies that address relationships between facilities and physicians.

If relationships with physicians are properly structured, but not diligently administered, failure to administer the arrangements as agreed may result in violations of the law. Any arrangement with a physician must be structured to ensure compliance with legal requirements, our policies and procedures and with any operational guidance that has been issued. Most arrangements must be in writing and approved by the Legal Department. Failure to meet all requirements of these laws and regulations can result in serious consequences for a facility.

Keeping in mind that it is essential to be familiar with the laws, regulations, and policies that govern our interactions with physicians, two overarching principles govern our interactions with physicians:

> *We do not pay for referrals.* We accept patient referrals and admissions based solely on the patient's medical needs and our ability to render the needed services. We do not pay or offer to pay anyone -- colleagues, physicians, or other persons or entities -- for referral of patients.

> *We do not accept payments for referrals we make.* No HCA Healthcare colleague or any other person acting on behalf of the organization is permitted to solicit or receive anything of value, directly or indirectly, in exchange for the referral of patients. Similarly, when making patient referrals to another healthcare provider, we do not take into account the volume or value of referrals that the provider has made (or may make) to us.

### Extending Business Courtesies and Tokens of Appreciation to Potential Referral Sources

Any entertainment, gift or token of appreciation involving physicians or other persons who are in a position to refer patients to our healthcare facilities must be undertaken in accordance with corporate policies, which have been developed consistent with federal laws, regulations, and rules regarding these practices. HCA Healthcare colleagues must consult Company policies prior to extending any business courtesy or token of appreciation to a potential referral source.

## Legal and Regulatory Compliance

HCA Healthcare provides varied healthcare services in many states. These services are provided pursuant to appropriate federal, state, and local laws and regulations, and the conditions of participation for federal healthcare programs. Such laws, regulations, and conditions of participation may include, but are not limited to, subjects such as certificates of need, licenses, permits, accreditation, access to treatment, consent to treatment, medical record-keeping, access to medical records and confidentiality, patients' rights, clinical research, end-of-

12

life care decision-making, medical staff membership and clinical privileges, corporate practice of medicine restrictions, and Medicare and Medicaid program requirements. The organization is subject to numerous other laws in addition to these healthcare laws, regulations, and the conditions of participation.

We have developed policies and procedures to address many legal, accreditation, certification and regulatory requirements. However, it is impractical to develop policies and procedures that encompass the full body of applicable law, standards, conditions and regulation. Obviously, those laws, standards, conditions and regulations not covered in organization policies and procedures must be followed. There is a range of expertise within the organization, including operations counsel and numerous functional experts (i.e., Responsible Executives), who should be consulted for advice concerning human resources, legal, regulatory, standards and the conditions of participation requirements.

Anyone aware of violations or suspected violations of laws, regulations, standards and the conditions of participation, or Company policies and procedures must report them immediately to a supervisor or member of management, the Facility Human Resources Business Partner, the Facility Ethics and Compliance Officer (ECO), the Division ECO, the Ethics Line, or the Corporate Ethics and Compliance Officer.

## Accreditation and Surveys

In preparation for, during and after surveys, HCA Healthcare colleagues must deal with all accrediting and external agency survey bodies in a direct, open and honest manner. No action should ever be taken in relationships with accrediting or external agency survey bodies that would mislead the accrediting or external agency survey teams, either directly or indirectly.

The scope of matters related to accreditation or external agency survey is extremely significant and broader than the scope of this Code of Conduct. The purpose of our Code of Conduct is to provide general guidance on subjects of wide interest within the organization. Accrediting bodies and external agency survey entities may address issues of both wide and somewhat more focused interest.

From time-to-time, government agencies and other entities conduct surveys in our facilities. We respond with openness and accurate information. In preparation for or during a survey or inspection, HCA Healthcare colleagues must never conceal, destroy, or alter any documents; lie; or make misleading statements to the agency representative. Colleagues also must never attempt to cause another colleague to fail to provide accurate information or obstruct, mislead, or delay the communication of information or records relating to a possible violation of law.

Anyone aware of violations or suspected violations of truthful and factual representations and responses to survey agencies must report them immediately through the chain of command or to the facility's ECO.

## Business and Financial Information

### Accuracy, Retention, and Disposal of Documents and Records

Each HCA Healthcare colleague is responsible for the integrity and accuracy of our organization's documents and records, not only to comply with regulatory and legal requirements but also to ensure records are available to support our business practices and actions. No one

13

may alter or falsify information on any record or document. Records must never be destroyed in an effort to deny governmental authorities that which may be relevant to a government investigation.

Medical and business documents and records are retained in accordance with the law and our record retention policy, which includes comprehensive retention schedules. Medical and business documents include paper documents such as letters and memos, computer-based information such as e-mail or computer files on disk or tape, and any other medium that contains information about the organization or its business activities. It is important to retain and destroy records only according to our policy. HCA Healthcare colleagues must not tamper with records. No one may remove or destroy records prior to the specified date without first obtaining permission as outlined in the Company records management policy. Finally, under no circumstances may an HCA Healthcare colleague use patient, colleague or any other individual's or entity's information to personally benefit (e.g., insider trading or marketing of the data).

### Coding and Billing for Services

We have implemented policies, procedures and systems to facilitate accurate billing to government payers, commercial insurance payers, and patients. These policies, procedures, and systems conform to pertinent federal and state laws and regulations, including using the required ICD-10 coding system as of October 1, 2014. We prohibit any colleague or agent of HCA Healthcare from knowingly presenting or causing to be presented claims for payment or approval which are false, fictitious, or fraudulent.

In support of accurate billing, medical records must provide reliable documentation of the services we render. It is important that all individuals who contribute to medical records provide accurate information and do not destroy any information considered part of the official medical record.

Accurate and timely documentation also depends on the diligence and attention of physicians who treat patients in our facilities. We expect those physicians to provide us with complete and accurate information in a timely manner.

Any subcontractors engaged to perform billing or coding services are expected to have the necessary skills, quality control processes, systems, and appropriate procedures to ensure all billings for government and commercial insurance programs are accurate and complete. HCA Healthcare expects such entities to have their own ethics and compliance programs and code of conduct. In addition, third-party billing entities, contractors, and preferred vendors under contract consideration must be approved consistent with the corporate policy on this subject.

For technical coding questions in a hospital or ambulatory surgery center contact the Coding Helpline via the Encoder through the "Contact Us" on the Help menu. For billing and other coding questions you may contact the Regs Helpline.

### Confidential Information

The term "Confidential Information" refers to proprietary information about our organization's strategies and operations as well as patient, colleague, and third-party information. Improper use or disclosure of Confidential Information could violate legal and ethical obligations. HCA Healthcare colleagues may use Confidential Information only to perform their job responsibilities and shall not share such information with others unless the individuals and/or entities have a

14

legitimate need to know the information in order to perform their specific job duties or carry out a contractual business relationship, provided disclosure is not prohibited by law or regulation.

Confidential Information also covers virtually anything related to HCA Healthcare's operations that is not publicly known, such as personnel data (e.g., employee ID numbers and information) maintained by the organization; patient lists and clinical information, including individually-identifiable patient information and clinical quality data; patient financial information, including credit card data and social security numbers; passwords; pricing and cost data; information pertaining to acquisitions, divestitures, affiliations and mergers; financial data; details regarding federal, state, and local tax examinations of the organization or its joint venture partners; proprietary information from a research collaborator or sponsor or the data generated from the research; strategic plans; marketing strategies and techniques; supplier and subcontractor information; and proprietary computer software. Some photos and videos may be considered confidential information.

Use of due care and due diligence is required to maintain the confidentiality, availability and integrity of information assets the Company owns or of which it is the custodian. Because so much of our clinical and business information is generated and contained within our computer systems, it is essential that each HCA Healthcare colleague protect our computer systems and the information contained in them by not sharing passwords and by reviewing and adhering to our Information Protection & Security (IPS) policies and standards.

HCA Healthcare colleagues are responsible for the safe handling and protection of Sensitive Information as outlined in our IPS policies and standards when they encounter it as part of their job duties. This includes when sensitive data is e-mailed outside the Company or otherwise stored, posted, or sent through the Internet; stored on portable devices such as laptops, tablets, and mobile phones; or transferred to removable media such as CD or USB drive. IPS policies and standards require, among other things, that the individual and/or entity be validated and the information be encrypted. HCA Healthcare colleagues must be extremely careful in the use of Digital Media, taking care to not disclose patient or other sensitive information — whether at work or at home, and using Company or personal systems.

Any HCA Healthcare colleague who knows or suspects confidential information to have been compromised must promptly report the potential security breach to the Facility ECO, Facility Privacy Officer (FPO), or Facility Information Security Official (FISO).

If an individual's employment or contractual relationship with HCA Healthcare ends for any reason, the individual is still bound to maintain the confidentiality of information viewed, received or used during the employment or contractual business relationship with HCA Healthcare. This provision does not restrict the right of a colleague to disclose, if they wish, information about their own compensation, benefits, or terms and conditions of employment. Copies of confidential information in an employee's or contractor's possession shall be left with HCA Healthcare at the end of the employment or contractual relationship.

### Cost Reports

We are required by federal and state laws and regulations to submit certain reports of our operating costs and statistics. We comply with federal and state laws, regulations, and guidelines relating to all cost reports. These laws, regulations, and guidelines define what costs are allowable and outline the appropriate methodologies to claim reimbursement for the cost of services provided to program beneficiaries.

15

Several HCA Healthcare policies address cost report compliance and articulate our commitment to: maintain and distribute a Reimbursement Manual to Reimbursement Department personnel that includes corporate and departmental policies and procedures; provide effective and timely education and training programs for Reimbursement Department personnel regarding federal and state laws, regulations and guidelines, and corporate policies; maintain a standardized workpaper package to provide consistency in the preparation, organization, presentation, and review of cost reports; apply a uniform cost report review process; identify and exclude non-allowable costs; adhere to documentation standards; and use transmittal letters to report protested items and make other appropriate disclosures. Also, we submit our cost report process to internal audits and maintain a peer review process.

All issues related to the preparation, submission and settlement of cost reports must be performed by or coordinated with our Reimbursement Department.

### Electronic Media

All communications systems, including but not limited to computers, electronic mail, Intranet, Internet access, Company-provided telephones, and voice mail, are the property of the organization and are to be used primarily for business purposes in accordance with electronic communications policies and standards. Limited reasonable personal use of HCA Healthcare communications systems is permitted; however, users should assume these communications are not private. Users of computer and facility telephonic systems should presume no expectation of privacy in anything they create, store, send, or receive on the computer and telephonic systems, and the Company reserves the right to monitor and/or access communications usage and content consistent with Company policies and procedures. Colleagues that are eligible for Company-owned devices are responsible for the safe-handling, protection, compliant usage, and return of the device.

Colleagues may not use Company devices or Company-provided communication channels or access the Internet or Digital Media to view, post, store, transmit, download, or distribute any threatening materials; knowingly, recklessly, or maliciously false materials; obscene materials; or anything constituting or encouraging a criminal offense, giving rise to civil liability, or otherwise violating any laws. Also, these channels of communication may not be used to send chain letters, personal broadcast messages, photos or videos, or copyrighted documents that are not authorized for reproduction.

Colleagues who abuse our communications systems or use them excessively for non-business purposes may lose these privileges and be subject to disciplinary action.

Colleagues shall comply with HCA Healthcare's information security policies and standards governing the use of information systems. Individuals may only use User IDs assigned to them individually and are not permitted to share or disclose any user account that is used to access HCA Healthcare systems or information. Colleagues shall never download unauthorized or unlicensed software, or use tools or techniques to break or exploit HCA Healthcare information security measures or those used by other companies or individuals.

### Financial Reporting and Records

We have established and maintain a high standard of accuracy and completeness in documenting, maintaining, and reporting financial information. This information serves as a basis for managing our business and is important in meeting our obligations to patients, colleagues,

16

shareholders, suppliers, and others. It is also necessary for compliance with tax and financial reporting requirements.

We are required to maintain books and records of our activities consistent with applicable legal requirements, which in reasonable detail accurately and fairly reflect our transactions and dispositions of assets. HCA Healthcare maintains a system of internal controls designed to provide reasonable assurance that all transactions are executed in accordance with management's authorization and are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles (GAAP). Our consolidated financial statements are certified by our officers as fairly presenting in all material respects our financial condition, results of operations and cash flows in accordance with GAAP and Securities and Exchange Commission rules and regulations. Financial information used for general business purposes, including estimates, projections, or general financial reports, must be sufficiently reliable and complete to fairly and reasonably serve the purposes for which the information is compiled and presented.

We diligently seek to comply with all applicable auditing, accounting and financial disclosure laws, including but not limited to the Securities Exchange Act of 1934 and the Sarbanes-Oxley Act of 2002 and certain requirements imposed by the New York Stock Exchange. Senior financial officers receive training and guidance regarding auditing, accounting and financial disclosure relevant to their job responsibilities. They are also provided the opportunity to discuss issues of concern with the Board of Directors' Audit and Compliance Committee. Anyone having concerns regarding questionable accounting or auditing matters should report such matters to the Board of Directors' Audit and Compliance Committee by contacting the HCA Healthcare Ethics Line (1-800-455-1996) or http://hcahealthcareethicsline.ethix360.com.

### Intellectual Property Rights and Obligations

Any work of authorship, invention, or other creation ("Development") created by a colleague during the scope of the colleague's employment with HCA Healthcare shall be considered the property of HCA Healthcare, including any patent, trademark, copyright, trade secret or other intellectual property right in the Development. Whether something is developed during the scope of a colleague's employment depends on a number of factors, including:

- the nature of the colleague's work,
- whether the Development is related to HCA Healthcare's business,
- whether the colleague was directed to produce the Development as part of the colleague's work,
- whether the colleague utilized HCA Healthcare intellectual property or resources at least in part to make the Development, and
- whether the colleague created the Development while being paid by HCA Healthcare.

If any Development created is copyrightable or patentable, then it will be considered a "Work for Hire" under the United States Copyright Act, with HCA Healthcare being considered to be the author and owner of such work.

When creating Developments for HCA Healthcare, colleagues shall respect the intellectual property rights of others. Any works or inventions created by colleagues prior to employment by HCA Healthcare shall be disclosed to HCA Healthcare upon commencement of employment,

17

and management and Legal Department approval shall be obtained prior to any use of these works or inventions in a Development for HCA Healthcare.

By acknowledging this Code of Conduct, a colleague specifically agrees to be bound by these provisions of the Code of Conduct. As such, the acknowledgment serves as an assignment by the named colleague to HCA Healthcare of all right, title, and interest in all Developments created by the colleague within the scope of their employment, as well as an appointment of the Secretary for HCA Healthcare as the colleague's attorney-in-fact to execute documents on their behalf for the foregoing purposes. Colleagues shall assist HCA Healthcare in obtaining and enforcing intellectual property rights in their Developments, while employed by HCA Healthcare and after termination of employment.

# Workplace Conduct and Employment Practices

### Conflict of Interest

A conflict of interest may occur if an HCA Healthcare colleague's outside activities, personal financial interests, or other private interests interfere or appear to interfere with their ability to make objective decisions in the course of the coleague's job responsibilities. A conflict of interest may arise when an HCA Healthcare colleague takes actions or has interests that make it difficult to perform their HCA Healthcare work objectively and effectively. Conflicts of interest also arise when an HCA Healthcare colleague or a member of their family receives improper benefits as a result of their position in HCA Healthcare. Loans to, or guarantees of obligations of, such persons are of special concern. HCA Healthcare colleagues are obligated to ensure they remain free of conflicts of interest in the performance of their responsibilities at HCA Healthcare. If colleagues have any question about whether an outside activity or private interest might constitute a conflict of interest, they must obtain the written approval of their supervisor and ECO before pursuing the activity or obtaining or retaining the interest. Clinical decisions will be made without regard to compensation or financial risk to HCA Healthcare leaders, managers, clinical staff, or licensed, independent practitioners.

No waiver of this conflict of interest provision may be granted to an Executive Officer (i.e., an officer subject to Section 16 of the Securities Exchange Act of 1934) or director unless approved in advance by the Audit and Compliance Committee of the Board of Directors.

### Controlled Substances

Some of our colleagues routinely have access to prescription drugs, controlled substances, and other medical supplies. Many of these substances are governed and monitored by specific regulatory organizations and must be administered by physician order only. Prescription and controlled medications and supplies must be handled properly and only by authorized individuals to minimize risks to us and to patients. If one becomes aware of inadequate security of drugs or controlled substances or the diversion of drugs from the organization, the incident must be reported immediately. HCA Healthcare facilities strictly enforce reporting of any violations of diverting medications by facility staff or privileged practitioners.

### Copyrights

HCA Healthcare colleagues may only copy and/or use copyrighted materials pursuant to the organization's policy on such matters.

18

## Corporate Opportunities

HCA Healthcare colleagues are prohibited from taking for themselves personal opportunities that are discovered through the use of HCA Healthcare property, information or position for personal gain and/or competing with HCA Healthcare. HCA Healthcare colleagues owe a duty to HCA Healthcare to advance its interests when the opportunity so arises.

## Equal Employment Opportunity

HCA Healthcare is committed to providing an environment where everyone is treated with fairness, dignity, and respect. We will make ourselves accountable to one another for the manner in which we treat one another and for the manner in which people around us are treated. We are committed to recruit and retain talent reflective of the patients and communities we serve. We strive to create and maintain a setting in which we celebrate differences and consider them strengths of the organization.

HCA Healthcare is an equal opportunity workforce and no one shall discriminate against any individual with regard to race, color, religion, gender, national origin, age, disability, sexual orientation, gender identity or expression, genetic information or veteran status with respect to any offer, or term or condition, of employment or other protected characteristics in accordance with applicable federal, state, or local laws. Reasonable accommodations will be made to known qualified individuals with disabilities.

## Government Contracting

Many HCA Healthcare affiliates have contracts with local governments, state governments, or the United States Federal Government. When entering into these contracts, it is the responsibility of the individual signing the offer or acceptance to ensure that a plan is in place to comply with all aspects of the contract, including clauses incorporated by reference. No one should sign a contract with a government entity on an HCA Healthcare affiliate's behalf without first having a plan to comply with all regulatory obligations of such contract.

One requirement of federal government contracts that we have elected to make applicable to all colleagues and business associates is the prohibition on trafficking in persons. HCA Healthcare, its affiliates, and subcontractors will abide by all provisions of this U.S. policy, including the prohibitions on recruiting fees, forced labor, and sex trafficking. Failure to meet these requirements can result in discipline as described elsewhere in the Code.

## Harassment and Workplace Violence

Each HCA Healthcare colleague has the right to work in an environment free of harassment and disruptive behavior. We do not tolerate harassment by anyone based on the diverse characteristics or cultural backgrounds of those who work with us. Degrading or humiliating jokes, slurs, intimidation, or other harassing conduct is not acceptable in our workplace.

Sexual harassment is prohibited. This prohibition includes unwelcome sexual advances or requests for sexual favors in conjunction with employment decisions. Moreover, verbal or physical conduct of a sexual nature that interferes with an individual's work performance or creates an intimidating, hostile, or offensive work environment has no place at HCA Healthcare.

Harassment also includes incidents of workplace violence. Workplace violence includes robbery and other commercial crimes, stalking, violence directed at the employer, terrorism, and hate

19

crimes committed by current or former colleagues. Colleagues who observe or experience any form of harassment or violence should report the incident to their supervisor, the Human Resources Department, a member of management, the Facility ECO, or the Ethics Line.

### Health and Safety

All HCA Healthcare facilities comply with all government regulations and rules, HCA Healthcare policies, and required facility practices that promote the protection of workplace health and safety. Our policies have been developed to protect our colleagues from potential workplace hazards. Colleagues must become familiar with and understand how these policies apply to their specific job responsibilities and seek advice from their supervisor or the Safety Officer whenever they have a question or concern. It is important that each colleague immediately advise their supervisor or the Safety Officer of any serious workplace injury or any situation presenting a danger of injury so timely corrective action may be taken to resolve the issue.

### Hiring of Former and Current Government and Fiscal Intermediary/Medicare Administrative Contractor Employees

The recruitment and employment of former or current U.S. government employees may be impacted by regulations concerning conflicts of interest. Hiring employees directly from a fiscal intermediary or Medicare Administrative Contractor requires certain regulatory notifications. Colleagues should consult with the Corporate Human Resources Department or the Legal Department regarding such recruitment and hiring.

### Ineligible Persons

We do not contract with, employ, or bill for services rendered by an individual or entity that is excluded or ineligible to participate in federal healthcare programs; suspended or debarred from federal government contracts and has not been reinstated in a federal healthcare program after a period of exclusion, suspension, debarment, or ineligibility. We routinely search the Department of Health and Human Services' Office of Inspector General and General Services Administration's lists of such excluded and ineligible persons. A number of Company policies address the procedures for timely and thorough review of such lists and appropriate enforcement actions.

Colleagues, vendors, and privileged practitioners at one or more HCA Healthcare facilities are required to report to us if they become excluded, debarred, or ineligible to participate in federal healthcare programs.

### Insider Information and Securities Trading

In the course of colleagues' employment with HCA Healthcare, they may become aware of non-public information about HCA Healthcare or another company that could be material to an investor's decision to buy or sell the organization's securities. Material, non-public information may include, among other things, plans for mergers, or significant sales or acquisitions of assets, financial results, financial projections or guidance, new legislation or regulations, changes in management, or other business dealings. Colleagues may not discuss this type of information with anyone outside of the organization. Within the organization, colleagues should discuss this information on a strictly "need to know" basis only with other colleagues who require this information to perform their jobs.

20

Securities laws and HCA Healthcare policy prohibit individuals from trading in the marketable securities of an organization that is publicly held or traded or influencing others to trade in such securities on the basis of material, non-public information. These restrictions are meant to ensure the general public has complete and timely information on which to base investment decisions.

If an HCA Healthcare colleague obtains access to material, non-public information about the organization, or any other company while performing their job, the colleague may not use that information to buy, sell, transfer, gift or effect other transactions of publicly registered and traded securities of HCA Healthcare or that other company. Even if they do not buy, sell, transfer, gift or effect other transactions of such securities based on what they know, discussing the information with others, such as family members, friends, vendors, suppliers, and other outside acquaintances, is prohibited until the information is considered to be public. Information is considered to be public on the second full trading day after the date of a general release of the information to the media. In addition, HCA Healthcare directors, officers and certain other designated HCA Healthcare Colleagues are subject to more detailed corporate securities trading policies, including certain pre-clearance procedures and blackout periods.

### License and Certification Renewals

Colleagues, individuals retained as independent contractors, and privileged practitioners in positions which require professional licenses, certifications, or other credentials are responsible for maintaining the current status of their credentials and shall comply at all times with federal and state requirements applicable to their respective disciplines. To assure compliance, HCA Healthcare may require evidence of the individual having a current license or credential status.

HCA Healthcare does not allow any colleague, independent contractor or privileged practitioner to work without valid, current licenses or credentials. Each colleague must have evidence of current and valid licensure, certification, registration, accreditation or credential as required by their position description. Each facility must have appropriate processes and procedures to assure documentation of compliance with each position description requirement.

### Personal Use of HCA Healthcare Resources

It is the responsibility of each HCA Healthcare colleague to preserve our organization's assets including time, space, materials, supplies, equipment, and information. Organization assets are to be maintained for business-related purposes. As a general rule, the personal use of any HCA Healthcare asset without prior supervisory approval is prohibited. The occasional use of items, such as copying facilities or telephones, where the cost to HCA Healthcare is insignificant, is permissible. Any community or charitable use of organization resources must be approved in advance by one's supervisor. Any use of organization resources for personal financial gain unrelated to the organization's business is prohibited.

### Relationships Among HCA Healthcare Colleagues

In the normal day-to-day functions of an organization like HCA Healthcare, there are issues that arise which relate to how people in the organization deal with one another. It is impossible to foresee all of these, and many do not require explicit treatment in a document like this. A few routinely arise, however. One involves gift giving among colleagues for certain occasions. While we wish to avoid any strict rules, no one should ever feel compelled to give a gift to anyone, and any gifts offered or received should be appropriate to the circumstances. A lavish gift to anyone

21

in a supervisory role would clearly violate organization policy. Another situation, which routinely arises, is a fund-raising or similar effort undertaken by individual colleagues, in which no one should ever be compelled to participate. Similarly, when the Company or a facility determines to support charitable organizations such as the United Way, no colleague should be compelled to contribute to the charitable organization, nor should there be any workplace consequences of such non-participation.

### Relationships with Subcontractors and Suppliers

HCA Healthcare is the majority owner and managing general partner of HealthTrust. On behalf of its member entities, including HCA Healthcare, HealthTrust negotiates contracts with supply and service vendors. HealthTrust has a Code of Conduct and Business Relationship Statement that outline its commitment to ethical and compliant behavior and its expectations of the same by its contractors. Copies of HealthTrust's Code and Statement are available its website at: www.healthtrustpg.com. HealthTrust participates in the Healthcare Group Purchasing Industry Initiative as a founding member. This is an umbrella group of the largest healthcare group purchasing organizations in the country intended to promote the highest standards of business conduct in these activities.

Those seeking to be suppliers of HCA Healthcare should understand that virtually all of the system-wide procurement effort is executed, in effect, by HealthTrust. As in any large organization, once central procurement decisions have been made, it is anticipated that local facilities will utilize the negotiated contracts. Organizations that compete unsuccessfully through HealthTrust for national agreements with HCA Healthcare, or, for whatever reason, elect not to compete in such processes, should not be disappointed by efforts of those in the HCA Healthcare supply chain to maintain compliance with negotiated national agreements. We encourage those with new technologies or product innovations to be certain that HealthTrust fully understands their capabilities.

We must manage our consulting, subcontractor, and supplier relationships in a fair and reasonable manner, free from conflicts of interest and consistent with all applicable laws and good business practices. We promote competitive procurement to the maximum extent practicable. Our selection of consultants, s ubcontractors, suppliers, and vendors will be made on the basis of objective criteria including quality, technical excellence, price, delivery, adherence to schedules, service, and maintenance of adequate sources of supply. Our purchasing decisions will be made on the supplier's ability to meet our needs, and not on personal relationships and friendships. We employ the highest ethical standards in business practices in source selection, negotiation, determination of contract awards, and the administration of all purchasing activities.

We comply with contractual obligations not to disclose vendor confidential information unless permitted under the contract or otherwise authorized by the vendor. (The subject of Business Courtesies, which might be offered by or to subcontractors or suppliers, is discussed on pages 26 to 27 of this Code.)

### Research, Investigations, and Clinical Trials

We follow the highest ethical standards in full compliance with federal and state laws and regulations in any research, investigations, and/or clinical trials conducted by our physicians and professional staff. We do not tolerate research misconduct, which includes activities such as making up or changing results, copying results from other studies without performing the clinical

22

investigation or research, failing to identify and deal appropriately with investigator or institutional conflicts of interest, and proceeding without Institutional Review Board (IRB) approval when required. Our first priority is always to protect the patients and human subjects and respect their rights during research, investigations, and clinical trials.

Physicians conducting clinical trials of investigational products and services are expected to fully inform all subjects of their rights and responsibilities of participating in the clinical trial. All potential subjects in a clinical trial are fully informed of potential discomforts and are given a full explanation of the risks, expected benefits, and alternatives to participation. The subjects are fully informed of the procedures to be followed, especially those that are experimental in nature. Refusal of a potential subject to participate in a research study or the voluntary withdrawal of their participation in an existing study will not compromise their access to services or other benefits to which they are otherwise entitled. A subject's voluntary informed consent to participate in a clinical trial is documented and retained pursuant to Company and hospital policies.

Any HCA Healthcare facility or colleague applying for or performing research of any type must follow all applicable research guidelines and privacy policies and maintain the highest standards of ethics and accuracy in any written or oral communications regarding the research project. As in all accounting and financial record-keeping, our policy is to submit only true, accurate, and complete costs related to research grants. Any HCA Healthcare facility or colleague engaging in human subject research must do so consistent with Company policies and any IRB conditions of approval.

### Substance Abuse and Mental Acuity

To protect the interests of our colleagues and patients, we are committed to an alcohol and drug-free work environment. All colleagues must report for work free of the influence of alcohol and illegal drugs. Reporting to work under the influence of any illegal drug or alcohol; having an illegal drug in a colleague's system; or using, possessing, or selling illegal drugs while on HCA Healthcare work time or property may result in immediate termination. We may use drug testing as a means of enforcing this policy.

It is also recognized individuals may be taking prescription or over-the-counter drugs, which could impair judgment or other skills required in job performance. Colleagues with questions about the effect of such medication on their performance or who observe an individual who appears to be impaired in the performance of their job must immediately consult with their supervisor.

## Competitive Activities and Marketing Practices

We operate in a highly competitive environment. Our competitive activities must conform to the high standards of integrity and fairness reflected in this Code of Conduct. The Company requires compliance with antitrust and other laws governing competitive activities, and with the Company's written policies governing interactions with competitors, customers and suppliers.

### Antitrust and Unfair Competition

The Company has strict restrictions on communications with competitors, which are set forth in Company policy. Generally, colleagues are not to discuss with competitors non-public "competitively sensitive topics" as defined in th policy. Because the antit rust laws are so

23

complex and their application can depend upon the conditions in local markets, it is not practical to adopt written policies to govern all situations. Colleagues should consult with their supervisors or the Legal Department for guidance concerning competitive activities, laws and policies relating to their areas of responsibility.

### Marketing and Advertising

Consistent with laws and regulations that may govern such activities, we may use marketing and advertising activities to educate the public, provide information to the community, increase awareness of our services, and to recruit colleagues. We strive to present only truthful, fully informative, and non-deceptive information in these materials and announcements.

While it is permissible to compare and contrast our services and prices, it is against Company policy to intentionally disparage other persons or businesses based on information that is untrue, or not known to be true, or to intentionally inerfere with another business's contractual and business relationships through wrongful means. This does not prevent fair, non-deceptive competition for business from those who may also have business relationships with a competitor.

### Global Anti-Corruption

It is our policy to comply with all anti-corruption and anti-bribery laws that apply to Company operations, including the Foreign Corrupt Practices Act (FCPA) and the anti-corruption laws of nations in which HCA Healthcare conducts business. The Company has a Global Anti-Corruption Policy that sets out policies and procedures for our business dealings with Foreign Officials and prohibits colleagues from giving, offering or authorizing the provision of anything of value to, or for the benefit of, a Foreign Official, in order to obtain or retain business, to secure any other business advantage, or to obtain beneficial governmental treatment, except as specifically permitted in the Policy. Before offering or giving anything of value to any individual who may be an official, employee, or representative of a Foreign Government, or of a state-owned or controlled entity, colleagues must comply with all Company policies.

## Environmental Compliance

It is our policy to comply with all environmental laws and regulations as they relate to our organization's operations. We act to preserve our natural resources to the full extent reasonably possible. We comply with all environmental laws and operate each of our facilities with the necessary permits, approvals, and controls. We diligently employ the proper procedures to provide a good environment of care and to prevent pollution.

In helping HCA Healthcare comply with these laws and regulations, all HCA Healthcare colleagues must understand how job duties may impact the environment, adhere to all requirements for the proper handling of hazardous materials, and immediately alert supervisors to any situation regarding the discharge of a hazardous substance, improper disposal of hazardous and medical waste, or any situation which may be potentially damaging to the environment.

## Responsible AI

In keeping with our mission, HCA Healthcare is committed to developing and using technologies and best practices that improve patient care and empower our workforce. As artificial intelligence (AI) technology is used and developed by HCA Healthcare to enhance and support our work, it is

24

essential we are using AI in a responsible manner. We have established a Responsible AI program to ensure the safe, effective and ethical use of AI technology.

Colleagues using, developing or engaging AI are expected to comply with HCA Healthcare's policies and standards and with legal and regulatory requirements. Patient and colleague data are to be utilized in a safe and secure manner to protect risk and maintain privacy. The HCA Healthcare Responsible AI Program Policy includes guidance regarding quality control of outputs, solution development and monitoring, cybersecurity protection and adherence to guidelines prohibiting malicious use.

While HCA Healthcare will take full advantage of AI's potential to enhance patient care and support workforce functions, we will not compromise our standard of care nor compromise our commitment to our mission and values.

# Business Courtesies

### General

This part of the Code of Conduct should not be considered in any way as an encouragement to make, solicit, or receive any type of entertainment or gift. For clarity purposes, please note that these limitations govern activities with those outside of HCA Healthcare. This section does not pertain to actions between HCA Healthcare and its colleagues or actions among HCA Healthcare colleagues themselves. (See "Relationships Among HCA Healthcare Colleagues" on page 22.)

### Receiving Business Courtesies

We recognize there will be times when a current or potential business associate, including a potential referral source, may extend an invitation to attend a social event in order to further develop a business relationship. An HCA Healthcare colleague may accept such invitations, provided: (1) the cost associated with such an event is reasonable and appropriate, which, as a general rule, means the cost will not exceed $150.00 per person; (2) no expense is incurred for any travel costs (other than in a vehicle owned privately or by the host entity) or overnight lodging; and (3) such events are infrequent. The limitations of this section do not apply to business meetings at which food (including meals) may be provided. Prior to accepting invitations to training and educational opportunities that include travel and overnight accommodations at reduced or no cost to a colleague or HCA Healthcare, consult our policies and seek appropriate approvals.

HCA Healthcare colleagues may accept gifts with a total value of $75.00 or less in any one year from any individual or organization who has a business relationship with HCA Healthcare. For purposes of this paragraph, physicians practicing in HCA Healthcare facilities are considered to have such a relationship. Perishable or consumable gifts given to a department or group are not subject to a specific dollar limitation; however, such gifts may not be received from the same business associate more than six times per year. HCA Healthcare colleagues may accept gift certificates, but may never accept cash or financial instruments (e.g., checks, stocks). Finally, under no circumstances may an HCA Healthcare colleague solicit a gift.

This section does not limit HCA Healthcare facilities from accepting gifts, provided they are used and accounted for appropriately.

### Extending Business Courtesies to Non-referral Sources

25

No portion of this section, "Extending Business Courtesies to Non-referral Sources," applies to any individual who makes, or is in a position to make, referrals to an HCA Healthcare facility. Such business courtesies are addressed in the *Extending Business Courtesies to Potential Referral Sources* section of this Code and Company policies.

Meals and Entertainment. There may be times when a colleague wishes to extend to a current or potential business associate (other than someone who may be in a position to make a patient referral) an invitation to attend a social event (e.g., reception, meal, sporting event, or theatrical event) to further or develop a business relationship. The purpose of the entertainment must never be to induce any favorable business action. During these events, topics of a business nature must be discussed and the host must be present. These events must not include expenses paid for any travel costs (other than in a vehicle owned privately or by the host entity) or overnight lodging. The cost associated with such an event must be reasonable and appropriate. As a general rule, this means the cost will not exceed $150.00 per person. Moreover, such business entertainment with respect to any particular individual must be infrequent, which, as a general rule, means not more than three times per year. Consult Company policy for events that are expected to exceed $150 or were not expected to but inadvertently do exceed $150. That policy requires establishing the business necessity and appropriateness of the proposed entertainment. The organization will under no circumstances sanction any business entertainment that might be considered lavish or in questionable taste. Departures from the $150.00 guideline are highly discouraged.

Sponsoring Business Events. Also, HCA Healthcare facilities may routinely sponsor events with a legitimate business purpose (e.g., hospital board meetings or retreats). Provided that such events are for business purposes, reasonable and appropriate meals and entertainment may be offered. In addition, transportation and lodging can be paid for. However, all elements of such events, including these courtesy elements, must be consistent with the corporate policy on such events.

Gifts. It is critical to avoid the appearance of impropriety when giving gifts to individuals who do business or are seeking to do business with HCA Healthcare. We will never use gifts or other incentives to improperly influence relationships or business outcomes. In order to avoid embarrassment, an effort should be made to ensure that any gift we extend meets the business conduct standards of the recipient's organization. Gifts to business associates who are not government employees must not exceed $75.00 per year per recipient. Any gifts to Medicare or Medicaid beneficiaries must not exceed $15.00 per item nor total more than $75.00 per year per recipient. An HCA Healthcare colleague or facility may give gift certificates, but may never give cash or financial instruments (e.g., checks, stocks). The corporate policy on business courtesies permits occasional exceptions to the $75 limit to recognize the efforts of those who have spent meaningful amounts of volunteer time on behalf of HCA Healthcare.

U.S. Federal and state governments have strict rules and laws regarding gifts, meals, and other business courtesies for their employees. HCA Healthcare does not provide any gifts, entertainment, meals, or anything else of value to any employee of the Executive Branch of the Federal government or its fiscal intermediaries, except for minor refreshments in connection with business discussions or promotional items with the HCA Healthcare or facility logo valued at no more than $10.00. With regard to gifts, meals, and other business courtesies involving any other category of government official or employee, colleagues must determine the particular rules applying to any such person and carefully follow them.

26

# Government Relations and Political Activities

The organization and its representatives are required to comply with all federal, state, and local laws governing participation in government relations and political activities.

## Public Policy

HCA Healthcare engages in federal, state and local public policy debates on targeted issues impacting healthcare policy and hospitals, where it believes its views to be in the best interest of the company, patients, employees or communities the Company serves. As part of our advocacy strategy, HCA Healthcare takes positions that it believes improve access to healthcare and strengthen hospitals' ability to provide critical care, all of which is in the public interest. HCA Healthcare encourages trade associations with which it is associated to do the same.

## Political Activities

Participation in the political process is a personal choice. A colleague may, of course, participate in the political process on their own time and at their own expense. It is important to separate personal and corporate political activities in order to comply with the appropriate rules and regulations relating to lobbying. No use of organization resources, including company e-mail, is appropriate for personally engaging in political activity. While engaging in any personal political activities, it is important that HCA Healthcare colleagues not give the impression they are speaking on behalf of or representing HCA Healthcare in these activities. Colleagues cannot seek to be reimbursed by HCA Healthcare for any personal contributions.

## Political Contributions

As a general policy, HCA Healthcare funds or resources are not contributed directly to individual political campaigns, political parties, or other organizations which intend to use the funds primarily for political campaign objectives. Those who seek exceptions to this general rule may only do so after obtaining the appropriate approvals required in relevant policies. HCA Healthcare resources restricted by this policy include financial and non-financial donations such as using work time and telephones to solicit for a political cause or candidate or the loaning of HCA Healthcare property for use in the political campaign. The conduct of any political action committee associated with the organization is to be consistent with relevant laws and regulations. HCA Healthcare's political action committees contribute to candidates based on their commitment to health care access, hospitals and other sites of care and ability and position to impact public policy.

## Conduct with Public Officials

At times, HCA Healthcare may ask colleagues to make personal contact with government officials or to write letters to present the Company's position on specific issues. In addition, it is a part of the role of some HCA Healthcare management to interface on a regular basis with government officials. If a colleague is making these communications on behalf of the organization, they must be certain to be familiar and comport with laws and regulations governing this behavior and adhere to them. Guidance is always available from the Corporate Government Relations and Legal Departments as necessary.

# The Company's Ethics and Compliance Program

27

***Program Structure***

The Ethics and Compliance Program is intended to demonstrate in the clearest possible terms the absolute commitment of the organization to the highest standards of ethics and compliance. The elements of the program include setting standards (the Code and Policies and Procedures), communicating the standards, providing a mechanism for reporting potential exceptions, monitoring and auditing, and maintaining an organizational structure that supports the furtherance of the program. Each of these elements is detailed below.

These elements are supported at all levels of the organization. Providing direction, guidance and oversight are the Audit and Compliance Committee of the Board of Directors; the Corporate Ethics and Compliance Steering Committee consisting of senior management; and the Corporate Ethics and Compliance Policy Committee consisting of senior management and representative facility CEOs.

The Chief Ethics and Compliance Officer for the organization and the Ethics and Compliance Department are responsible for the day-to-day direction and implementation of the Ethics and Compliance Program. This includes developing resources (including policies and procedures, training programs, and communication tools) for and providing support (including operating the Ethics Line, conducting program assessment, and providing advice) to Facility ECOs and others.

Responsible Executives are individuals in the Corporate Office who have expertise in various areas of compliance risk and who are called upon in their areas of expertise to lead policy and training development efforts, conduct monitoring and auditing as appropriate, and provide advice.

Playing a key role in ensuring the successful implementation of our Ethics and Compliance Program, Facility ECOs are responsible for distributing standards, ensuring training is conducted, conducting monitoring and responding to audits, investigating and resolving Ethics Line cases, and otherwise administering the Ethics and Compliance Program in their facilities. Hospital ECOs are also expected to establish and maintain a Facility Ethics and Compliance Committee (FECC) to assist them in these efforts. All Divisions and Markets have appointed Division or Market ECOs, who assist in directing and assessing the Ethics and Compliance Program for their Divisions or Markets.

Another important resource who may be able to address issues arising out of this Code of Conduct is the Human Resources Business Partner. Human Resources Business Partners are highly knowledgeable about many of the compliance risk areas described in this Code of Conduct that pertain to employment and the workplace and are responsible for ensuring compliance with various employment laws. If a concern relates to specific details of an individual's work situation, rather than larger issues of organizational ethics and compliance, the Human Resources Business Partner is the most appropriate person to contact. In that we promote the concept of management autonomy at local facilities, every effort should be made to resolve workplace conduct and employment practice issues through the individual's supervisor and the Human Resources Business Partner at the local facility. Experience has shown that this is an effective and productive way to deal promptly with these matters. Division Human Resources Business Partners also assist in investigating and resolving Ethics Line cases and workplace conduct and employment practices issues. HCA Healthcare routinely reviews the operation of this problem-solving procedure and may periodically modify the details of the approach in order to maximize its effectiveness. In circumstances where you seek to utilize the problem-solving procedure, we encourage you to inquire about the specifics of how the

28

procedure operates. Your local Human Resources Department or representative can provide this information.

All of these individuals or groups are prepared to support HCA Healthcare colleagues in meeting the standards set forth in this Code. Membership lists for each of the Corporate entities and the Facility ECOs can be found at the Ethics and Compliance site on the organization's Intranet.

### Setting Standards

With respect to our Ethics and Compliance Program, we set standards through this Code of Conduct, ethics and compliance policies and procedures and, occasionally, through other guidance mechanisms, such as Compliance Alerts and advisory memoranda. It is the responsibility of each individual to be aware of those policies and procedures that pertain to their work and to follow those policies and procedures.

### Training and Communication

Comprehensive training and education has been developed to ensure that colleagues throughout the organization are aware of the standards that apply to them. Code of Conduct training is conducted at the time an individual joins the organization and annually for all colleagues. Compliance training in areas of compliance risk (e.g., billing, coding, cost reports) is required of certain individuals. Company policies outline the training requirements.

All ethics and compliance training is required o be recorded in the Company's learning management system, the HealthStream Learning Center (HLC). Through the HLC, system administrators and ECOs track colleagues' compliace with their training requirements   and report such information as necessary.

Many resources regarding our program are available to all HCA Healthcare colleagues on our Intranet and to the general public on the Internet. We encourage all colleagues to frequently visit both sites.

### Resources for Guidance and Reporting Concerns

To obtain guidance on an ethics or compliance issue or to report a concern, individuals may choose from several options. We encourage the resolution of issues, including human resources- related issues (e.g., payroll, fair treatment and disciplinary issues), at a local level. Colleagues should use the human resources-related problem solving procedure at their facility to resolve such issues. It is an expected good practice, when one is comfortable with it and think it appropriate under the circumstances, to raise concerns first with one's supervisor. If this is uncomfortable or inappropriate, the individual may discuss the situation with the Facility Human Resources Business Partner, the Facility ECO, or another member of management at the facility or in the organization. Individuals are always free to contact the Ethics Line at 1-800-455-1996 or http://hcahealthcareethicsline.ethix360.com.

HCA Healthcare makes every effort to maintain, within the limits of the law, the confidentiality of the identity of any individual who reports concerns or possible misconduct. There is no retribution or discipline for anyone who reports a concern in good faith. Any colleague who deliberately makes a false accusation with the purpose of harming or retaliating against another colleague is subject to discipline.

29

### Personal Obligation to Report

We are committed to ethical and legal conduct that is compliant with all relevant laws and regulations and to correcting wrongdoing wherever it may occur in the organization. Each colleague has an individual responsibility for reporting any activity by any colleague, physician, subcontractor, or vendor that appears to violate applicable laws, rules, regulations, accreditation standards, standards of medical practice, federal healthcare conditions of participation, or this Code. If a matter that poses serious compliance risk to the organization or that involves a serious issue of medical necessity, clinical outcomes or patient safety is reported locally, and if the reporting individual doubts that the issue has been given sufficient or appropriate attention, the individual should report the matter to higher levels of management or the Ethics Line until satisfied that the full importance of the matter has been recognized. If a matter that poses concern regarding the safety or quality of care provided to a patient in the hospital is identified and was reported locally but thought to be unresolved, an additional avenue for reporting is available through notification to The Joint Commission. There will be no retaliatory disciplinary action taken against an employee who reports concerns to The Joint Commission.

### Internal Investigations of Reports

We are committed to investigating all reported concerns promptly and confidentially to the extent possible. The Chief Ethics and Compliance Officer coordinates any findings from corporate-led investigations and immediately recommends corrective action or changes that need to be made. We expect all colleagues to cooperate with investigation efforts.

### Corrective Action

Where an internal investigation substantiates a reported violation, it is the policy of the organization to initiate corrective action, including, as appropriate, making prompt restitution of any overpayment amounts, notifying the appropriate governmental agency, instituting whatever disciplinary action is necessary, and implementing systemic changes to prevent a similar violation from recurring in the future.

### Discipline

All violators of the Code will be subject to disciplinary action. The precise discipline utilized will depend on the nature, severity, and frequency of the violation and may result in any or all of the following disciplinary actions:

- *Oral warning;*
- *Written warning;*
- *Written reprimand;*
- *Suspension;*
- *Termination; and/or*
- *Restitution.*

### Measuring Program Effectiveness

We are committed to assessing the effectiveness of our Ethics and Compliance Program through various efforts. Much of this effort is provided by the Internal Audit Department, which routinely conducts internal audits of issues that have regulatory or compliance implications. Responsible Executives routinely undertake monitoring efforts in support of policies and compliance in

30

general. Facilities conduct self-monitoring, and the Ethics and Compliance Department conducts reviews of facility ethics and compliance programs designed to assess facility implementation of the Code, policies and procedures, Ethics Line and related investigations, and monitoring efforts. These compliance process reviews permit the Ethics and Compliance Department to identify and share best practices.

Most of these methods of assessment result in reports of findings by the reviewers and corrective action plans by the facilities that are reviewed. Through these reviews, we are continuously assessing the effectiveness of the Program and finding ways to improve it.

### Acknowledgment Process

HCA Healthcare requires all colleagues to acknowledge their review of the Code, confirm they understand it represents mandatory policies of HCA Healthcare and agree to abide by it. New colleagues are required to do so as a condition of employment. Each HCA Healthcare colleague is also required to participate in annual Code of Conduct training, and records of such training must be retained by each facility.

Adherence to and support of HCA Healthcare's Code of Conduct and participation in related activities and training is considered in decisions regarding hiring, promotion, and compensation for all candidates and colleagues. New colleagues must receive Code of Conduct training within 30 days of employment.

31

Acknowledgment Card

I certify that I have reviewed the HCA Healthcare Code of Conduct and understand it represents mandatory policies of the organization. I agree to abide by the Code.

_____

Signature

_____

Printed Name
(as listed in personnel records)

_____

Department

_____

Facility

_____

Universal ID (e.g., 3-4 UID) or last four digits of Social Security Number

_____

Date

September 3, 2025

Via Email   Michael.McAlevey@hcahealthcare.com

Michael McAlevey
Executive Vice President, Chief Legal and Administrative Officer
HCA Healthcare / Mission Hospital / Sweeten Creek Mental Health Center
HCA Healthcare
One Park Plaza
Nashville, TN 37203

Melina Arrowood
11 Stone House Road
Arden, NC 28704

RE: HCA and Melina Arrowood Matter

Dear Michael:

I am a victim and the father of a special needs minor victim of the conduct of your company HCA and one of your employees, Melina Arrowood.  I represent myself and my child - I am not an attorney, and I am currently waiving my rights to legal representation.  My daughter and I are the "Madson Family."

I have reached out to your local law firm Roberts Stevens and they are unwilling to confirm whether or not they represent HCA or Melina, so I'm sending this to you.

I believe that I have significant and well-supported claims against HCA and Melina, individually.  I am prepared to file claims in Buncombe County Superior Court or any other appropriate venue at my discretion.  Prior to that and short of litigation, however, I am willing to discuss a mutually agreeable resolution to the issues raised in this letter.

The claims against HCA and Melina include, but are not limited to:

- Negligence and Breach of Standard of Care
- Failure to provide basic care
- Failure to address patient concerns
- ADA violations relating to the treatment of an autistic minor
- HIPPA violations relating to the treatment of an autistic minor
- Retaliatory conduct towards a parent

- Retaliatory conduct towards a special needs minor
- Civil conspiracy
- Misrepresentation
- Intentional infliction of emotional distress.
- Corporate practice of medicine
- Section 504 violation
- Harassment
- Civil RICO (if lobby discharges have occurred more than once at Sweeten Creek)
- Pattern of Discrimination (if the request for a follow-on discharge appointment is not granted)

To the extent HCA or Melina will require additional time to assess and evaluate the items discussed in this letter, I would consider a 7-day tolling agreement that would allow the parties to continue to discuss and further evaluate these issues and would allow you to create the first draft if you have a template that is acceptable to HCA and Melina.

**Evidence Preservation Notice:**
To ensure that all potentially relevant documents and communications are maintained, I demand that HCA and Melina immediately take all necessary steps to preserve the following categories of materials:

1. Meeting notes and memos – Any internal memoranda, notes, or minutes of meetings where any Madson Family person was mentioned.

2. HCA – all records and documents, including the medical record, relating to HCA's care of the Madson Family.

3. The Missed Medication Dose – all records and documents relating to HCA's missed evening medication dose to a minor victim, including her sleep aid Trazadone.

4. The Conspiracy – I raised a number of concerns about my daughter's care under HCA's supervision and faced resistance and misinformation from a number of HCA employees, even within the C-suite. I believe her resultant discharge appointment was orchestrated in an unusual manner in a willful, purposeful, illegal, and immoral way because of the concerns I had expressed to a large number of HCA employees.

5. Parental Attempt to Record a Phone Call – All internal records or communication relating to me or any other parent attempting to record a conversation with HCA employees as followup to the Missed Medication Dose.

6. The Crime aka the Consipracy aka the Retaliatory Conduct aka The Lobby Discharge aka at least one HIPPA violation aka at least one ADA violation – Retaliatory conduct is a crime. Retaliatory conduct against a minor is a different kind of crime (especially with the Hippocratic Oath and everything). My daughter's discharge appointment occurred in a standing position in the front lobby of Sweeten Creek Mental Health Center. The attendees of the meeting were me, my daughter, and 2 HCA employees. The other nonmedical persons and complete strangers who attended my daughter's discharge appointment include but may not be limited to a female security guard, a female front desk associate, and a female sitting with her legs crossed flipping through a magazine who was 5 feet from all of this (noticeably not wearing hospital credentials OR a visitor badge). I felt rushed and I am uncertain if I understood the discharge information thoroughly. I feel like that placed my daughter at risk of having another mental health emergency. I have navigated multiple discharge appointments for my daughter, including a prior experience at Sweeten Creek, and I have never had an experience like this. Notably, no therapist or counselor was involved in this discharge.

7. Electronic data and metadata – All electronically stored information (ESI), including emails, spreadsheets, database entries, and shared drive files related to this matter.

8. Surveillance Camera Footage – All copies of interior security camera footage from the front lobby of the Sweeten Creek Mental Health Facility from 9am til 11am on Friday August 29, 2025.

9. Melina Arrowood's cell phone

10. Melina Arrowood's land line phone records (phone number 828-213-1219)

11. Fiona Madson's medical record (I have formally requested the medical record through Mission's process

12. All forms of communications or meeting notes with the law firm Roberts Stevens in Asheville, NC.

13. A list of all HCA employees or agents present in the lobby during the Lobby Discharge.

**Litigation Hold Notice**
In anticipation of potential litigation, you are under an obligation to preserve all documents and information related to this matter. This obligation extends to your owners, employees, officers, and third-party agents who may have relevant information. HCA and Melina must take affirmative steps to prevent the deletion, alteration, or destruction of any such materials, whether in hard copy or electronic form. This includes suspending any routine document destruction

policies, auto-deletion settings, and ensuring that relevant employees and IT personnel are notified of this hold. Failure to comply with this preservation demand could result in legal consequences, including but not limited to spoliation sanctions. If you believe that any potentially relevant materials may be subject to automatic deletion or destruction, please notify us immediately so that we can discuss necessary preservation steps.

**Insurance Notification**
You are hereby instructed to provide immediate written notice of this litigation hold to all insurance carriers that may provide coverage for the claims and issues described herein, including but not limited to general liability, directors and officers liability, professional liability/medical malpractice, directors and officers liability, and any other applicable insurance policies. You must ensure that your insurers are made aware of the potential claims so that they may take appropriate action to preserve coverage and fulfill their duties. Please confirm in writing that such notice has been provided.

**Follow-On Discharge Appointment Request**
By way of this letter, I'm requesting a parent-only follow-on discharge appointment. The discharge was so rushed in the lobby, and the nurses were talking so fast and I feel like the safest thing for my daughter is for me to personally walk through the discharge information again. There wasn't a counselor there. There was no flat surface for the papers. The papers were getting crumbled by the male nurse. I feel like a counselor needs to be involved in the follow-on appointment. I am available to do that in person, this Friday. Please let me know when and where I should be for this meeting and who will be attending for HCA. I feel like I did not understand the discharge properly and it may be placing my daughter at risk. I am requesting your help. I left Melina a voicemail with questions about the discharge and she did not call me back. It's been 6 days.

**Waiving the Right to Representation**
Again, I am not an attorney and I am unrepresented. I hereby waive all rights I have to my own legal counsel in any interaction with you, other HCA employees, or Melina. Anyone can just call or text me anytime, my cell phone number is 404-226-2040.

Please confirm, in writing (email is acceptable), that HCA and Melina have implemented a litigation hold in compliance with this request.


Sincerely,


Bill Madson

August 30, 2025

Via Email jbarnette@roberts-stevens.com

RE: HCA Matter

Dear Jonathon:

I represent myself with respect to certain matters arising from an experience that my daughter and I had with your client HCA and potentially with your firm Roberts Stevens ("RS"). This notice applies to the extent your firm has any direct awareness of my recent experience or my daughter's recent experience with HCA. My daughter and I are the "Madson Family."

I believe that I have significant and well supported claims against RS and HCA. I am prepared to file claims in Buncombe County Superior Court or any other venue at my discretion. Prior to that and short of litigation, however, I am willing to discuss a mutually agreeable resolution to the issues raised in this letter. To the extent RS will require additional time to assess and evaluate the items discussed in this letter, I will consider a 7-day tolling agreement that would allow the parties to continue to discuss and evaluate these issues.

**Evidence Preservation Notice:**
To ensure that all potentially relevant documents and communications are maintained, I demand that RS immediately take all necessary steps to preserve the following categories of materials:

1. Meeting notes and memos – Any internal memoranda, notes, or minutes of meetings where any Madson Family person was mentioned.

2. HCA – all records and documents relating to HCA's care of the Madson Family.

3. The Missed Medication Dose – all records and documents relating to HCA's inability to fulfill its obligation to maintain a consistent medication regime for my daughter while charged with her care in an acute stabilization mental health setting.

4. The Conspiracy – I believe RS may have conspired with HCA to commit a crime against a minor. I raised a number of concerns about my daughter's care under HCA's supervision and faced resistance and misinformation from a number of HCA employees. I believe her resultant discharge appointment was orchestrated in an unusual manner in a willful, purposeful way because of the concerns I expressed to a large number of HCA employees. I have reason to believe HCA seeks advice from RS on local legal matters and I have reason to believe that RS

communicated with HCA about the Madson Family in the time leading up to my daughter's discharge appointment.

5. The Crime aka the Retaliatory Conduct aka The Discharge Appointment aka at least one HIPPA violation – Retaliatory conduct is a crime. Retaliatory conduct against a minor is a different kind of crime. My daughter's discharge appointment occurred in a standing position in the front lobby of Sweeten Creek Mental Health Center. The attendees of the meeting were me, my daughter, and 2 HCA employees. The other non☐medical persons and complete strangers who attended my daughter's discharge appointment include but may not be limited to a female security guard, a female front desk associate, and a female sitting with her legs crossed flipping through a magazine who was 5 feet from all of this. I felt rushed and I am uncertain if I understood the discharge information thoroughly. I feel like that placed my daughter at risk of having another mental health emergency. I feel like there are privacy concerns relating to this. I have navigated multiple discharge appointments for my daughter and I have never had an experience like this.

6. Electronic data and metadata – All electronically stored information (ESI), including emails, spreadsheets, database entries, and shared drive files related to this matter.

7. Surveillance Camera Footage – All copies of interior security camera footage from the front lobby of the Sweeten Creek Mental Health Facility from 9am til 11am on Friday August 29, 2025.

8. Meeting List – All times, dates, and attendees of any in-person meetings with RS and/or HCA concerning the Madson Family.

**Litigation Hold Notice**
In anticipation of potential litigation, you are under an obligation to preserve all documents and information related to this matter. This obligation extends to your owners, employees, officers, and third-party agents who may have relevant information. RS must take affirmative steps to prevent the deletion, alteration, or destruction of any such materials, whether in hard copy or electronic form. This includes suspending any routine document destruction policies, auto-deletion settings, and ensuring that relevant employees and IT personnel are notified of this hold. Failure to comply with this preservation demand could result in legal consequences, including but not limited to spoliation sanctions. If you believe that any potentially relevant materials may be subject to automatic deletion or destruction, please notify us immediately so that we can discuss necessary preservation steps.

**Special Note on Attorney Client Privilege**
Attorney Client does privilege does not exist in the furtherance of a crime. RS may not have attorney client privilege in this matter.

**Professional Liability Insurance**
I request that you provide a copy of this letter to your professional liability insurance provider.

**State Bar Requirements**
I request that RS and its attorneys honor any obligations they have with NC State Bar as it relates to the information and allegations contained in this letter or simply the receipt of or the viewing of this letter.

Please confirm, in writing (email is acceptable), that RS has implemented a litigation hold in compliance with this request.

I am not an attorney and I am unrepresented. I hereby waive all rights I have to my own legal counsel in any interaction with RS or HCA.

Sincerely,


Bill Madson



# ROBERTS
# &STEVENS
### ATTORNEYS AT LAW

City Centre Building • 301 College Street, Suite 400 • Asheville, NC 28801
Post Office Box 7647 • Asheville, NC 28802
T 828.252.6600 • F 828.258.6955

October 22, 2025

*Writer's Direct Dial no.: 828-210-6873*
*E-mail Address: pjackson@roberts-stevens.com*

Mr. William Madson                              ***Via Email and US Mail***
33 Pheasant Drive
Asheville, NC 28803
bill@cliftontrust.com

**Re: Madson (Mission Hospital & Sweeten Creek)**

Dear Mr. Madson:

Please be advised that this firm has been engaged to represent Warren Deponti, Matthew Edwards, Melina Arrowood, Greg Lowe, and Jonathon Gluck with respect to the above-referenced matter.

By way of this letter, we ask that you cease and desist direct communications with Mission/HCA representatives. Please address my office with any future communications concerning issues identified in your August 30, 2025 Litigation Hold Notice, your October 18, 2024 letter to Dr. Warren Deponti, and/or any/all communications concerning your claim(s) against the above-named individuals and/or Sweeten Creek agents and employees.

Sincerely,

ROBERTS & STEVENS, P.A.

Phillip T. Jackson

Jordan P. Barnette

PTJ/am

## Bill Madson

| | |
|---|---|
| **From:** | Bill Madson <bill@cliftontrust.com> |
| **Sent:** | Thursday, September 4, 2025 12:10 AM |
| **To:** | Michael.McAlevey@hcahealthcare.com |
| **Cc:** | 'Bill Madson' |
| **Subject:** | Litigation Hold Notice - HCA and Melina |
| **Attachments:** | HCA and Melina - Lit Hold Notice - Final.pdf |

Good evening, Michael.  Please check this out and get back to me.


Bill Madson
Clifton Property Trust, LLC
Mobile:  404.226.2040
www.cliftontrust.com

1



## SWEETEN CREEK
### MENTAL HEALTH & WELLNESS CENTER
A CAMPUS OF MISSION HOSPITAL

Dear Patient,

Our mission at Mission Health - Mission Hospital is to provide our patients with the highest quality health care that we can. To accomplish this, we need to know what we are doing right and what needs improvement. We depend on our patients and their families to keep us informed.

By sharing your thoughts and feelings about your health care experience, you can help make our care better for future patients and their families. Please take a few minutes to complete the enclosed patient satisfaction survey and return it to the locked box on the unit or in the postage-paid envelope. Feel free to express your opinions. Your response is confidential.

Thank you, and please accept our best wishes for your good health.

Sincerely,

Greg Lowe
Chief Executive Officer





## INPATIENT BEHAVIORAL HEALTH SURVEY

We thank you in advance for completing this questionnaire. When you have finished, please mail it in the enclosed envelope.

## BACKGROUND QUESTIONS

1. Date of admission:

   ☐☐ / ☐☐ / ☐☐☐☐
   month    day      year

2. Date of discharge:

   ☐☐ / ☐☐ / ☐☐☐☐
   month    day      year

3. Admitted through an Emergency Department .......... ○ Yes  ○ No

4. Referred by your physician ...... ○ Yes  ○ No

5. Patient's sex .................... ○ Male  ○ Female

6. Patient's age ................................. ☐☐☐

7. Who is completing this survey? **(select one only)**
   ○ Patient
   ○ Friend
   ○ Legal Guardian
   ○ Spouse
   ○ Family Member
   ○ Other _____
                        (specify)

8. Did a nurse leader visit during your stay?
   ○ Yes
   ○ No

---

**INSTRUCTIONS:** Please rate the services you received from our facility. <u>Select the response</u> that best describes your experience. If a question does not apply to you, please skip to the next question. Space is provided for you to comment on good or bad things that may have happened to you.

> Please use black or blue ink to fill in the circle completely.
> Example: ●

| YOUR CARE | very poor 1 | poor 2 | fair 3 | good 4 | very good 5 |
|---|---|---|---|---|---|
| 1. Staff's concern for your privacy | ○ | ○ | ○ | ○ | ○ |
| 2. How well the staff showed concern for your emotional needs | ○ | ○ | ○ | ○ | ○ |
| 3. Your feeling of safety on the unit | ○ | ○ | ○ | ○ | ○ |
| 4. Staff's efforts to include you in decisions about your care | ○ | ○ | ○ | ○ | ○ |

**Comments** (describe good or bad experience): _____

_____

| NURSES | very poor 1 | poor 2 | fair 3 | good 4 | very good 5 |
|---|---|---|---|---|---|
| 1. Courtesy and respect of the nurses | ○ | ○ | ○ | ○ | ○ |
| 2. | ○ | ○ | ○ | ○ | ○ |

## CARE PROVIDERS (...continued)

| | very poor 1 | poor 2 | fair 3 | good 4 | very good 5 |
|---|---|---|---|---|---|
| 2. Helpfulness of time spent with the care providers | O | O | O | O | O |
| 3. Information provided by the care providers about your condition | O | O | O | O | O |

**Comments** (describe good or bad experience):_____

_____

_____

## PROGRAM ACTIVITIES

| | very poor 1 | poor 2 | fair 3 | good 4 | very good 5 |
|---|---|---|---|---|---|
| 1. Helpfulness of group therapy sessions | O | O | O | O | O |
| 2. Helpfulness of social/recreational activities | O | O | O | O | O |

**Comments** (describe good or bad experience):_____

_____

_____

## MEALS

| | very poor 1 | poor 2 | fair 3 | good 4 | very good 5 |
|---|---|---|---|---|---|
| 1. Quality of the food | O | O | O | O | O |
| 2. Quantity of the food | O | O | O | O | O |

**Comments** (describe good or bad experience):_____

_____

_____

## DISCHARGE

| | very poor 1 | poor 2 | fair 3 | good 4 | very good 5 |
|---|---|---|---|---|---|
| 1. Understanding of your medication instructions at discharge | O | O | O | O | O |
| 2. Information provided about your care after discharge | O | O | O | O | O |
| 3. Instructions on what to do if you need help after discharge (when to seek help, whom to call, etc.) | O | O | O | O | O |

**Comments** (describe good or bad experience):_____

_____

_____

## OVERALL ASSESSMENT

| | very poor 1 | poor 2 | fair 3 | good 4 | very good 5 |
|---|---|---|---|---|---|
| 1. How well the staff worked together to care for you | O | O | O | O | O |
| 2. Overall rating of care given at this facility | O | O | O | O | O |
| 3. Likelihood of your recommending this facility to others | O | O | O | O | O |

**Comments** (describe good or bad experience):_____

_____

_____

Patient's Name: (optional)_____

Telephone Number: (optional)_____



# North Carolina Medical Board

Devdutta G. Sangvai, MD, JD, MBA: President | Anuradha Rao-Patel, MD: President-Elect | Robert L. Ric

October 23, 2025

Via Electronic Mail

**PERSONAL AND CONFIDENTIAL**

WILLIAM J Madson
33 Pheasant Drive
Asheville, NC 28803

Re: North Carolina Medical Board - Request for Additional Information

Dear Mr. WILLIAM Madson:

The North Carolina Medical Board ("Board") has received your complaint submitted regarding Dr. Warren DePonti. However, to complete the review process, the Board requests that you provide the additional information noted below. **Please respond by 11/06/2025.**

**For continuity and efficiency in processing your complaint, please reply directly to this email and not file a new, duplicate complaint. Please note that submitting medical records is not a substitute a detailed narrative or response.**

- **Please provide a copy of the 50 page document you mentioned in your complaint.**

Thank you for your prompt attention to this request. Once this information has been received, the re process can take six months or more; however, when the review has been completed and the results cons by the Board, you will be informed of the Board's decision.

If you have any questions please email Complaints@ncmedboard.org or call 919-326-1100 ext. 501. Plea reference your case number when calling or returning any correspondence to the Board.

Sincerely,

*Carren Mackiewicz*

Carren D. Mackiewicz, NCCP
Director of Administrative Investigations
Legal Department
919-326-1100 ext. 438

**caseID: I072J-CLONP**

3127 Smoketree Court, Raleigh, NC 27604 | P.O. BOX 20007, Raleigh, NC 27619
Tel: (919) 326-1100 | Fax: (919) 326-1131 | Email: info@ncmedboard.org | www.ncmedboard.org
Case 1:25-cv-00425-MOC-WCM    Document 1-2    Filed 11/26/25    Page 105 of 107



**North Carolina Medical Board**

Anuradha Rao-Patel, MD: President | Robert L. Rich Jr., MD: President-Elect | Mark A. Newell, MD, MMM: Secretary/Treasurer

November 03, 2025

Via Electronic Mail

William J Madson
33 Pheasant Drive
Asheville, NC 28803

Re: North Carolina Medical Board Complaint Received

Dear Mr. William Madson:

The North Carolina Medical Board ("Board") has received your complaint concerning Dr. Matthew Thomas Edwards. Each complaint filed with the Board is taken seriously and carefully reviewed. A copy of was forwarded to Dr. Edwards for review and response to the Board. The complaint you submitted serve full statement and you will not be contacted unless clarification or additional information is needed

The Board has no authority over hospitals, facilities, their internal policies and procedures or thei general staff. You may wish to contact the hospital's "patient advocate" and share your concerns, i Additionally, you may also contact the North Carolina Department of Health Service Regulation at 1-8 as they are the state agency that provides hospital and facility oversight. You may also pursue your concerns with the facility's practice manager and/or internal patient complaint process, if applicable.

The Board cannot advise you about filing a lawsuit. You will need to contact an attorney to advise y regarding that type of question/concern.

The Office of Civil Rights is the agency that investigates HIPAA allegations (accuracy of records, co etc.). Therefore, you may also contact that agency at 1-866-627-7748 for information regarding their review process and/or further resolution of your concerns related to records.

The North Carolina Medical Board does not license nurses. For any concerns related to nurses you may contact the agency listed below for information regarding their complaint review process.

NC Board of Nursing
4516 Lake Boone Trail
Raleigh, NC 27607
919-782-3211
www.ncbon.com

While the complaint process results may not change the situation as noted in your complaint, it can b opportunity for Dr. Edwards to learn how to do things differently or better with future patients shou have any concerns that indicate a violation of the Medical Practice Act.

If you wish to request a general status report you may email complaints@ncmedboard.org. Please include your name and the **case number** noted at the bottom of this letter on any emails/correspondence to the Board.

3127 Smoketree Court, Raleigh, NC 27604 | P.O. BOX 20007, Raleigh, NC 27619
Tel: (919) 326-1100 | Fax: (919) 326-1131 | Email: info@ncmedboard.org | www.ncmedboard.org
Case 1:25-cv-00425-MOC-WCM    Document 1-2    Filed 11/26/25    Page 106 of 107

# North Carolina Medical Board

Anuradha Rao-Patel, MD: President | Robert L. Rich Jr., MD: President-Elect | Mark A. Newell, MD, MMM: Secretary/Treasurer

**The initial investigative process may take up to six months or more**. When the review is completed and a decision has been made you will be notified in writing of the outcome. Please refer to the attached further information concerning the Board's review process.

Sincerely,

Carren D. Mackiewicz, NCCP
Director of Administrative Investigations
Legal Department
919-326-1100, ext. 438

Attachment

**caseID: 2025-3249**

3127 Smoketree Court, Raleigh, NC 27604 | P.O. BOX 20007, Raleigh, NC 27619
Tel: (919) 326-1100 | Fax: (919) 326-1131 | Email: info@ncmedboard.org | www.ncmedboard.org

Case 1:25-cv-00425-MOC-WCM   Document 1-2   Filed 11/26/25   Page 107 of 107