FILED
ASHEVILLE, NC

JAN 08 2026

U.S. DISTRICT COURT
W. DISTRICT OF N.C.

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| BILL MADSON, individually and as next friend of CHILD, a minor, <br><br> Plaintiffs, <br><br> v. <br><br> ROBERTS & STEVENS, P.A., and <br> PHIL JACKSON, Esq. and <br> JORDAN BARNETTE, Esq. and <br> HCA HEALTHCARE, INC. and <br> MH MISSION HOSPITAL, LLLP and <br> GREG LOWE, and <br> MELINA ARROWOOD, and <br> MICHAEL MCALEVEY, Esq. <br><br> Defendants | Case # 1:25-cv-00425-MOC-WCM <br><br><br> **AMENDED COMPLAINT** <br><br><br> **JURY TRIAL DEMANDED** |

Plaintiff Bill Madson brings this action before the court on a pro se basis, on behalf of himself and his minor child CHILD, alleging as follows:

### INTRODUCTION

1. In August 2025, CHILD, who is diagnosed with autism, was admitted to the HCA facilities referred to as Mission Hospital and Sweeten Creek Mental Health Center in Asheville, NC for acute mental health concerns. Madson deemed her care to be unsatisfactory for a number of reasons, including potential federal civil rights violations. Madson was also troubled by the fact that HCA's Chief Operating Officer Melina

Arrowood misrepresented herself as a nurse during an 11-minute phone call with Madson the day before CHILD's discharge as a result of Sweeten Creek missing an important dose of medication for CHILD. Madson believes the discharge appointment itself was simultaneously violative of at least 30 CMS provisions. For the avoidance of any doubt, however, medical claims are not a part of this litigation.

2. On October 18, with the express goal of protecting his and his child's rights and preserving evidence, Madson sent a litigation hold notice and evidence preservation letter to an HCA employee named Dr. Warren Deponti. Dr. Deponti was one of the physicians that signed off on CHILD's discharge.

3. Over a multi-week period starting on October 20, 2025 after directly replying to this litigation hold notice, Defendants coordinated a series of coercive, misleading, and retaliatory cease-and-desist directions that unlawfully silenced Plaintiffs, which intentionally chilled their federally protected civil-rights activities, and the HCA Defendants had reason to know about .

4. At all times during the Defendants' unlawful cease and desist campaign, the HCA facility was identified as being in Immediate Jeopardy (to not receive future federal funding) from the Centers For Medicare and Medicaid Services (CMS).

5. Given the backdrop of Immediate Jeopardy and the fact that Madson was encouraging HCA employees to report this issue to superiors and to state and federal agencies if applicable, Defendants had reason to want to delay any legal filings until after the hospital had navigated the Immediate Jeopardy identification.

6. All of the RS Defendants' communication occurred via e-mail and 100% of the RS Defendants' emails and attached files are included in this complaint filing (including the exhibit file).

7. Plaintiffs are in the middle of a patient rights crisis, a civil rights crisis, and an evidentiary crisis, all because of the Defendants' conduct. The resultant harm is ongoing.

8. Plaintiffs seek an Emergency Temporary Restraining Order from the Court in a separate filing.

9. Plaintiffs bring these 13 counts before this Court: First Amendment Retaliation, Interference With The Right To Petition The Government, Prior Restraint On Protected Speech, ADA Retaliation, Section 504 Retaliation, Civil Conspiracy To Violate Federal Rights, Abuse of Process, Intentional Infliction Of Emotional Distress, Negligent Infliction of Emotional Distress, Civil Conspiracy, Tortious Interference, Unfair and Deceptive Trade Practices, and Negligent Supervision.

## PARTIES

10. Defendant Roberts & Stevens, P.A. ("RS") is a North Carolina corporation with a principal office located at 301 College Street, Suite 400, Asheville, NC 28801. It may be served at that address.

11. Defendant Phil Jackson, Esq. ("Jackson") is a North Carolina resident who may be served at his office located at 301 College Street, Suite 400, Asheville, NC 28801. Attorney Jackson was admitted to practice law in the state of North Carolina on August 26, 1994 and is licensed to practice today (Bar #21134).

12. Defendant Jordan Barnette, Esq. ("Barnette") is a North Carolina resident who may be served at his office located at 301 College Street, Suite 400, Asheville, NC 28801.

Attorney Barnette was admitted to practice law in the state of North Carolina on August 27, 2018 and is licensed to practice today (Bar #53380).

13. RS, Jackson, and Barnette are herein referred to as the RS Defendants when referenced as a group.

14. Defendant HCA Healthcare, Inc. ("HCA") is a Tennessee corporation with a principal office address of 1 Park Plaza, Nashville, TN 37203. It may be served at that address.

15. Defendant MH Mission Hospital, LLLP ("MH Mission") is a North Carolina limited liability partnership with a principal office address of 1 Park Plaza, Nashville, TN 37203. It may be served through its registered agent CT Corporation System at 160 Mine Lake Court, Suite 200, Raleigh, NC 27615.

16. Defendant Greg Lowe ("Lowe") is a North Carolina resident who may be served at his office located at 509 Biltmore Avenue, Asheville, NC 28801.

17. Defendant Melina Arrowood ("Arrowood") is a North Carolina resident who may be served at her office located at 509 Biltmore Avenue, Asheville, NC 28801.

18. Defendant Michael McAlevey ("McAlevey) is a Tennessee resident who may be served at his office at 1 Park Plaza, Nashville, TN 28801. Attorney McAlvey is a licensed attorney in the state of Tennessee (BPR # 039831)

19. HCA, MH Mission, Lowe, Arrowood, and McAlevey are herein referred to as the HCA Defendants when referenced as a group.

## JURISDICTION, VENUE, AND CONDITIONS PRECEDENT

20. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States, including the First

Amendment, 42 U.S.C. § 1983, the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12203, and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

21. This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over Plaintiffs' related state-law claims because those claims form part of the same controversy as the federal claims.

22. Personal jurisdiction is proper in this Court as to all Defendants because the acts giving rise to Plaintiffs' claims occurred in substantial part within the Western District of North Carolina. Those acts were expressly directed at Plaintiffs in this District, caused harm in this District, and continue to cause harm in this District. In addition, personal jurisdiction is proper under principles of agency and civil conspiracy. Defendants acted in concert and within the scope of a common plan, and the acts of each Defendant in furtherance of that plan are attributable to the others for the purposes of jurisdiction.

23. All conditions precedent to filing this action have been satisfied, excused, or have otherwise occurred.

## FACTUAL ALLEGATIONS

24. In late August 2025, Madson's child CHILD received what he considered to be inadequate care in the HCA hospital system in Asheville, NC. Madson has executed an affidavit (Madson Affidavit, Exhibit A) detailing the facts of the Plaintiffs' experience at the hospital.

25. The Plaintiffs make no claims in this lawsuit regarding CHILD's medical treatment; however, that treatment is the background of a litigation hold notice that initiated communication between Madson and the RS Defendants who represent HCA and that communication is central to this lawsuit.

26. Issues involved in the August 2025 treatment include but are not limited to: Madson witnessing the ER staff not being able to locate a child in its care (not CHILD – another child) for approximately 15 minutes on August 23, HCA facilities not meeting hygiene protocols for adolescent minors, HCA facilities not providing scheduled medicine to CHILD, Defendant Arrowood misrepresenting herself as a nurse in an 11-minute phone call with Madson the day before CHILD's discharge, and then finally CHILD's discharge taking place in the lobby of Sweeten Creek, in about a 3-4 minute period, while standing up the entire time, with strangers present, with no medical professionals present, with no patient safety plan, and no patient teach back.

27. The North Carolina Medical Board has opened two investigations into this matter, one for each discharging physician (Dr. Warren Deponti and Dr. Matthew Edwards).

28. On September 4, 2025 Madson sent a litigation hold notice (HCA Litigation Hold, Exhibit B) to HCA's Chief Legal Officer named Michael McAlevey, a licensed attorney in the state of Tennessee practicing as in-house counsel for HCA. Attorney McAlevey never responded.

29. On October 10, 2025 the Centers for Medicare and Medicaid (CMS) identified the HCA-owned Mission system as being in Immediate Jeopardy (Exhibit C). The crux of an Immediate Jeopardy identification is that CMS is identifying serious issues with care and threatening to discontinue providing Medicare and Medicaid funds if a corrective plan is not implemented with 21 days.

30. Each of the eight Defendants would have known about the Immediate Jeopardy designation. In fact, Lowe and Arrowood were almost certainly personally and directly

engaged with various CMS personnel during the 21-day corrective window. The
Immediate Jeopardy notice is in fact addressed to Lowe directly.

31. Madson's research suggests that a CMS Immediate Jeopardy designation is the most
serious state or federal regulatory finding that can be issued against a hospital.

32. HCA's facilities in Asheville, NC also received Immediate Jeopardy designations in
March 2021 and February 2024.

33. According to publicly available information that HCA has filed with the Securities and
Exchange Commission, they have a market capitalization of around $100 billion,
typically have $1-2 billion cash on hand, and have gross revenue of around $70 billion.
HCA states that 55% of their revenue is derived from CMS sources, so in a recent 12-
month period, their gross revenue attributable to CMS was around $35 billion. CMS-
affiliated revenue is crucial to the survival of any hospital, and it is likely that HCA
receives more CMS-affiliated revenue than any other entity in the United States.

34. On October 18, 2025 Madson delivered a litigation hold notice (Deponti Litigation Hold,
Exhibit D) via FedEx and email to Dr. Warren Deponti, a physician at Sweeten Creek
who provided medical services to CHILD. Madson copied a law firm named Roberts &
Stevens because he had reason to believe they may represent the local hospital system.
The body of the email was a request for the doctor to review an attachment. The
attachment was a 54-page litigation hold notice. The litigation hold notice itself is
relevant to this matter in these ways:

- Madson clearly stated he was not an attorney.

- Madson clearly stated he was advocating for the rights of his autistic child who has
certain federal protections.

- Madson clearly stated that there was no current litigation ongoing between Madson and any other parties relating to the treatment of CHILD.
- Madson clearly stated there were potentially several federal causes of action, including civil rights matters, that were applicable to CHILD's treatment.
- Madson clearly stated that he wanted HCA employees to report the matter internally and to appropriate state and federal agencies, and they had an obligation to do so.
- The four corners of the litigation hold document exclusively contain information that was not only lawful but also privileged and protected.

35. The Deponti Litigation Hold requests that any HCA-employed reader report the incident to their superiors and/or federal agencies, based on the requirements of the HCA Healthcare Code of Conduct, which is believed to be required to be acknowledged and signed as a condition of employment with HCA. The Deponti Litigation Hold includes a copy of the HCA Healthcare Code of Conduct.

36. On October 20 at 6:04am, Madson emailed Ruth Kain, who is known to be HCA's Chief Nursing Officer at Mission. Madson's words were: "I want to bring the conduct of at least 4 nurses to your attention, while also mentioning that a business executive purported to a nurse in a recent interaction with me." This email is located in Exhibit E.

37. That same morning at 6:59am, Madson emailed the licensed medical professionals who are members of Mission's Board of Trustees (Dr. Alex Schneider, Dr. Donald Gajewski, Dr. Gregory Campbell, and Dr. William Shillinglaw). Madson's words were "I'm reaching out to you concerning hospital misconduct during the treatment of my daughter, an autistic minor…My opinion is this matter qualifies for review by the Quality, Safety, and Service Committee." This email is located in Exhibit F.

38. That same morning at 7:22am, Madson emailed HCA employee Cynthia Hunter after receiving a letter from Ms. Hunter in September. Madson discussed medical protocols and what he believed to be a direct and purposeful misrepresentation contained in CHILD's medical record, in addition to the noncompliant discharge that occurred in the Sweeten Creek lobby. Madson asked Ms. Hunter to "please escalate this internally." This email is located in Exhibit G.

39. Madson seeks to correct a statement made in its TRO Response in Support where Madson said he had not contacted any administrative staff members at Mission. Ms. Hunter may in fact be considered an administrative staff member. Madson did not discuss litigation in this email and was simply replying to communication that Ms. Hunter delivered to Madson a few weeks prior.

40. Sometime on that same day October 20, HCA opened an internal investigation into one or more of Madson's concerns. In a letter dated December 12, an HCA employee named Emily Allen wrote to Madson:

> "We are writing to inform you that on October 20, 2025, we discovered information contained in [CHILD] medical record at Mission Hospital may have been inappropriately disclosed on August 29, 2025. Mission Hospital thoroughly investigated this situation and determined [CHILD] first and last name, medications, and follow-up appointment information, when verbally communicated by workforce members during the discharge process, may have been inadvertently overheard by an unauthorized third party.
>
> We have addressed the situation and are taking steps to prevent such incidents from happening in the future. The workforce members were appropriately sanctioned in accordance with facility policy and retained on the appropriate safeguards to use when discussing patient information. We are also in the process of retraining our workforce concerning our privacy policies.
>
> We are committed to the property handling and protection of your information. In the event you have any questions or concerns, please do not hesitate to contact me at 828-213-8541 and Emily.Allen4@HCAHealthcare.com. We sincerely apologize for any inconvenience this may have caused.

41. Madson notes that this letter was delivered to Stephanie Madson, Madson's ex-wife and CHILD's mother, who now goes by Stephanie Allen. On November 21, Ms. Allen provided a Limited Power of Attorney for Madson to serve as the point of contact for all matters relating to CHILD's August treatment. That Limited Power of Attorney is located in Exhibit O. Madson requests that Defendants make all future contact to him directly.

42. Emily Allen signs the letter as the "Facility Privacy Official." Her LinkedIn profile also references her job title as the Assistant Ethics and Compliance Officer. The complete letter is located in Exhibit N.

43. In this letter, a high-ranking compliance employee is telling Madson that he can contact her. She's offering her direct line telephone number and her email address and saying it is ok to contact her directly. Madson must again seek permission to do so, or he may suffer the consequences of a 27-attorney law firm in his hometown who represents the wealthiest business entity in all of Western North Carolina.

44. Also on that same day October 20, at 5:18pm, is the exact moment where the Plaintiffs begin to have less-than-100% access to their protected civil rights and patient rights, as a direct result of Attorney Jackson's response to the Deponti Litigation Hold:

"Dear Mr. Madson – Please allow this email to confirm that I have been retained to represent MH Mission Hospital, LLLP (hereinafter "Mission"), its affiliated corporate entities, its officers, its agents, and its employed physicians related to this matter. Please do **not** have any further communication of any type with any person at Mission related to this matter. Please direct all communications to this email address or the address listed below. To the extent that you have already sent via email, US Mail, or overnight courier any communication to any person at Mission related to this matter, I ask that you provide a copy of that communication to me directly."

45. The word "not" was stylized using bolding and underlining in the author's original email. This form of stylizing would be repeated by Defendants in the future.

46. Attorney Jackson attempted to stifle the rights of me and my child at this very moment, knowing that I had federal civil rights issues with his client because of my child's care, knowing about Immediate Jeopardy, knowing that I wanted HCA employees to report issues to federal government agencies, knowing I'm not attorney, knowing there is no ongoing litigation, and knowing how patient rights are supposed to work as the chosen legal professional of the largest hospital operator in the United States.

47. Information on the RS Defendants' website indicates they have been in business for 40 years, and they attribute their success to "decades of conscientious legal work." Plaintiffs assert that RS Defendants' conduct is not conscientious is this particular matter.

48. Plaintiffs' rights have been impaired by the RS Defendants, creating a chilling effect on Madson's advocacy for CHILD, in a purposeful way.

49. Plaintiffs believe this communication from Attorney Jackson and other communication from RS Defendants violate various Rules of Professional Conduct as established by the North Carolina State Bar including but not limited to Rule 3.1 (Meritorious Claims and Contentions), Rule 3.4 (Fairness to Opposing Party), Rule 4.3 (Dealing with an Unrepresented Person), Rule 4.4a (Respect for the Rights of Third Persons), and Rules 8.4a and 8.4b (Conduct Prejudicial to the Administration of Justic). These rules are listed in detail in Exhibit I.

50. Two hours later, Madson responded to Attorney Jackson:

"I'm going to stop your sanctionable conduct, citing Rule 8.4 and the First Amendment. I can and will contact anyone I want, whenever I want, with whatever information I want, in whatever

setting I want. If you want to walk down the path of telling me what I can and can't do, please keep doing do so in writing. My daughter and I are victims of your client's conduct."

51. As Madson asserts in this email, Attorney Jackson's communication violates the First Amendment and other provisions of the United States Constitution, including the Fourteenth Amendment and Article VI. These provisions are listed in detail in Exhibit K.

52. Madson thought his reply would be effective enough that it would end the issue and he's be able to push forward with advocacy, but he was wrong. Attorney Jackson had an option here to choose de-escalation, but the Plaintiffs would soon find out the cease-and-desist campaign had only just begun.

53. The Deponti Litigation Hold dealt with a patient's rights issue from August 28/29 and Madsons belief that various HCA employees have requirements to report the issues he identified. Then on October 20, Plaintiffs' rights were challenged by the Defendants, resulting in harm, and all of this is happening while the Defendants' client is under federal investigation for serious issues relating to patient rights. Patient Rights is one of the four primary issues identified by CMS in their October 10 Immediate Jeopardy identification.

54. Attorney Jackson never replied to Madson's email. Madson believes Attorney Jackson's email is improper, and Madson immediately references how the email is violative of the standards for the conduct of legal professionals (especially towards unrepresented parties) and the constitutional rights of the Plaintiffs.

55. Attorney Jackson tells Madson that he represents an entity named MH Mission Hospital, LLLP but does not mention if he is a representative of Dr. Deponti and does not provide any information about this entity called MH Mission Hospital, LLLP. That business

entity might be involved in the hospital or might not, but Madson believes CHILD's rights are too important to make any kind of assumptions about anything.

56. Relating to the name of the business entity, an applicable analogy would be that Madson can go to the NC secretary of state website and form an LLC called Bill's Hamburgers LLC and then open a restaurant that exclusively sells hot dogs. So while Attorney Jackson felt comfortable defining what Madson's rights would be going forward, he offered no legal basis for doing so, all without clarifying who he represents or how this entity called MH Mission Hospital, LLLP is even connected to Madson in any way.

57. On October 18, Defendant Lowe, the CEO of Mission Hospital, received the Deponti Litigation Hold via email. On October 21 at 10:16am, Lowe signed for a Fedex package that contained a copy of the Deponti Litigation Hold.

58. On October 18, Defendant Arrowood, the COO of Mission Hospital received the Deponti Litigation Hold via email. On October 21, Arrowood refused delivery of a Fedex package from Madson, according to a Fedex employee that called Madson afterward.

59. On or around October 20, each of the HCA Defendants had reason to know about Madson's attempts to advocate for his daughter. In this way, all eight Defendants knew or should have known about the cease-and-desist campaign.

60. The next day (October 21, 2025), Madson emailed Dr. Deponti to ask him if this Attorney Jackson is his representative:

"Last night I received a response to your Litigation Hold Notice from someone named Phil Jackson. Do you know him? He claims to be a legal professional representing an entity called MH Mission Hospital LLLP. His email and my response are below.

Are you in some way connected to an entity called MH Mission Hospital LLLP? He did not offer any background of this entity called MH Mission Hospital LLLP so I do not have any way of knowing what that entity is, or why he is responding to a Litigation Hold Notice to

you. Approximately 24 hours ago, I asked him if he represented you and he has not responded. Did your insurance company hire him to be your representative?"

61. On October 22, 2025, Madson received an email from Attorney Jordan Barnette, who also works at Roberts & Stevens. Attorney Jackson is copied on this email. The text of the email refers me to an attachment, a pdf labled "Madson - Notice of Representation_Cease and Desist(3763231.3).pdf." In the attachment, Attorney Barnette confirms that he represents Dr. Deponti, but goes on: "By way of this letter, we ask that you cease and desist direct communications with Mission/HCA representatives." The letter is written on Roberts Stevens' letterhead.

62. Attorney Barnette states:

"I can inform you that our firm has been engaged to represent the aforementioned persons and entities as it relates to the claims concerning your daughter and other items you have noted in prior correspondence. I can further advise that I am in receipt of the attachments you provided via email to me, today.

As for the other items of note in your emails, I do not plan on providing a response to those queries and I will reiterate my request that you cease and desist communicating with those represented individuals, directly."

63. At this point, Madson is not to contact the hospital or any hospital employees for any reason at all – if he does, he may suffer the consequences of a huge law firm representing one of the largest companies in the United States.

64. During this exchange, Attorney Barnette mentions that he represents HCA Healthcare Inc. While Madson was unable to confirm any information about the business entity called MH Mission Hospital, LLLP, he was able to confirm that HCA Healthcare, Inc. is the largest hospital system in the United States, the owner of Asheville's local hospital system, and has a net worth in excess of $100 billion.

65. So from this moment forward, there is a $100 billion dollar balance sheet behind all communication Madson received from the attorneys, including and especially the cease-and-desist communications. It's the very definition of a chilling effect on patient civil rights.

66. Attorney Barnette has confirmed to me that his firm represents Melina Arrowood as an individual in addition to RS' representation of HCA. Ms. Arrowood is prominently mentioned in the Deponti Litigation Hold because of an 11-minute phone conversation that her and Madson had on August 28, the day before CHILD's discharge. In that conversation, Arrowood said was she was in nursing but I later googled her name, the first result was the HCA Mission Health website where she is listed as the Chief Operating Officer of Mission Hospital. Madson was shocked.

67. The next day, my daughter's discharge appointment occurred in the lobby of Sweeten Creek, in a public setting, lasted only 3 or 4 minutes, with multiple strangers present, and did not include a patient safety plan.

68. Because the discharge took place in the Sweeten Creek lobby, video surveillance footage likely exists and is inarguably an important piece of evidence as Madson continues advocating for CHILD.

69. On September 4, Madson sent the HCA Litigation Notice to Attorney McAlevey in an effort to preserve this video footage.

70. But now Madson knows Attorney Barnette represents both Ms. Arrowood and HCA Healthcare, Inc., so he replies to Attorney Barnette with this bullet pointed question/comment list about Ms. Arrowood and my attempt to preserve the video surveillance footage:

- "Can you confirm that she has received the attached Litigation Hold Notice?
- I delivered this to an HCA employee named Michael McAlevey on 9/3/25 but no one wrote me back. I've attached the correspondence.
- I tried to send this to her yesterday, and she refused delivery according to the Fedex driver who called me, so I don't what's going on but I'm sending it to you now since you represent her.
- In the communication, I requested further discharge guidance from Melina but no one wrote me back."

71. Attorney Barnette is telling Madson that he will not communicate about the delivery of a litigation hold notice to his client's Chief Legal Officer. His exact words, as mentioned above, are: "I do not plan on providing a response to those queries." Barnette is an attorney and won't tell Madson if his own client's lead attorney received a credible legal notice – this kind of delay tactic was prominent throughout Madson's interactions with the RS Defendants. Madson believes the reason is that the longer they could push out or possibly completely stop Madson's medical lawsuit, the more likely that HCA was able to survive Immediate Jeopardy.

72. Madson is trying to confirm that two of Attorney Barnette's clients received evidence preservations notices and he won't talk to me about it.

73. So this is the sequence Madson experienced at this point:

    - Arrowood (Chief Operating Officer) on the phone with him pretending to be in nursing and not disclosing she was a C-suite executive.

    - Attorney McAlevey (HCA's Chief Legal and Administrative Officer) not replying to a litigation hold notice that came directly from him, an unrepresented father of a special needs minor.

- The attorneys who represent the HCA Defendants are pounding Madson with cease and desist notices and then directly say they won't talk to him about evidence preservation.

- And then backdrop for every bit of this is the hospital's Immediate Jeopardy designation from CMS which is zeroed in on patients' rights.

- Madson is trying to pursue his rights and preserve evidence while none of my counterparties will listen to him or give him a straight answer. That's the exact state of affairs on October 22.

74. RS Defendants have weaponized their law licenses and the balance sheet of their HCA Defendant clients to cause harm to Plaintiffs. There is a lot of money on the line if CMS pulls the plug on Medicare and Medicaid funding and the Defendants are willing to do almost anything to prevent that from happening.

75. RS Defendants stand to earn substantial legal fees from their representation of HCA. HCA is almost certainly their largest individual client or one of their largest clients, so the goal of navigating Immediate Jeopardy during Madson's advocacy was effectively a joint and several matter between the RS Defendants and the HCA Defendants – their interests are one in the same, they all directly or indirectly what the CMS money to keep flowing and that is why they worked together to try to silence Madson.

76. Madson learned that patients having the ability to file their own supplemental complaint to CMS, so he did that and he is now a Supplemental Complainant with CMS. Madson let the RS Defendants know he pursued this advocacy with CMS.

77. Seeking additional clarity about his rights, on October 26, I send this email to the

Defendants and again do not get a response:

"Phil and Jordan,

You've told me you represent these 5 individuals:  Warren Deponti, Matthew Edwards, Melina Arrowood, Greg Lowe, and Jonathon Gluck.

My question is if I am allowed to use any of the methods below to have direct contact with them.

- Email
- Mail
- Process Server

Please let me know Yes or No on each of those three methods.

For at least the fifth time, I'm letting you know in writing that I am not an attorney.  There is no active litigation between me and any of the Represented Individuals, so no court has yet established rules for who can contact who.  I believe it is within my rights to contact these individuals, but you have sent me a cease-and-desist letter among other attached forms of potential intimidation.  I don't want a powerful law firm like Roberts Stevens to sue me, so I'm seeking clarity about what my rights are and what they aren't relating to these Represented Individuals.  I'm currently nervous about trying to follow your rules while still maintaining my civil rights.

I will await your response.

Bill"

78. Madson's research indicates that many commercial buildings that have public areas (such

as office buildings and hospitals) preserve surveillance footage for 60 days and then it's

automatically deleted.  CHILD's discharge occurred on August 29, 2025.  Sixty days

from then is October 28.  Madson is working against that potential deadline of October

28 at all times the Defendants are trying to delay Madson's advocacy.

79. In the middle of this civil rights disaster purposefully orchestrated by these eight

Defendants, the video footage evidence may be automatically deleted.  All of this chilling

cease and desist communication and follow-on obfuscation is occurring at the very

moment that the video surveillance footage may be subject to automatic deletion. Every second that goes by increases the odds of spoilation, but every second that goes by also inches HCA closer to surviving the Immediate Jeopardy identification.

80. On October 24, 2025, Madson was sorting through some paperwork on the desk in his home office and came across a survey from Mission Hospital that was handed to him at the conclusion of my daughter's discharge appointment. Madson's recent experience with Mission was unsatisfactory and he wanted to fill the survey out in its entirety. But he paused, knowing he had received multiple cease-and-desist communications from Roberts Stevens – they have told him that he can't contact anyone with the hospital but this survey is certainly going to the hospital. Madson asked for Attorney Jackson's permission to fill out the survey with this email:

"Phil,

In the lobby of the Sweeten Creek Mental Health Center at the conclusion of my daughter's 3-4 minute discharge appointment, the male nurse handed me an envelope. Inside the envelope (and attached to this email) was a letter from Greg Lowe, the CEO of Mission Hospital. In this letter, Greg mentioned to me "you can help make our care better for future patients and families." I am interested in doing that. The letter was placed in my hand and signed by Greg so he was communicating directly to me. The envelope contained a 2-page survey to highlight what Sweeten Creek is "doing right and what needs improvement." I have some actionable ideas for improvement, and I want to share them with Greg.

However, in your email below and Jonathon's emails yesterday (mentioning the words 'cease and desist' on back-to-back emails), you all have told me that you represent Greg Lowe and that I am no longer allowed to contact him directly. I had previously made you aware that I was not an attorney, but I'm doing so again – I am a private citizen and single father advocating for my child's rights. I am not an attorney.

While I am advocating for my daughter's rights and offering suggestions for systemic improvement vis a vis Greg's survey, I want to make sure to not get sued by a powerful law firm like yours - so I am asking you this question:

May I have your permission to fill this out and mail it to Greg?

I'm asking you to get back to me by 7pm tonight, because I'm running errands in the morning and I want to stop by the post office. Greg included a prepaid postage envelope, so I don't even need a stamp.

Bill"

81. Attorney Jackson did not respond so I emailed Attorney Barnette with this question:

"Jordan, I didn't hear from Phil. Will you allow me to process the survey that Greg asked for?"

Again, more delays in response time which inches video evidence towards deletion and inches

HCA through surviving Immediate Jeopardy.

82. Attorney Barnette replied:

**"You may return the survey via the post-paid envelope.**

As for whether I can permit you to communicate directly via email/mail with our represented personnel in this matter—I would refer you to the prior correspondence attached to you email asking that you cease and desist making continued communications.

Additionally, I have noted much urgency in your correspondence with certain requests demanding responses by a specific date certain or time of day (even if a request is sent the same day). For my part, I will endeavor to communicate with you promptly and professionally concerning this matter but I am generally unlikely to adhere to any immediate or protracted deadlines. I hope that you understand."

83. The bold emphasis on the entire first sentence was contained in Attorney Barnette's

original email.

84. The bolding and the use of word "may" are both crucial. The cease-and-desist

mechanism designed by the Defendants is fully operational in this moment. Attorney

Barnette is 'allowing Madson' to fill out a Mission Hospital survey, so Attorney Barnette

controls what Madson can and can't do with this hospital. At this moment, he is letting

Madson know that it is appropriate for Madson to only work through the RS Defendants

and that is it sensible and appropriate to seek permission from RS – the process as designed in the cease-and-desist campaign is working for the Defendants. Collectively, the RS Defendants have effectively become the arbiter of what Madson can and cannot do during this process, and this email is the evidence of that.

85. Attorney Barnette has taken note of how anxious Madson is to communicate about evidence preservation – the reason Madson is anxious is because this video footage might get automatically deleted and there's a potential deadline of October 28. Attorney Barnette is telling Madson to expect delays and he will be in touch whenever it works for him. More delay tactics.


86. On October 30, Madson emailed Attorney Jackson and Attorney Barnette with the text below, with a subject line of "Cease and Desist Recap."

"Jordan,
I understand that I cannot impose any kind of deadline on the timing for a response from you – I get that. I also understand you have a job to do, and you are doing your best.

That said, your cease-and-desist letter (and repeated follow-up about it) is not lawful. I am not attorney, and I am not represented by an attorney, and you knew that well in advance of sending me a cease and desist. I am individual, and I have some claims against individuals that happen to be your clients now, those individuals are medical professionals that treated my child in what I what I think was an inappropriate manner, and no laws exist that I say I cannot contact those individual medical professionals. In fact, so many laws exist that say I can do exactly that.

Prior to your cease and desist, one individual client of yours received 3 emails from me and one fedex package from me. Your other individual clients received one email from me and one Fedex package from me (although one of your clients refused delivery of the Fedex package). The contents of all communication were legal and medical documents relating to the treatment of my child.

You've been careful not to 'demand' me to cease and desist but saying 'please cease and desist' is akin to a violent criminal saying 'kindly let me cut your arm off' – the 'please' and 'kindly' don't really matter.

As it relates to this cease-and-desist issue, your communication has been intimidating. It certainly has a direct and purposeful chilling effect on patient rights. I believe sending a cease and desist to an unrepresented non-attorney minor patient's dad violates CMS protocols, among a litany of others.

Bill"

87. A few days later, Madson received a letter from Carren D. Mackiewicz who is the Director of Administrative Investigations with the North Carolina Medical Board. In the prior week, the North Carolina Medical Board opened an investigation into two doctors that treated my child. Madson had processed an online complaint form and received document requests from NCMB on the same day he filled out the complaint form. Ms. Mackiewicz's letter mentions:

"You may wish to contact the hospital's "patient advocate" and share your concerns, if applicable. Additionally, you may also contact the North Carolina Department of Health Service Regulation at 1-800-662-7030 as they are the state agency that provides hospital and facility oversight. You may also pursue your concerns with the facility's practice manager and/or internal patient complaint process."

88. Madson would like to pursue discussions with these various opportunities to promote his rights and his child's rights, but again Madson pauses, because of the pattern of communication from the Defendants. He has a $100 billion balance sheet telling him to watch his step or suffer consequences.

89. Attorney Barnette and Attorney Jackson do not respond. More delays.

90. On November 7, Madson again requests permission from these attorneys to pursue his rights and CHILD's rights in the email below:

"Phil and Jonathon,

I need to revisit your cease-and-desist communication.

I'm attaching two letters I received relating to Warren and Matthew. The notices are from the Director of Administrative Investigations of the North Carolina Medical Board.

In the letter concerning Matthew, Ms. Mackiewicz relays to me the option to reach out to the hospital's patient advocate, practice manager, and internal patient complaint personnel. I am interested in doing that, but the problem for me is I have all this cease-and-desist communication from Roberts Stevens. It's worth noting that Ms. Mackiewicz had a copy of the cease-and-desist letter and follow-on emails before sending me this letter.

I'm clearly stating again:

-   I am a private citizen and not an attorney. I made you aware of that in writing on 8/29/25 and multiple times thereafter. There has never been a question about whether or not I was an attorney.
-   I am not represented by an attorney. I made you aware of this on 8/29/25 and multiple times thereafter. In fact, at this point, I have not even consulted an attorney on this matter.
-   I have not filed any lawsuits. There is no ongoing litigation of any kind. Once litigation begins, a Court will almost certainly order me to communicate exclusively with Roberts Stevens on this matter if you are still representing the defendants at that time. When that happens, the request will be reasonable and lawful, and I will of course follow the Court's directions.
-   My communications with HCA/Mission personnel preceding your cease-and-desist communications were all lawful and protected by my civil rights, my child's civil rights, and my child's patient rights. The substantive part of the communication was a 54-page detailed summary of my child's experience that I delivered to the individual doctors and individual executives involved with my child's care. There was nothing aggressive or threatening about any of my communication.
-   Not an attorney, not in litigation, all communications are protected by CMS, other state and federal entities, and the Consititution.

I do not believe there is any legal basis for your cease-and-desist communication, so it is now time for you to either own or abandon the cease-and-desist communication:

-   **Owning It.** If you want to own it and state it again, or point me to prior communications like you have before, I require a legal basis. Your response will necessarily have to conflict with the advocacy opportunities that Ms. Mackiewicz mentioned to me in her letter. In the absence of a clear legal basis for the cease-and-desist communication, your response would be indicative of an ongoing-multiple-law-violating attempt at restricting the rights of a special needs minor.

-   **Abandoning It.** If you want to abandon it and effectively say 'don't worry about the all of the prior cease-and-desist communication,' your intimidation process will have started on 10/20/25 with Phil's original email and ended on day that I receive I response that we are done with the concept of a cease-and-desist. In this way, you will have essentially

'bookended' the timeframe that you were engaged in restricting the rights of a special needs minor.

I want to avoid any doubt in terms of the precise rights that I strongly believe you are trying to restrict my child from pursuing – the things that immediately come to mind as I'm typing this are ADA, 504, and CMS 42 CFR §482.13(a)(2) & (a)(7).

Jordan had previously let me know that Roberts Stevens' will not be adhering to any response timelines requests from me, so please respond at your leisure.

Bill"

91. Madson wants to contact the Sweeten Creek facilities manager to obtain a copy of the video surveillance footage, but he has all of this threatening communication that tells him he is not allowed to.

92. Desperate to get more information, Madson tries one more time to clarify whether HCA received the litigation hold and evidence preservation notice on September 4, the receipt of which would have required Attorney McAlevey to take affirmative steps to preserve the video surveillance footage on September 4, even as McAlevey was apparently unwilling to confirm receipt of a lawful notice from a patient's father.

93. The Defendants and Madson have another email exchange about the September 4 HCA Litigation Hold, which again appears to take them some time and wordsmithing:

11/7/25 at 7:02pm – Bill Madson writes: "Can you confirm that your client HCA Healthcare received the attached litigation hold notice that I sent to Michael McAlevey on 9/4/25? The original email with metadata is attached for reference."

11/13/25 at 3:33pm – Attorney Barnette writes: "This was received. Thank you."

11/14/25 at 10:48am – Bill Madson writes " When you say "this was received" you are referring to HCA having received the litigation hold notice on 9/4/25 – is that correct? "This was received" could also mean you simply received my email and are acknowledging receipt of my email. Just looking to avoid any ambiguity."

11/19/25 at 6:27pm – Bill Madson writes "Following back up here. I'm not being obtuse. "This was received" has two distinct possible meanings. Either you are saying you just received my email, or you are saying that your client received the litigation hold email when I sent it – as it relates to evidence preservation in the matter concerning my child, those are two extraordinarily different messages. I'm asking for clarity again, five days after asking for it for the first time. It's appropriate for you to clarify this for me.

11/19/25 at 6:28pm – Attorney Barnette writes, "Thanks for following up, Bill. It was received by the client."

94. Madson first asked the Defendants about the September 4 evidence preservation request on October 22. Madson got a straight answer for the first time 28 days later - Twenty. Eight. Days. Madson wanted to talk about spoliation concerns, and the Defendants chose to try and shut him up with a cease-and-desist campaign. Every second that ticked by over that 28 days increased the odds of the primary evidence being destroyed. An evidentiary crisis is underway because of the conduct of the Defendants.

95. Plaintiffs do not have access to their civil rights as a result of the conduct of the Defendants. The Defendants have become the Judge and Jury for what Madson can and cannot do relating to the HCA Defendants' poor medical treatment of his child. This matter has escalated to a point where an actual Judge and Jury are needed to restore what is left of Plaintiffs' rights as a direct result of the conduct of the Defendants.

96. All eight Defendants must be aware of various CMS Conditions of Participation. In Exhibit J, Madson references what he believes are some of the applicable CMS provisions that govern Patient Rights. Some of the applicable provisions include:

42 C.F.R. § 482.13(a)(2) – Right to Voice Complaints / Grievances
"The patient has the right to voice grievances regarding treatment or care that is (or fails to be) furnished and the right to have those grievances reviewed by the hospital.
The patient has the right to be free from any form of reprisal or discrimination for exercising his or her rights."

42 C.F.R. § 482.13(a)(2)(i) – Hospitals Must Establish a Grievance Process

"The hospital must establish a process for prompt resolution of patient grievances."

42 C.F.R. § 482.13(a)(2)(ii) – Written Notice Requirement
"The hospital must ensure that the grievance process includes a procedure for submission of a written notice to the patient containing the name of a hospital contact person, the steps taken to investigate the grievance, the results of the grievance process, and the date of completion."

97. Each of the eight Defendants are either businesses or individuals operating at the very top end of healthcare and healthcare litigation in Western North Carolina. HCA is the largest hospital operator in the country and owns the largest hospital in Western North Carolina. The HCA employee Defendants are all senior executives. RS is their chosen legal representative in Western North Carolina. Each of the RS attorneys is a tenured healthcare litigator whose services were chosen by the largest hospital operator in the United States out of all of the possible attorneys in Western North Carolina. There is no good reason for the eight Defendants to not know about these CMS provisions.

98. Mission Hospital also has its own policies concerning patients' rights. Pulled directly from Mission's website, Exhibit L outlines Mission's "Patient Rights and Responsibilities." To report "Patient Complaints and Grievances" within HCA, Mission offers two options, either call the Facility Patient Advocate at 828-213-1111 or the HCA Healthcare Ethics Line at 800-455-1996. Notably, there are actually no words or instructions provided to patients other than to list these two phone numbers and a few agencies. Nonetheless, Madson wanted to contact and still wants to contact the Facility Patient Advocate and the HCA Healthcare Ethics Line, he is unable to without the Defendants revoking their prior cease-and-desist communication. There is no good reason for the eight Defendants to not know about Mission's own policies.

99. The cease-and-desist campaign shut off all of these opportunities to Madson, which caused harm and continues to cause harm to Plaintiffs.

100. All eight Defendants knew or had reason to know about the cease-and-desist campaign against Madson.

101. Exhibit H contains all of the RS Defendants' email communication to Madson. There has been no verbal communication from the RS Defendants, so this exhibit contains 100% of their communication to Madson.

102. On December 10, the RS Defendants submitted to the Court a Brief In Opposition to Motion for Temporary Restraining Order. The full copy of this brief is located in Exhibit M. RS Defendants offer 3 main explanations or rationale for why their cease-and-desist campaign was appropriate and lawful:

    a. RS Defendants think Plaintiffs are pursuing medical claims. Plaintiffs assert that this Amended Complaint does not pursue any medical claims.

    b. RS Defendants think Plaintiffs should be suing their client HCA. In this Amended Complaint, Plaintiffs are doing so. All eight Defendants knew or had reason to know about the cease-and-desist campaign, and the Plaintiffs are not misunderstood about who or why they are suing each of the eight Defendants.

    c. RS Defendants used the word 'please' and 'ask' from time to time during their cease-and-desist campaign, and they are asking this Court to believe that 'please' is the operative word in the phrase 'please cease and desist.'

103. Based on this Brief, Madson has reason to believe that one or more Defendants may believe any communication between one or more of the RS Defendants and one or

more of the HCA Defendants are subject to attorney client privilege. Plaintiffs assert that attorney-client privilege will not apply to this matter because the crime-fraud exemption removes that protection if the legal advice was in furtherance of misconduct. The cease-and-desist pattern of communication was not lawful and did not have a lawful purpose. Defendants will challenge attorney client privilege in this matter at the earliest opportunity.

104.     In this Brief, the RS Defendants state the following: "Plaintiff made serious threats that would make any party want to have their lawyer handle communications." RS Defendants want the Court to believe that Plaintiffs' litigation hold notices, evidence preservation notices, and protected advocacy (by a minor patient's unrepresented father) represent a "threat," but within the same Reply in Opposition to the TRO, they tell the Court to believe that their own repeated cease-and-desist communication - from a 27-attorney law firm representing a $70 billion revenue client with a $100 billion market capitalization – is not a "threat." The Plaintiffs disagree and believe the Defendants weaponized their law licenses and their client's balance sheet against the Plaintiffs – that is an actual threat, and it impaired the rights of Plaintiffs and still does so, causing harm to Plaintiffs.

105.     In the October 18 Deponti Litigation Hold notice delivered to high-ranking HCA employees, Madson requested that any HCA-employed reader do the following:

-    Take note that COO Melina Arrowwood was almost certainly involved in influencing a patient outcome for an autistic child.

-    Take note that CHILD received a Lobby Discharge that violated at least 30 CMS standards.

- Take note of another incident in which Madson was a witness but not a directly involved party in which ER staff could not locate a child in its care for approximately 15 minutes (ER1 lobby on the afternoon of August 23).
- Report qualifying matters to their appropriate superiors.
- Report qualifying matters to the appropriate government agencies.
- Uphold the standards that HCA lays out in HCA Healthcare Code of Conduct, which is required to be signed by all employees and outlines the process for reporting misconduct with a great deal of specificity.
- Use the Department of Justice Whistleblower Program if HCA retaliates against an employee for reporting.

106.     During Immediate Jeopardy, the Defendants didn't want Madson talking to HCA employees, but the real reason may have had less to do with litigation and much more to do with the fact that Madson wanted other HCA employees to be aware of some extreme issues relating to C-suite conduct and report them where appropriate. In fact, Lowe and Arrowood were almost certainly in direct contact with CMS personnel at the exact time the cease-and-desist campaign sought to shut Madson up. At this crucial time when CMS was about to shut off the money, the Defendants could not have Madson advocating for incident reporting involving alleged misconduct of the Chief Operating Officer, while CMS surveyors were on site, and the Defendants were willing to break laws to accomplish their mission. The communication coming from the RS Defendants on behalf of the HCA Defendants was not indicative of zealous representation – it was indicative of purposefully constructed illegal behavior designed to silence an unrepresented father of a special needs minor who received poor treatment based on any objective assessment of

the facts. They worked together to silence Madson and possibly obstruct a federal investigation.

107.       On or around December 16, the North Carolina Department of Justice opened a file with HCA relating to the cease-and-desist campaign. Exhibit O contains a letter indicating the same.

108.       The Deponti Litigation Hold notice mentioned that any HCA employees with awareness of the issues relating to CHILD's treatment should report the matter internally, or report it to The Joint Commission if not handled appropriately on an internal basis. This reporting requirement and associated process of reporting was not Madson's idea, for it is outlined in detail in the HCA Healthcare Code of Conduct.

109.       The HCA Healthcare Code of Conduct is issued and signed by HCA corporate-level CEO Sam Hazen.

110.       One or more plaintiffs have acknowledged that at least eight HCA employees obtained copies of the Deponti Litigation Hold Notice.

111.       In the Deponti Litigation Hold Notice, Madson wrote, "Multiple failures to report would become evidence of a systemic coverup."

112.       On October 18, Hazen received the Deponti Litigation Hold notice.


## COUNTS

For each Count, every prior paragraph in this document is realleged and incorporated by reference as if fully set forth in the Count.


## COUNT I

**Federal Cause of Action**

**First Amendment Retaliation**

**42 U.S.C. § 1983**

**(Against All Defendants)**

113.     Defendants retaliated against Plaintiffs for engaging in core protected speech by

mandating that Madson stop pursuing federally protected advocacy or any

communication at all with HCA.

**COUNT II**

**Federal Cause of Action**

**Interference With The Right To Petition The Government**

**42 U.S.C. § 1983**

**(Against All Defendants)**

114.     Defendants interfered with Madson's right to contact HCA about CHILD's

treatment and the need to preserve evidence. HCA is a state actor because it operates a

licensed hospital performing a public health function operating under extensive state and

federal controls. Defendants acted under color of state law when they used their

authority to retaliate against protected advocacy and suppress reporting related to patient

safety and disability rights.

**COUNT III**

**Federal Cause of Action**

**Prior Restraint On Protected Speech**

**42 U.S.C. § 1983**

**(Against All Defendants)**

115.     Defendants imposed an unconstitutional prior restraint by prohibiting Madson

from contacting people and businesses directly connected with CHILD's care.

**COUNT IV**

**Federal Cause of Action**

**ADA RETALIATION**

**42 U.S.C. § 12203**

**(Against All Defendants)**

116.     Defendants knew that CHILD had an autism diagnosis.  Each Defendant is a long-

term and high-ranking healthcare specialist, and while each may have been acting in

different capacities, each Defendant should have known about the Americans With

Disabilities Act and the rights associated therewith.

**COUNT V**

**Federal Cause of Action**

**Section 504 Retaliation**

**29 U.S.C. § 794**

**(Against All Defendants)**

117.     Defendants intentionally obstructed efforts to secure disability-related protections

for Plaintiffs.

## COUNT VI

### Federal Cause of Action

### Civil Conspiracy To Violate Federal Rights

### 42 U.S.C. § 1983

### (Against All Defendants)

118.     Defendants worked together in a unified, cohesive way to obstruct Plaintiffs'
federally protected rights.  Plaintiffs allege a tri-level conspiracy by and between the RS
Defendants working together, by and between the HCA defendants working together, and
by and between members of the RS Defendant group and the HCA Defendant group
working together in a coordinated effort to retaliate against protected advocacy and
suppress further communication.

### Count VII

### State Cause of Action – Supplemental Jurisdiction

### Abuse of Process

### (Against All Defendants)

119.     The Defendants used legal threats to accomplish the improper purpose of
suppressing Plaintiffs' lawful and protected conduct.

### COUNT VIII

### State Cause of Action – Supplemental Jurisdiction

### Intentional Infliction Of Emotional Distress

**(Against All Defendants)**

120.     Defendants' conduct was extreme, outrageous, and intended to cause Plaintiffs

distress in a willful and wanton way, or with reckless disregard for doing the same.

## COUNT IX

**State Cause of Action – Supplemental Jurisdiction**

**Negligent Infliction of Emotional Distress**

**(Against All Defendants)**

121.     Defendants should have known the distress their communications will have

caused the Plaintiffs.

## COUNT X

**State Cause of Action – Supplemental Jurisdiction**

**Civil Conspiracy**

**(Against All Defendants)**

122.     Defendants worked together in a unified, cohesive way to obstruct Plaintiffs'

state protected rights.  Plaintiffs allege a tri-level conspiracy by and between the RS

Defendants working together, by and between the HCA defendants working together, and

by and between members of the RS Defendant group and the HCA Defendant group

working together in a coordinated effort to retaliate against protected advocacy and

suppress further communication.

## COUNT XI

**State Cause of Action – Supplemental Jurisdiction**

**Tortious Interference With Legal Rights**

(Against All Defendants)

123.     Defendants intentionally interfered with prospective legal rights include the right
to advocate, report incidents, preserve evidence and pursue legal remedies relating to
CHILD's care at an HCA facility.  Defendants knew such rights existed and acted
without justification for the purpose of silencing Plaintiffs.

# COUNT XII

**State Cause of Action – Supplemental Jurisdiction**

**Unfair and Deceptive Trade Practices**

**N.C. Gen. Stat. § 75-1.1**

(Against All Defendants)

124.     Defendants engaged in unfair and deceptive acts and practices affecting
commerce by using their institutional power and alleged legal authority to intimidate
Plaintiffs, suppress protected advocacy, and misrepresent Plaintiffs' rights to
communicate and seek accountability from HCA.  Defendants' conduct was unethical,
oppressive, and substantially injurious to Plaintiffs.

## COUNT XIII

## State Cause of Action – Supplemental Jurisdiction

## Negligent Supervision

## (Against only Defendant Roberts & Stevens, PA, HCA Healthcare, Inc. and MH Mission Hospital, LLLP)

125.      Each of the business entity Defendants failed to properly supervise its employees and prevent the misconduct directed towards Plaintiffs.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs Bill Madson and CHILD request that this Court enter judgment in our favor and against all Defendants, jointly and severally, and further:

(a) Award us compensatory damages to be determined by a jury on each of the above-stated counts; and

(b) Award us punitive and exemplary damages, in an amount to be determined by a jury, on each of the above-stated counts; and

(c) Tax the prejudgment interest of the damages, attorneys' fees and costs of this action to the Defendants, as of the date of the filing of this Complaint; and

(d) Award us such other and further relief as may be appropriate.

## DEMAND FOR JURY TRIAL

Madson respectfully demands a trial by jury with respect to each claim in this Complaint.

This the 8th day of January, 2025.

Respectfully submitted,

Bill Madson

Address:     33 Pheasant Drive

Asheville, NC 28803

Mobile:      404-226-2040

Email:       bill@cliftontrust.com